Jerry L. Steering, Esq. [State Bar No. 122509]
LAW OFFICES OF JERRY L. STEERING
4063 Birch Street, Suite 100
Newport Beach, California 92660
Telephone: (949) 474-1849
Facsimile: (949) 474-1883
e-mail: info@steeringlaw.com

Attorney for plaintiff Andrea Heath

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANDREA HEATH,<br><br>    Plaintiff,<br><br>        vs.<br><br>CITY OF DESERT HOT SPRINGS, ANTHONY SCLAFANI, PATRICK WILLIAMS, EDWIN SMITH, KATE SINGER, JASON SIMPSON, RICK DANIELS, GABRIELLA MENDOZA, GUSTAVO PAIZ, PAUL TAPIA and DOES 1 through 10, inclusive,<br><br>    Defendants. | ) Case No.: CV12-02318 PSG (OPx)<br>)<br>) PLAINTIFF'S REQUEST FOR<br>) JUDICIAL NOTICE IN OPPOSITION<br>) TO ALL DEFENDANTS' MOTIONS<br>) TO DISMISS PLAINTIFF'S<br>) COMPLAINT (F.R.CIV.P.12(b)(6))<br>)<br>)<br>) PRESENT HEARING DATES FOR<br>) MOTIONS TO DISMISS:<br>)<br>)    JANUARY 28, 2013<br>)<br>) TIME:   1:30 P.M.<br>)<br>) CTRM:   880<br>)<br>) UNITED STATES DISTRICT JUDGE<br>) PHILIP S. GUITERREZ<br>) |

**COMES NOW** the plaintiff to this action and respectfully requests that this Honorable Court take judicial notice of the attached documents, that show the following:

- Attached Exhibit "A", copy of Plaintiff's Original Government Tort Claim, filed on March 28, 2012;

PLAINTIFF'S REQUEST FOR JUDICIAL NOTICE IN OPPOSITION TO ALL DEFENDANTS' MOTION TO DISMISS
1

1   • Attached Exhibit "B", copy of Plaintiff's Second Government Tort

2      Claim, filed on March 30, 2012;

3

4   • Attached Exhibit "C", copy of Division of Labor Standards Enforcement

5      Letter (*Jimenez v. Domino's Pizza, Inc.*, 238 F.R.D. 241, 245 (C.D. Cal.

6      Sept. 26, 2006))(Court may take judicial notice of letter from Labor

7      Commissioner);

8   • Attached Exhibit "D", copy of City of Desert Hot Springs Police

9      Department Memorandum of Understanding for 2009 through 2001;

10

11  Dated:  January 9, 2013

12                                        JERRY L. STEERING

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT "A"

<table>
<tr><td>

**File With:**<br>
**City Clerk's Office**<br>
**City of Desert Hot Springs**<br>
**65-950 Pierson Blvd.**<br>
**Desert Hot Springs, CA 92240**

</td><td>

## CLAIM FOR MONEY OR DAMAGES AGAINST THE CITY OF DESERT HOT SPRINGS

</td><td>

RESERVE FOR FILING STAMP

CLAIM NO._____

</td></tr>
</table>

**Method of delivery office use only:**
- □ US Mail (postmark date: _____)
- □ Hand –delivered (date: _____)
- □ Delivery service (please list: _____)
- □ Other (please list: _____)
- □ Email (date: _____)

A claim must be presented, as prescribed by the Government Code of the State of California, by the claimant or a person acting on his/her behalf and shall show the following:

**If additional space is needed to provide your information, please attach sheets, identifying the paragraph(s) being answered.**

1.  Name and Post Office address of the Claimant:

    Name of Claimant:   Andrea Heath

    Post Office Address:   67780 Garbino Road, Cathedral City, CA   92234

2.  Post Office address to which the person presenting the claim desires notices to be sent:

    Name of Addressee:   Jerry L. Steering, Esq.   Telephone:  (949)474-1849

    Post Office Address:   4063 Birch Street, Ste. 100, Newport Beach, CA   92660

3.  The date, place and other circumstances of the occurrence or transaction which gave rise to the claim asserted.

    Date of Occurrence: October 21, 2011   Time of Occurrence:  N/A

    Location:   65-950 Pierson Blvd., Desert Hot Springs, CA 92240

    Circumstances giving rise to this claim:

    See Exhibit "A" - Attachment to Government Claim For Damages
    By Claimant Andrea Heath.

4.  General description of the indebtedness, obligation, injury, damage or loss incurred so far as it may be known at the time of the presentation of the claim.

    See Exhibit "A" - Attachment To Government Claim For Damages
    By Claimant Andrea Heath.

5.  The name or names of the public employee or employees causing the injury, damage, or loss, if known.

    Anthony Sclafani, Patrick Williams, Kate Singer, Paul Tapia,Radames
    Gill, Gustavo Paiz, David Henderson, Michael Valentich, Rick Daniels,
    Jason Simpson, Ken Perry and Commander Edwin Smith.

**Page 1 of 3**

6. **If amount claimed totals less than $10,000:** The amount claimed if it totals less than ten thousand dollars ($10,000) as of the date of presentation of the claim, including the estimated amount of any prospective injury, damage, or loss, insofar as it may be known at the time of the presentation of the claim, together with the basis of computation of the amount claimed.

Amount Claimed and basis for computation:

_____

_____

**If amount claimed exceeds $10,000:** If the amount claimed exceeds ten thousand dollars ($10,000), no dollar amount shall be included in the claim. However, it shall indicate whether the claim would be a limited civil case. A limited civil case is one where the recovery sought, exclusive of attorney fees, interest and court costs does not exceed $25,000. An unlimited civil case is one in which the recovery sought is more than $25,000. (See CCP § 86.)

☐ Limited Civil Case          ☒ Unlimited Civil Case

You are required to provide the information requested above in order to comply with Government Code §910. Additionally, in order to conduct a timely investigation and possible resolution of your claim, the [CITY/AGENCY] requests that you answer the following questions.

7. Claimant(s) Social Security Number(s):

Available from Claimant's attorney Jerry L. Steering, on request.

8. Claimant(s) Date(s) of Birth:

March 28, 1969

9. Name, address and telephone number of any witnesses to the occurrence or transaction which gave rise to the claim asserted:

Anthony Sclafani, Patrick Williams, Kate Singer, Paul Tapia,

Radames Gill, Gustavo Paiz, David Henderson, Michael Valentich,

Rick Daniels, Jason Simpson, Ken Perry and Commander Edwin Smith

10. If the claim involves medical treatment for a claimed injury, please provide the name, address and telephone number of any doctors or hospitals providing treatment:

Daniel Waston, M.D.

_____

_____

*If applicable, please attach any medical bills or reports or similar documents supporting your claim.*

11. If the claim relates to an automobile accident:

| Claimant(s) Auto Ins. Co.: | Telephone: |
|---|---|
| Address: | |
| | Insurance Policy No.: |
| | |
| Insurance Broker/Agent: | Telephone: |
| Address: | |
| | |
| Claimant's Veh. Lic. No.: | Vehicle Make/Year: |
| Claimant's Drivers Lic. No.: | Expiration: |

Page 2 of 3

*If applicable, please attach any repair bills, estimates or similar documents supporting your claim.*

## READ CAREFULLY

For all accident claims, place on following diagram name of streets, including North, East, South, and West; indicate place of accident by "X" and by showing house numbers or distances to street corners. If City/Agency Vehicle was involved, designate by letter "A" location of City/Agency Vehicle when you first saw it, and by "B" location of yourself or your vehicle when you first saw

City/Agency Vehicle; location of City/Agency vehicle at time of accident by "A-1" and location of yourself or your vehicle at the time of the accident by "B-1" and the point of impact by "X."

NOTE: If diagrams below do not fit the situation, attach hereto a proper diagram signed by claimant.



**Warning:** Presentation of a false claim is a felony (Penal Code §72). Pursuant to CCP §1038, the City/Agency may seek to recover all costs of defense in the event an action is filed which is later determined not to have been brought in good faith and with reasonable cause.

Signature: _____   Date: March 28, 2012

JERRY L. STEERING,
ATTORNEY FOR CLAIMANT

## EXHIBIT "A" - ATTACHMENT TO GOVERNMENT CLAIM FOR DAMAGES
## BY CLAIMANT ANDREA HEATH

On or about June 26, 1996 Claimant was hired by the City of Desert Hot Springs as a sworn police officer with the Desert Hot Springs Police Department. Claimant excelled in her duties as a police officer with the Desert Hot Springs Police Department, and enjoyed working in that capacity.

On or about April 11, 2007 Claimant met with FBI Special Agent Steve Novak and Assistant Unites States Attorney Lamar Baker, and reported to them various violations of the use of unreasonable force upon, and false arrests of, civilians, by several Desert Hot Springs Police Department officers[1], and the cover-up of the same; in violation of 18 U.S.C. §§ 241[2] and 242[3], and in violation of Cal. Penal Code §§

---

[1] Including but not limited to, then Desert Hot Springs Police Department Sergeants Anthony Sclafani and David Henderson.

[2] 18 U.S.C. § 241. If two or more persons conspire to injure, oppress, threaten, or intimidate any person in any State, Territory, Commonwealth, Possession, or District in the free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States, or because of his having so exercised the same;

or

If two or more persons go in disguise on the highway, or on the premises of another, with intent to prevent or hinder his free exercise or enjoyment of any right or privilege so secured - They shall be fined under this title or imprisoned not more than ten years, or both; and if death results from the acts committed in violation of this section or if such acts include kidnapping or an attempt to kidnap, aggravated sexual abuse or an attempt to commit aggravated sexual abuse, or an attempt to kill, they shall be fined under this title or imprisoned for any term of years or for life, or both, or may be sentenced to death.

[3] 18 U.S.C. § 242. Whoever, under color of any law, statute, ordinance, regulation, or custom, willfully subjects any person in any State, Territory, Commonwealth, Possession, or District to the deprivation of any rights, privileges, or immunities secured or protected by the Constitution or laws of the United States, or to different punishments, pains, or penalties, on account of such person being an alien, or by reason of his color, or race, than are prescribed for the punishment of citizens, shall be fined under this title or imprisoned not more than one year, or both; and if bodily injury results from the acts committed in violation of this section or if such acts include the

1

118[4], 127[5], 128[6], 133[7], 134[8], 135[9], 146[10], 149[11], 170[12], 181.1[13], 182(2)[14]
**and other California criminal statutes involving the beating / torturing**

---

use, attempted use, or threatened use of a dangerous weapon, explosives, or fire, shall be fined under this title or imprisoned not more than ten years, or both; and if death results from the acts committed in violation of this section or if such acts include kidnapping or an attempt to kidnap, aggravated sexual abuse, or an attempt to commit aggravated sexual abuse, or an attempt to kill, shall be fined under this title, or imprisoned for any term of years or for life, or both, or may be sentenced to death.

[4] Cal. Penal Code § 118. (a) Every person who, having taken an oath that he or she will testify, declare, depose, or certify truly before any competent tribunal, officer, or person, in any of the cases in which the oath may by law of the State of California be administered, willfully and contrary to the oath, states as true any material matter which he or she knows to be false, and every person who testifies, declares, deposes, or certifies under penalty of perjury in any of the cases in which the testimony, declarations, depositions, or certification is permitted by law of the State of California under penalty of perjury and willfully states as true any material matter which he or she knows to be false, is guilty of perjury.

This subdivision is applicable whether the statement, or the testimony, declaration, deposition, or certification is made or subscribed within or without the State of California.

[5] Cal. Penal Code § 127. Every person who willfully procures another person to commit perjury is guilty of subornation of perjury, and is punishable in the same manner as he would be if personally guilty of the perjury so procured.

[6] Cal. Penal Code § 128. Every person who, by willful perjury or subornation of perjury procures the conviction and execution of any innocent person, is punishable by death or life imprisonment without possibility of parole. The penalty shall be determined pursuant to Sections 190.3 and 190.4.

[7] Cal. Penal Code § 133. Every person who practices any fraud or deceit, or knowingly makes or exhibits any false statement, representation, token, or writing, to any witness or person about to be called as a witness upon any trial, proceeding, inquiry, or investigation whatever, authorized by law, with intent to affect the testimony of such witness, is guilty of a misdemeanor.

[8] Cal. Penal Code § 134. Every person guilty of preparing any false or ante-dated book, paper, record, instrument in writing, or other matter or thing, with intent to produce it, or allow it to be produced for any fraudulent or deceitful purpose, as genuine or true, upon any trial, proceeding, or inquiry whatever, authorized by law, is guilty of felony.

[9] Cal. Penal Code § 135. Every person who, knowing that any book, paper, record, instrument in writing, or other matter or thing, is about to be produced in evidence upon any trial, inquiry, or investigation whatever, authorized by law, willfully destroys or conceals the same, with intent thereby to prevent it from being produced, is guilty of a misdemeanor.

[10] Cal. Penal Code § 146. Every public officer, or person pretending to be a public officer, who, under the pretense or color of any process or other legal authority, does any of the following, without a regular process or other lawful authority, is guilty of a misdemeanor:

2

of persons, the false arrest / false imprisonment of persons, the concealment / destruction of evidence, the framing of persons[15], and associated offenses.

After Claimant provided said above-referenced information to FBI Special Agent Steve Novak and Assistant Unites States Attorney Lamar Baker, she immediately noticed that she was being treated differently by other officers. Once Claimant returned to the Desert Hot Springs Police Department station, she noticed that she was being treated differently by the other officers in said department. Claimant noticed that none of her fellow officers were speaking to her, and were making remarks about me "ratting" them out.

In July of 2007 Claimant took time off of work[16] pursuant to the Family Leave Act.
On or about on February 7, 2008 Claimant returned back to work[17] and was thereupon demoted to the rank of patrol officer. Claimant was

---

(a) Arrests any person or detains that person against his or her will.
[11] 149. Every public officer who, under color of authority, without lawful necessity, assaults or beats any person, is punishable by a fine not exceeding ten thousand dollars ($10,000), or by imprisonment in a county jail not exceeding one year, or pursuant to subdivision (h) of Section 1170, or by both that fine and imprisonment.
[12] At the Desert Hot Springs Police Department. Cal. Penal Code § 170. Every person who maliciously and without probable cause procures a search warrant or warrant of arrest to be issued and executed, is guilty of a misdemeanor.
[13] 118.1. Every peace officer who files any report with the agency which employs him or her regarding the commission of any crime or any investigation of any crime, if he or she knowingly and intentionally makes any statement regarding any material matter in the report which the officer knows to be false, whether or not the statement is certified or otherwise expressly reported as true, is guilty of filing a false report punishable by imprisonment in the county jail for up to one year, or in the state prison for one, two, or three years. This section shall not apply to the contents of any statement which the peace officer attributes in the report to any other person.
[14] 182. (a) If two or more persons conspire:
   (1) To commit any crime.
   (2) Falsely and maliciously to indict another for any crime, or to procure another to be charged or arrested for any crime.
[15] Including giving perjured court testimony and conspiring with other officers to do so.
[16] At DHSPD.
[17] At DHSPD.

3

told that her position as an Investigator for the Sexual Assault / Child Abuse Unit had been eliminated, and Claimant's pay was decreased by 5%. Moreover, said Investigator position with the Sexual Assault / Child Abuse Unit, had, in fact, not been eliminated, and had then been given to a new hire non-sworn person with and at the Desert Hot Springs Police Department ("DHSPD".)

Moreover, substantially contemporaneously, DHSPD Sergeant Anthony Sclafani ("SCLAFANI"), was promoted to Administration Sergeant. As Administration Sergeant SCLAFANI was in charge of Patrol, scheduling, training, armory, issuing weapons, hire of new police officers, termination of employee's, vehicles, and ordering supplies.

During that time, although Claimant was a veteran officer with the DHSPD, she was being treated like a newly hired officer. Claimant was told by officers less seasoned and experienced than her, that SCLAFANI directed them to make Claimant take all of the police reports[18], because he felt Claimant needed additional training; something completely untrue.

Also, after Claimant spoke to the Justice Department (as discussed above), she was receiving little to no back-up assistance on her calls for service with the DHSPD. Claimant was even dispatched at times to handle two calls for service at a time, which was highly unusual, and no other DHSPD officer was treated this way.

Claimant responded to numerous high risks calls, such as subjects fighting, domestic violence calls, man with gun calls, robbery calls, suspicious circumstances calls, and no DHSPD back-up officer's would respond to the scene of the call for service. Claimant had to call the DHSPD dispatchers several times to get a back-up officer, and the back-up officers would take more than the usual time to respond

---

[18] For a call for service by DHSPD.

4

to her calls for back-up; all of this placing Claimant in great danger.

On or about  May 23, 2008 Claimant met SCLAFANI in his office at the DHSPD. He asked Claimant what she had spoken to the FBI about. SCLAFANI was upset and asked Claimant what she had seen of the Angelica Vargas incident[19]. SCLAFANI told Claimant that he didn't think it was right that he was facing going to prison for a *"piece of shit, who was banging on the jail wall."* SCLANFANI also told Claimant[20] that she should look into applying for a police officer job at another police department; implicitly because of the information of criminal wrongdoing by SCLAFANI, Sgt. David Henderson[21] ("HENDERSON") and other DHSPD officer that Claimant reported to the "Justice Department" (the United States Department of Justice, that includes the United States Attorney's Offices, and the FBI.)

On November 8, 2008, SCLAFANI refused to assist[22] Claimant handle a dangerous call for service (fight and weapons call), and she ended-up having to handle a violent person beating-up another by herself; again placing Claimant at great risk of serious injury to herself.

In December of 2008, Claimant was dispatched to a call for service involving an assault with deadly weapon, with two suspects fighting the hotel owner. Claimant was dispatched as the primary officer and DHSPD Officer Stephen O'Connor was dispatched as the secondary officer. The two of them[23] were just at the DHSPD station before the call. As Claimant drove to the call, she observed Officer O'Connor

---

[19] In that incident, the female DUI arrestee vomited at the DHSPD, and SCLAFANI, along with several other DHSPD officers, took turns kicking, stomping and tasing said female DUI arrestee until she was unconscious and convulsing on the floor of the station, and when she crawled away from the officers, they pepper-sprayed her and continued to torture her.

[20] Several times.

[21] Formerly Lieutenant Henderson; demoted on or about July 1, 2005.

[22] SCLAFANI drove back to the DHSPD station and left Claimant alone to handle the violent call for service.

[23] Claimant and O'Connor.

5

driving behind her. Claimant got out of her vehicle and observed several subjects fighting outside, near the pool area. Due to multiple subjects fighting, Claimant needed Officer O'Connor's assistance, but Officer Steven O'Conner was nowhere to be found. Claimant kept calling him on the radio to assist her, because of the hotel owner had been beaten unconscious, and Claimant had to apprehend both combative suspects by herself. Claimant asked for help from a citizen nearby because the situation was so volatile and violent. Officer O'Connor purposely delayed assisting Claimant; apparently for the purpose of furthering the acts of retaliation against Claimant for her having provided incriminating information about HENDERSON, SCLAFANI and other DHSPD officers, to the Justice Department. This caused her safety to be in jeopardy, and his response materially delayed the beating victim from receiving badly needed medical attention.

In December of 2008, Claimant was dispatched to a "Shots Fired" call for service by DHSPD. When Claimant arrived at the scene, she observed a vehicle with bullet holes on the driver's door and blood on the front seat of the vehicle. It appeared that there was a possible gunshot victim, and a suspect with unknown whereabouts. Claimant requested additional DHSPD back-up units, but was told that the other DHSPD officers were busy. Claimant received back-up units approximately thirty minutes later; an unusually long amount of response time for such a call. Prior to having told the Justice Department about said criminal conduct by SCLAFANI, HENDERSON and other DHSPD officers, above-referenced, Claimant was never expected to handle that type of dangerous call by herself, and had previously received back-up assistance immediately.

On or about December 14, 2008, Claimant responded to baby death call[24]. When Claimant arrived, SCLAFANI and Officer Brian

---

[24] For a Sudden Infant Death call.

6

Koahou were already on scene. Officer Koahou did not talk to Claimant at all. This was not normal DHSPD protocol, and in the past Claimant and Officer Koahou had communicated on calls. Officer Koahou also observed Riverside County Fire Department firefighters (including and especially Captain Frank Stewart), at location but no one spoke to Claimant. SCLAFANI spoke to Claimant briefly, but to a minimum. SCLAFANI asked Claimant to stand outside for an insignificant reason, such as to get the address. None of the officers gave Claimant any information about the call, which was abnormal because in the past, these types of calls were Claimant's specialty as an investigator.

This "silent treatment", and the failure of DHSPD officers to arrive as back-up officers to assist Claimant on her calls for service, even very dangerous calls, persisted throughout the remainder of Claimant's employment with the DHSPD while she was still an active duty police officer.

Also in 2008, SCLAFANI was placed in charge of the ordering and maintaining the weapons in the armory. SCLAFANI issued Claimant a Springfield .40 caliber pistol. Claimant immediately started having trouble with her DHSPD pistol qualifications, although she did not have problems with pistol qualifications beforehand. Claimant later found out that she was issued a different pistol from any other DHSPD officer. The pistol that SCLAFANI gave Claimant was larger and heavier than those pistols issued to the other DHSPD officers; an act by SCLAFANI to retaliate against her for providing information to the Department of Justice that incriminated him. This was causing Claimant to not qualify at the shooting range, and because that weapon was a major tool in saving Claimant's life and the lives of others, compromised Claimant's safety.

Thereafter, on or about June 7, 2008, SCLAFANI called Officers Stephen O'Connor and Mike Valentich into his office which was nearby Claimant's location at that time at the DHSPD station. The three of them made horrible and vicious *ad hominem* remarks about

7

Claimant, such as: that Claimant was the dumbest person that he/they knew, that Claimant acted like a bull-dyke, that Claimant was a fat pig, that Claimant smelled bad, and other offensive remarks, including racial epithets; all of which were overheard by Claimant, as she was in the next room. Claimant felt so degraded and humiliated that she gathered her belongings and left DHSPD for the night.

The following morning, June 8, 2008, Claimant related to DHSPD Chief Patrick Williams, what had happened with SCLAFANI, Officer O'Connor and Officer Valentich on June 7, 2008; above-referenced. Chief Williams directed Claimant to call DHSPD Commander Edwin Smith, and to tell him what had occurred.

Claimant called Commander Smith and spoke to him briefly. He asked for Claimant to come into his office within the next several days to talk about the matter, and Claimant did so. Claimant told Commander Smith that Claimant realized that SCLAFANI was upset with her because she had spoken to the Department of Justice about his crimes; including SCLAFANI'S torturing of Jamal White. Commander Smith said that he would talk to SCLAFANI. In fear of retaliation, Claimant explained to him that SCLAFANI had called Claimant into his office recently, and asked her about said FBI / DOJ[25] investigations; above-referenced. Claimant told him that SCLAFANI asked her why would she stand up for a "piece of shit" and not for him. Claimant told Commander Smith that Claimant was not even able to discuss the FBI / DOJ investigations with him at the time. Commander Smith acknowledged that she was not to talk about the FBI / DOJ investigations, and said he would speak to Chief Patrick Williams about it all.

In July of 2009 FBI Special Agent Novak called Claimant and asked her if she could meet him and another FBI Agent in Palm Springs soon. Claimant explained to him that she was on medical leave at the time but she would get back to him.

---

[25] The United States Department of Justice.

8

On or about July 23, 2009, Claimant spoke to the (City of Desert Hot Springs) Human Resources Department to ascertain if she was authorized to meet with FBI Special Agent Steve Novak regarding work[26]. Human Resources stated they had spoken to Chief Williams, who said that Claimant should wait until she comes back to work at DHSPD to meet with Special Agent Novak. Claimant post phoned all meetings with FBI at this time, pursuant to said directions by Human Resources.

In August and September of 2009, FBI Special Agent Steve Novak requested that Claimant meet with him at a Federal Building in Los Angeles on October 2, 2009. Claimant was still out on medical leave from work. Claimant asked Special Agent Novak to contact Chief Williams before she met with him, for his approval. Claimant left a voice mail message on Chief William's cell phone, stating that FBI Special Agent Steve Novak was requesting to meet with her.

On or about August 24, 2009, Claimant e-mailed Chief Williams a letter requesting an extension of medical leave, and left voice message on his cellular phone.

On or about August 25, 2009, Claimant left another message, this time on Chief William's voice mail, to call her back.

On August 27, 2009, DHSPD Sgt. David Henderson was indicted by a federal Grand Jury for one count of violation of 18 U.S.C. § 242; violation of federal constitutional rights under color of authority, for the torturing of Winston Chambers. *United States of America v. David Raymond Henderson*; United States District Court for the Central District of California, Case Number CR 09 00843.

---

[26] The DHSPD.

9

On or about September 30, 2009 Special Agent Steve Novak called Claimant, requesting to meet with her on October 2, 2009 in Los Angeles.

On or about October 01, 2009, Claimant met with Chief Patrick Williams at the DHSPD station in his office. She asked for his permission to take an extended medical leave, because she was having further surgical procedures. She explained to him that FBI Special Agent Steve Novak wanted to meet with her in Los Angeles on October 2, 2009. In response to that statement by Claimant to Chief Patrick Williams, Williams directed Claimant to tell Special Agent Novak that she was unable to drive to Los Angeles, due to her recovery from surgical procedures. Chief Williams directed Claimant to tell Agent Novak that he would either have to wait until Claimant came back to work, or Agent Novak needed to drive to Palm Springs to meet with Claimant. Chief Williams said he had not spoken to Special Agent Novak himself and knew nothing. Chief Williams told Claimant to take her time coming back to work, and that he would expect her to return to work after Christmas 2009.

On or about October I, 2009, pursuant to Chief Williams directions to Claimant, Claimant called and left a telephone message for Special Agent Steve Novak, stating that she had spoken to Chief Patrick Williams, and that either she needed to post phone their meeting, or that he would have to drive to a Palm Springs location to meet with Claimant.

On or about October 5, 2009 FBI Special Agent Steve Novak called Claimant and said he had left a message with the Chief Patrick Williams for Special Agent Novak to meet with Claimant.

On or about October 8, 2009, FBI Special Agent Steve Novak again called Claimant and asked her to meet with him.

10

On or about October 16, 2009, Claimant provided DHS Human Resources and DHSPD Chief Williams with a doctor's note for a longer extension of Claimant's medical leave.

On or about October 20, 2009 Claimant met with FBI Special Agent Steve Novak and Assistant United States Attorney Steve Arkow at the Palm Springs FBI office. FBI Special Agent Novak said he had spoken to Chief Williams on the telephone, and that he had confirmed the meeting with Commander Edwin Smith.

On or about October 21, 2009 Claimant received an e-mail from Chief Patrick Williams. Claimant called Chief Patrick Williams on his cellular phone and spoke to him briefly. Chief Williams said that Claimant did not hold-up her "end of the bargain". Claimant asked Chief Williams what he was talking about, and Chief Williams told Claimant that he did not want Claimant to have met with, or to meet with, the Justice Department.

On or about November 19, 2009 Claimant received a telephone call from Commander Kate Singer to confirm that the date for Claimant's return to work at DHSPD on November 23, 2009. Singer told me to return to duty on that date, but not to wear a police uniform (only civilian clothes) and not to carry her duty weapon until Claimant qualified on the shooting range on November 24, 2009. Commander Kate Singer also told Claimant that she needed to ride in the marked Patrol vehicle with Officer Paul Tapia (an officer for a short amount of time and still on probation status at DHSPD).

On or about November 19, 2009 Claimant returned to work from her medical leave. Claimant followed orders to wear civilian clothes and not to carry her duty weapon, as directed by Commander Singer. While Claimant and DHSPD Officer Tapia responded to a call of Domestic Violence and False Imprisonment call for service (and thereafter), Officer Tapia asked Claimant to start taking police reports. Claimant was approached by citizens and by co-workers, and asked

11

why she was not wearing a police uniform. Claimant felt embarrassed and humiliated, because she had worked with the public and other agencies as a regular sworn police officer for over twelve years by that time.

Claimant was, therefore, placed in dangerous situations by said orders, especially by policing without a police uniform, and by not carrying her duty weapon. This was unacceptable to Claimant, and was another form of continuous harassment of Claimant for telling the Justice Department about the criminal actions of SCLAFANI, HENDERSON and other DHSPD officers.

Claimant asked her on-duty watch commander, DHSPD Sgt. Radames Gil, why she was told not wear a Police Officer's uniform, and not to carry a gun while she was out in the field. Sgt. Gil said that Claimant was on the "hit list", and it did not matter; that she was being targeted to be fired from the DHSPD. DHSPD Sgt. Eddie Cole also told Claimant that the department was looking to fire Claimant, and to demote him, because he too had testified before the Federal Grand Jury that was investigating DHSPD, and for providing incriminating information to the Justice Department regarding the Excessive Use of Force (and other crimes) by SCLAFANI and HENDERSON[27].

November 25, 2009, Claimant arrived at DHSPD to work and wore her uniform even though Commander Singer told her not too. This was embarrassing and humiliating to Claimant in front of her peers and public. This conduct allowed other officers to doubt Claimant's credibility and to destroy her reputation as a long-time experienced police officer.

While Claimant was wearing her police officer uniform, she was immediately questioned by newly appointed Sergeant Gus Paiz why

---

[27] Sgt. Eddie Cole was later demoted from a sergeant to a police officer on Feb. 27, 2010 due to his cooperation with FBI.

was she wearing a police officer uniform[28]. Sgt. Paiz said he was told by Commander Singer that Claimant was to shred her old reports all day. While Claimant was doing so, SCLAFANI came in the room and started laughing. He asked me what I was doing, and made comments that Claimant was a Veteran officer and now a paper shredder. SCLAFANI said Claimant was on the" hit list" and that Claimant only needed to be concerned about being "fired", but he had to worry about going to prison and losing his family.

On or about November 29, 2009 Claimant was directed to ride with a newly hired DHSPD Police Officer Paul Tapia for the week. He had been out of Law Enforcement for about one or two years. Claimant was told to observe him on calls by Commander Singer, which was insulting and demeaning, as Claimant had been a police officer standing officer with the department, who also achieved a P.O.S.T. Field Training Officer Certificate[29], for many years, and Officer Tapia was newly hired officer was and still on employee probation[30]. Claimant felt humiliated and embarrassed that she was being treated like a new trainee police officer and was ordered to ride with newly hired Officer Tapia.

On or about December 8, 2009 FBI Special Agent Steve Novak called Claimant regarding her appearance to testify before the Federal Grand

---

[28] Sgt. Paiz was good friends with retired Lieutenant David Henderson and Sgt. Sclafani, both of whom were facing Federal Indictment for the Excessive Use of Force under color of authority; 18 U.S.C. § 242.

[29] Completed / issued 7/21/06.

[30] On or about November 30, 2009 Claimant was approached by Officer O'Connor at the DHSPD station. He told Claimant that he had been off work for approximately three or four months for a medical leave, but when he returned he did not have to ride with anyone. He asked Claimant why she thought I had to drive with Officer Tapia especially since I was a veteran officer of twelve years. This was an example of Claimant being treated differently from other officers that had been off of work in the past creating a hostile work environment.

13

Jury that was investigating the DHSPD, and she received a federal Grand Jury subpoena for her to testify before said Grand Jury. Claimant told him that he needed to contact DHSPD Chief Patrick Williams or Commander Edwin Smith.

On or about December 8, 2009, all DHSPD officers were told to attend an emergency DHSPD Police Officer's Association ("POA") meeting at South of the Border restaurant. When Claimant arrived, SCLAFANI and several of the newly hired DHSPD officer's did not speak to her, and sat on the other side of the restaurant from Claimant. SCLAFANI was in charge of the meeting, and asked Claimant if she thought that it was fair how Claimant was being treated; like a new "Boot"[31].

Officer Tapia ordered food, and verbally / vocally emphasized how he wanted extra *"cheese"*, and kept repeating himself; referring to Claimant being considered a *"rat"* by the DHSPD. SCLAFANI and the other officers laughed with Officer Tapia at his *"cheese"* comments. It appeared that most of the officers were new hired officers, that were on probation with the department. SCLAFANI was in charge of the hiring and firing at DHSPD at this point in time, and Claimant felt intimated by SCLAFANI being in such a position. Claimant later called DHSPD Officer Rex, to voice her concern about being treated poorly by the DHSPD, as he was the POA President. Claimant told him that she was called to testify before the federal Grand Jury on the following day.

On or about December 10, 2009, Claimant testified before a federal Grand Jury that was investigating the DHSPD at the United States Courthouse at 312 North Springs St. Los Angeles, California. Claimant called Commander Edwin Smith after she so testified, and told him that it appeared that the court was taking the allegations against DHSPD seriously. Commander Smith said he would speak to Chief Williams about the matter.

---

[31] A rookie officer.

14

On or about December 23, 2009, Claimant was on patrol and called into the DHSPD office and she observed SCLAFANI walking out of the same office. Sgt. Paiz told Claimant that Commander Singer told him that she had a problem; that Claimant had not turned in enough reports for the week as a veteran officer. Sgt. Paiz said he explained to her that the shift was at minimum staffing during the week and it was busy. Claimant asked him what report was he referring to, and he said a report that was generated in July of 2009 referring to a robbery report of an Ice Cream vendor. He said the element of the crime was missing on the report. Claimant told him that she was subpoenaed for court on the case about a week ago and that the District Attorney made no mention of any problems with the report. The suspect(s) / defendant(s) were convicted in the case. A few minutes later, DHSPD

Thereafter, also on or about December 23, 2009, Claimant was placed on a "discipline program" called ("PIP"); Performance Improvement Plan and was given an evaluation for the periods of January 1, 2007 through August 20, 2009; a two year evaluation which Claimant had never received in her tenure at the DHSPD. Claimant was given an evaluation by Sgt. Ken Peary (a newly hired Sergeant, still on probation with the department). Claimant was told that her performance was considered below standards and was placed the PIP for the next 90 days; notwithstanding that Claimant's performance was well above DHSPD standards. Claimant was subjected to this obloquy and humiliation (another adverse employment action), because Chief Williams was upset that Claimant met with the DOJ / FBI against his wishes. The PIP is normally a way the DHSPD "dissects" a police officer, in order to put together enough (bogus) paperwork (personnel file) to terminate the officer, when there are no legitimate grounds to do so.

On or about December 23, 2009 through January 16, 2010, Claimant was sent on high risk calls for service, without back-up, such as traffic stops, parole searches, burglary alarm calls, robbery alarm calls, pedestrian stops, party & loud music calls, subjects

fighting, domestic violence calls, etc. Claimant was also "benched" to work on reports in the DHSPD station[32]. Claimant was also demoralized, as her fellow officers were telling her that she was on the *"hit list"* and was going to be fired.

On or about January 17, 2010 through January 29, 2010, Claimant was assigned patrol cars with damaged radio's, and was unable to hear the DHSPD emergency radio traffic. Claimant was also assigned patrol cars that wouldn't start. Claimant had the computer taken out of her patrol vehicle by other DHSPD officers. Claimant was also logged-out of the computer on various times by others. In addition, Claimant was told by Sgt. Paiz that her integrity was being questioned because the DHSPD administration did not believe that Claimant was writing her own police reports, and that Detective Henson wrote her reports for her. This was untrue and was made up by SCLAFANI and his co-conspirators.

On or about January 29, 2010, Claimant met with the DHSPD computer technician, who stated that he could not find a problem with her computer log on and there was no known audit. Claimant felt that she was being harassed by her fellow officers. She was not receiving fair treatment like the other officers.

On or about January 30, 2010, Sgt. Paiz told Claimant that she did not appear to be a team player, and asked her if she felt like she was part of the shift. He gave Claimant a photo copy paper that stated *"team player"*. Claimant explained to Sgt. Paiz how degrading his question was, and as a veteran officer she had never had any complaints of being a team player.

On or about February 4, 2010, Claimant received a subpoena to appear in Indio – Riverside County Superior Court on an embezzlement felony case. Claimant was approached by new hired

---

[32] Taken off patrol duties. Another adverse employment action.

District Attorney Brad Braaten. He was laughing and told Claimant that he had received a copy of a documentation of Claimant's performance evaluation, and that stated that Claimant was on trainee status. He said he thought it was funny and a joke. Claimant felt humiliated and believed the documentation was sent intentionally to the District Attorney office; another violation of Claimants right to privacy in their personnel files pursuant to Cal. Gov't Code § 3300 et seq.

On or about February 4, 2010 Claimant returned to the computer station that she had been working on and the other computers were occupied at the time she walked in. She sat down at the computer and observed a Chocolate milk carton (which referred to Claimant; a member of the African-American race). Officer Steinhous said that they could have used Claimant on patrol today to help out. Claimant explained to him that she had been subpoenaed to court.

On or about February 10, 2010, SCLAFANI was indicted by a federal Grand Jury on two counts of violation of 18 U.S.C. § 242; violation of federal constitutional rights under color of authority, for his torturing of Angelica Vargas and Jamal White; *United States of America v. Anthony Sclafani*; United States District Court for the Central District of California, Case Number CR 10 00163. Claimant was a witness for the government in that case, against SCLAFANI, and her statements to the government (DOJ) about SCLAFANI'S conduct resulted[33] in said Indictment.

On or about February 11, 2010 Claimant was called into Commander Singer's office and met with her and Sgt. Paiz. Claimant was told by Commander Singer that she was being placed as a trainee officer and assigned to Officer Tapia (Tapia received a Field Training Certification in January 2010)[34]. This appeared to be another clear sign to Claimant

---

[33] Or at least contributed to.
[34] Singer had no legitimate examples of said allegations, and it was evident that Claimant was being run out of the DHSPD because of her complaints of criminal

17

that she was being harassed by the DHSPD Administration and fellow DHSPD officers. Claimant was told that she was going to start like a new trainee, and would go through all of the phases of what a newly hired officer would endure. Commander Singer said she just felt the PIP was not working out for Claimant and the department wanted to give Claimant every opportunity before they had to take other measures.[35]

On or about February 11, 2010, while on "Trainee status" with Officer Tapia ("FTO"[36]), Claimant was asked to sit in the passenger seat while he drove the vehicle to show Claimant how to drive.

On or about February 16, 2010, Officer Tapia told Claimant that he needed to handle calls as if she had no back-up officer available. Claimant told him that was an officer safety issue. He told Claimant that she needed to prove herself and that she had to pretend that there were no officers available. He said she was still on probation so basically he had to do what he had to do. He said that Claimant must understand what they were doing, and he didn't have a choice in the matter, and that he was just doing what he was told to do regarding Claimant.

On or about February 16, 2010, at a Community Policing Meeting at Tedesco Park, Claimant was speaking to the community about any problems they were having in their neighborhood or businesses. Chief Williams was also present, along with Sgt. Paiz and Officer Steinhous. A member of the community asked Claimant a question,

---

conduct to the Justice Department, and because of her having testified before a federal Grand Jury that was investigating allegations of criminal conduct by approximately 8 DHSPD officers; especially and including SCLAFANI and HENDERSON.

[35] Again, this was part of an ongoing conspiracy that included Chief Williams, Commander Singer, Sgt. Sclafani, Sgt. Henderson, and other DHSPD officers to retaliate against Claimant for her complaining to the Justice Department about criminal conduct by approximately 8 DHSPD officers; especially and including SCLAFANI and HENDERSON.

[36] Field Training Officer.

for which, Claimant asked for feedback from Chief Williams. Chief Williams told Claimant directly that she was not to speak to him.

Claimant felt humiliated, because he had been speaking to Officer Steinhouse and Sgt. Paiz just minutes before. About five to ten minutes later, Chief Williams made eye contact with Claimant and got up and left the meeting.

On or about February 18, 2010, Officer Tapia placed Claimant in unsafe situations, by insisting that she conduct traffic stops and vehicle searches by herself. Claimant had to handle all of the high risks calls to the point where she was basically handling all of the calls by herself. At times, Tapia would yell at Claimant; even in front of suspects. Claimant told Tapia that she was more than capable of handling situations, but that she needed to have assistance or she could get harmed. Tapia told Claimant to pretend there was no back-up available. Claimant felt this type of treatment was unsafe for her and for the public. The work environment was unsafe, hostile, a form of retaliation, and was getting worse as each day went on.

Officer Tapia asked Claimant to pretend in the back parking lot that she was a suspect. He told Claimant that he wanted to demonstrate how Claimant should handle a suspect. He asked Claimant to spread her feet apart and proceeded to put handcuffs on her. Claimant told him that she did not see how this was necessary and was very embarrassing in front of the other DHSPD officers. Officer Tapia said that Claimant needed to be more of a bitch.

On or about February 18, 2010, Officer Tapia, Officer Jason Hunter and Claimant were in the report room typing reports. Officer Tapia asked SCLAFANI if he wanted to get some coffee from Starbucks. Sgt. SCLAFANI replied: "No they don't serve coffee in federal prison". SCLAFANI told Officer Tapia that he would have to get use to "jail house coffee", and asked Officer Tapia (by yelling) if he ". . . ever tasted jail house coffee." Claimant felt intimated and that SCLAFANI

19

was directing his conversation towards her, as though it was her fault that SCLAFANI was now facing federal felony criminal charges.[37]

On or about February 22, 2010 DHSPD Detective Jim Henson told Claimant that SCLAFANI approached him earlier that day and asked if Claimant was stressed. SCLAFANI told him the most that Claimant needed to worry about was being fired, but he had to worry about going to prison.

On or about February 23, 2010, Claimant observed a photo copy of a picture of a little girl with her mother reading a book called *"Becoming a Bitch"*. Claimant believed that it was meant for her, and felt harassed by this. The name listed on the bottom was: *ms.cathedralcity.gov/exchange/GMendoza/Inbox/FW:%20Secredt%20 Book...2/20/2010.* Detective Jim Henson came into the DHSPD report room and told Claimant to save the poster because he believed it was meant for her, and that she might need it later. Claimant took possession of the poster and made photo copies.

The police officer, Gabrielle Mendoza, was employed by the city of Cathedral City Police Department ("CCPD") at the time. The city of Desert Hot Springs Police Department paid for two officers contracted from CCPD. Officer Mendoza was one of the officers. Officer Mendoza harrassed Claimant on about five occasions, which was only a small portion of the harassment that she endured since making a report to FBI about SCLAFANI and other DHSPD officers.

On or about February 26, 2010, DHSPD Detective Jim Henson told Claimant that SCLAFANI had called his cellular phone and told him that he needed some type of bail money for the federal charges against him, above-referenced, and he needed some collateral.

---

[37] For torturing Angelica Vargas and Jamal White.

20

On or about  March 1, 2010 Claimant spoke to FBI Special Agent Steve Novak regarding the retaliation / treatment that she was enduring at work. She expressed her concern over her job because she was told almost daily by her fellow officers that she was on the "list" to be fired.

On or about  March 7, 2010 Sgt. Paiz offered overtime hours to several new hire officers, but not to Claimant, who Paiz told was not eligible for overtime hours, because she was considered a trainee; notwithstanding the fact that she was the most senior officer with DHSPD 1996. This was another example of hostile work environment and Claimant was denied working any overtime (loss of money). In the past years, Claimant had always worked many shifts of overtime and was never denied until now.

On or about  March 7, 2010 SCLAFANI told Officer Tapia that he wanted to meet with Claimant in his back office. Claimant met with SCLAFANI, who was very aggravated. He said while he was recently driving home from work and got a telephone call from his attorney. The attorney told him he was being indicted for criminal charges and needed to turn himself in within the next thirty days. SCLAFANI asked Claimant what she told the FBI about his involvement with the female arrestee (referring to Angelica Vargas.) SCLAFANI said I couldn't have seen anything because nothing happened. SCLAFANI stated all Claimant needed to worry about was being fired, but he had to worry about being sent to prison. The conversation continued to the point where SCLAFANI said he had a trainee once that did not listen properly when it came to shooting techniques. He said he later found out the trainee had been shot and killed because he didn't take his gun out fast enough. SCLAFANI said he did not want to see that happen to Claimant. SCLAFANI suggested to Claimant that she take a stress leave, and think about retiring. SCLAFANI was influencing other officers and administration to threaten Claimant's employment and safety.

21

On or about  March 9, 2010, at a Training hosted by Riverside County Sheriff's Department for Perishable Skills Training, Officer Phillip Weigle (DHSPD officer), the other officers in the class said they heard Claimant was a veteran officer and had been placed as Trainee. Claimant was so humiliated and embarrassed; it appeared that Claimant's reputation as a police officer was sabotaged and tarnished.

On or about March 9, 2010, Claimant attended training the second day at the Ben Clark Training Center. She received a text message from Sgt. Gil telling her it was urgent for her to come back. He said that Claimant's trainee observations needed to be signed again because he had to change the wording. He said the administration wanted him to use stronger language. He again reminded Claimant that she was on the list to be fired. This was another threat of Claimant's employment ending.

Also that day, Claimant called SCLAFANI on his cellular phone. She asked for him to work it out so that the hostility and retaliation would stop. SCLAFANI said that Claimant should consider taking a stress leave and to use his name or Officer Tapia's name for the stress complaint. He said he wasn't worried about it and to do what Claimant needed, in order to survive. In the conversation that took place it appeared that SCLAFANI had no intentions of stopping or backing off so that Claimant could go to work as she normally had the previous years. It appeared out of control.

On or about March 17, 2010, DHSPD Officer Raul Sandoval was assigned as Claimant's F.T.O. (new hire on probationary period and received F.T.O certificate January of 2010). Claimant was dispatched to a call of a possible man with a gun. The dispatcher advised the suspect was carrying possibly a rifle, walking with three to four other males subjects dressed in dark clothing. The suspects were last seen near the vacant field of Pierson/ Mission Lakes.

22

While enroute to the call, Officer Sandoval told Claimant to explain to him what she was going to do. Claimant told him she was going to set up with other units and check the area. He asked Claimant if she was going to take her handgun out. Claimant said "No", that she was going to take the AR-15 rifle out of the vehicle. She looked at the AR-15 rifle that was locked in the gun rack in the vehicle as usual but she discovered there were no bullets and the entire magazine was missing from the rifle. Claimant asked Officer Sandoval where the bullets were to the rifle. Officer Sandoval said he stored them tucked in the side panel of the driver's door. At that point, Claimant felt that her life was being threatened and her safety was in danger. Claimant observed another police unit arrive to the scene. The officer never stopped to make contact and continued driving by Claimant. It was fortunate at the time, that Claimant did not come into any contact with an armed suspect but the situation was a clear sign that she was being retaliated against, and working in a hostile environment.

On or about March 17, 2010, Claimant had been called in the office by SCLAFANI to inspect her gun. This was unusual because in the history of her employment, Claimant was never asked by SCLAFANI to keep inspecting her gun. This appeared to Claimant to be another form of continued harassment and retaliation by SCLAFANI. Claimant was not quite sure why SCLAFANI continued to ask to look at her gun. Claimant did not trust him or what he was capable of by this point.

On or about March 18, 2010 Claimant called FBI Special Agent Novak's cellular phone number regarding her employment being threatened, and that she needed to meet with him. Special Agent Novak said that he would call her back with a date to meet. Also on that same day, Claimant texted SCLAFANI on his cellular phone, requesting the retaliation to stop. Claimant met with SCLAFANI and Sgt. Gil was present. A short time later, Claimant told them that she had spoken to the FBI about the retaliation that she was receiving at work.

EXHIBIT A - 26

Claimant told SCLAFANI that she believed that she was being retaliated against because of her testimony before the federal Grand Jury that Indicted SCLAFANI. SCLAFANI denied having any involvement in the threats that she was receiving regarding her employment. On the same date, March 18, 2010, Claimant was called into the DHSPD office to meet with Commander Singer and Sgt. Gil. Commander Singer said that Claimant's fellow officers reported to her that she had officer safety issues. Commander Singer said it appeared that Claimant lacked confidence, and referred to a call regarding an evaluation of 5150 WIC- elderly female. Commander Singer said Claimant took too long on the call. She said she received complaints from Claimant's fellow officers that she had officer safety issues, because her searching techniques of suspects were outdated. Claimant had never had any prior complaints in the past twelve years of her employment with DHSPD of any officer safety issues. She was not able to give Claimant any valid examples of Officer Safety issues that involved Claimant. Commander Singer said she was sending Claimant to an Officer's Survival course at the San Bernardino Sheriff's Training Center; training that was set-up by SCLAFANI.

Thereafter, Claimant was also notified that she was being sent to attend a Requalification Academy with Orange County Sheriff's Department. The course was designed for person's who needed to renew their POST certificate. Claimant did not fall into that category because she had an Advanced Post Certificate. Commander Singer said if Claimant passed the academy, that she would then have a meeting with herself and Chief Williams to ascertain if Claimant was able to keep her employment with the city of Desert Hot Springs. Claimant asked her on what grounds was Chief Williams looking to fire her. Commander Singer said she could get "rid" of Claimant because of her attitude. Claimant apologized to her and told her that she very much needed her job. This was the last day (March 18, 2010) that Claimant had worked as a police officer on patrol for DHSPD, and due to the ongoing harassment and retaliation, and continued threats of being fired, Claimant believed that her only alternative at that point

was to take a stress disability leave as, SCLAFANI had suggested; above-referenced. Claimant was afraid that she was going to be fired for an invalid reason, and if she continued working there (DHSPD) under the conditions described above, that her personal safety was unreasonably at risk. Claimant reasonably believed that said continued harassment / retaliation being perpetrated against her may also result in Claimant being killed or seriously injured while performing her police duties. She could not continue to function under these conditions, and became terribly stressed-out[38] from the continuous acts of harassment / retaliation; above-described. Accordingly, at that time, Claimant contacted Dr. Daniel Watson, and took a leave of absence due to mental and emotional distress / stress; especially being afraid for her personal safety.

On or about  March 22, 2010, Claimant called Commander Smith via cellular phone and told him that she had another appointment to meet with FBI Special Agent Steve Novak. He directed Claimant to call Commander Kate Singer and advise her, which Claimant did.

On or about  March 22, 2010, said FBI meeting was cancelled per Special Agent Novak. He stated he was working on a confidential detail at the time.

On or about March 29, 2010 Claimant was seen by her physician, Dr. Daniel Watson. Claimant expressed her concerns of feeling unsafe at work; especially because of SCLAFANI. Dr. Watson placed Claimant on medical disability at that time, as he felt that Claimant was not safe (under her working conditions, above-described), and that she was mentally unable to work under said above-referenced working conditions (i.e. continued acts of harassment and retaliation, including setting-up Claimant to be killed or injured, such as for lack of officer back-ups.)

---

[38] And, with SCLAFANI still at DHSPD, reasonably scared that SCLAFANI and his co-conspirators may just get Claimant killed on duty.

On or about March 29, 2010 Claimant received a text from Sgt. Gil, stating it was urgent that she call him. He told Claimant that Chief Williams told him that she was not to meet with the FBI on this date (March 29, 2010) because she was not able to work (disability leave.) Claimant called Special Agent Novak and passed on the details of what Chief Williams told her. Claimant cancelled the meeting.

On or about March 29, 2010 Claimant made a Worker's Compensation claim with DHS Human Resources. SCLAFANI was assigned as Claimant's Training Supervisor, and he was leading the charge to get Claimant out of the DHSPD.

On or about April 6, 2010, then Retired DHSPD Sgt. David Henderson and SCLAFANI surrendered on their federal Indictments; above-referenced.

On or about April 15, 2010, Commander Smith called Claimant and stated that Claimant was subpoenaed for court, and to contact DDA Roderick.

On or about April 17, 2010, DHSPD Officer Jim Henson told Claimant that SCLAFANI called his cellular phone and told him that Chief Williams waived the Administrative Leave rules and stated even though he (SCLAFANI) was placed on Administrative Leave he was permitted to contact any co-workers and fellow officers that he desired to contact. Claimant felt intimated and terrified that SCLAFANI was calling her boyfriend (Henson) who was at her house.

On or about May 15, 2010, Claimant had a Worker's Compensation appointment rescheduled, due to short notice and being out of town.

26

Claimant was requested to meet with Dr. Strong when she came to Palm Springs which was rescheduled with Worker's Compensation official Danny Fernandez

On or about  July 7, 2010, Claimant had a Worker's Compensation examination scheduled appointment. Claimant went to Dr. Strong's office, and met with the receptionist ("Olivia") at Dr. Barbara Strong's office. Claimant was told that someone had cancelled her appointment. Claimant explained to Dr. Strong that she did not cancel the appointment. Dr. Strong said she would not be able to see Claimant since someone had cancelled her appointment for that date.

On or about  July 7, 2010, Claimant called the office of Dr. Strong and spoke to the receptionist; Olivia. She stated according to her records Danny Fernandez from Worker's Comp had cancelled her appointment. This was without Claimant's knowledge. Claimant  then spoke to Mr. Fernandez on or about that date. Mr. Fernandez stated the City of DHS had obtained an attorney and that Claimant would have to wait until the attorney scheduled a doctor's appointment for her.

On or about  August 30, 2010, DHSPD Commander Smith called Claimant and stated that he needed to meet Claimant to give Claimant paperwork that was needed for IPD. Claimant met him in DHS at the 7-11 store.  He stated if Claimant was to meet at the station it would cause a lot of chaos at that time.

On or about September 6, 2010, Claimant was directed to fax paperwork to Commander Smith for IPD.

On or about September 9, 2010, Claimant met with Internal Affairs Investigator Jeff Love at Lackier & Diemmer, in their Upland, California office, to make a formal complaint against SCLAFANI regarding Claimant's hostile work environment (retaliation and harassment.)

On or about September 20, 2010, Claimant was contacted by
Commander Smith, who called and stated that he needed to meet with
Claimant regarding a records download for her taser.
On or about September 9, 2010, Claimant met with Commander Smith
at the DHSPD and provided him with her taser.

On or about September 29, 2010, Claimant observed David
Henderson and his girlfriend, Laura Scully, at Walmart, about 8:30 am.
After walking around Claimant observed Scully following her down
several isles of the store. Claimant then observed a male subject
that resembled Henderson (possible a relative) following Claimant on
every isle of the store and out of the store into the parking lot.
Claimant observed Henderson's truck parked in the parking lot with
him sitting in the driver's seat. Claimant felt afraid for her safety and
called her boyfriend Jim Henson. He was currently at work (DHSPD).
Claimant then called her daughter's father, Kendall Johnson, to meet
Claimant, because she was afraid for her safety; especially in light of
the sadistic and depraved David Henderson following her, which he
did. Claimant then drove nearby because she observed a motor cycle
police officer. Claimant parked her vehicle and did not notice
Henderson's vehicle at that time.

On or about October 20, 2010, Claimant received a call from
Commander Smith regarding IPD paperwork.

On or about November 10, 2010, Claimant called CCPD Captain
Conner and advised him that she was receiving annoying and
harassing phone calls from Officer G. Mendoza (in violation of CPC
653(m.) Claimant explained that she was already going through a
difficult situation and was home from DHSPD. Captain Conner said
that he would call her in the office and advise her that she was going
to be listed as a suspect and myself as a victim, and at this time
Claimant was non-desirous of prosecution, but told him she needed
to stop calling her or Claimant would file a criminal complaint against
her.

On or about  November 23, 2010, Claimant  received a call from 760-200-9431. Unknown caller hung up the phone. Claimant called Jim Henson and told him to tell Officer Mendoza to stop calling Claimant.

On or about  November 29, 2010, Claimant  received a call from a restricted number. Claimant recognized the caller's voice as Officer G. Mendoza. She asked someone what the deal was. Then she screamed "Fuck where my car is "and hung up the phone. Claimant called Jim Henson and advised him about her calling Claimant and told him to tell her to stop harassing Claimant.

On or about  December 1, 2010, Claimant called Officer Eddie Cole and explained that Officer G. Mendoza was calling her on a regular basis and was harassing Claimant. Claimant asked him if he could talk to her and tell her to stop calling or she was going to seriously report her harassing Claimant.

In December of 2010, Officer Mendoza was hired full time at Desert Hot Springs Police Department as a Sergeant.

On or about  January 1, 2011, FBI Special Agent Novak called Claimant advised her that the court dates were rescheduled for Sgt. Sclafani and/ David Henderson for March 29, 2011.

On or about  February 7, 2011, DHSPD Detective Jim Henson said he was advised that he had to meet with Commander Bressler and Sgt. Perry on February 9, 2011. He was nervous because he thought he was going to be retaliated against because he and Claimant were continuing to date.

On or about  February 9, 2011 Detective Jim Henson told Claimant that during the meeting that Commander Bressler asked him if

he and Claimant were still dating. Henson said Commander Bressler also asked him about SCLAFANI'S court date coming up; he wanted to make sure there was no "off duty" issues with the stress.

On or about February 2, 2011, SCLAFANI returned to work at DHSPD after the federal Indictment on both counts of Civil Rights Violations had issued.

On or about March 1, 2011, Dr. Job Lopez wrote Claimant a letter to return to work. Claimant sent a copy to Human Resources.

On or about March 2, 2011, Detective Jim Henson gave Claimant a large envelope that he stated Sgt. Peary told him to give to Claimant. Claimant observed a letter from POA regarding a meeting for officers currently working at DHSPD to attend. Claimant felt this was done to intimidate her.

On or about March 10, 2011, Dr. David Kauss wrote Claimant a letter to return to work, but to have no contact with SCLAFANI.

On or about March 14, 2011, Dr. Daniel Watson wrote Claimant a letter to return to work at DHSPD, but to have no contact with SCLAFANI due to fear of safety.

On or about March 23, 2011, 03/23/11 Claimant contacted Human Resources (Letty Gallegos-Gallardo,) who stated that she received the letter but stated she wasn't sure if the Police Department could accommodate her.

On or about April 25, 2011, Claimant again met with FBI Special Agent Novak, Assistant U.S. Attorney Steven Arkow and Assistant U.S. Attorney Cheryl O'Connor at the United States Courthouse. Claimant expressed her concerns that SCLAFANI was working at the Police Department while Claimant was being denied to go back to work for DHSPD.

On or about April 28, 2011, Claimant attended a FFDE with Dr. Ari Kalechstein. Dr. Kalechstein stated he had been provided letters from fellow officers against her. Dr. Kalechstein audio recorded the entire session and stated he was going to provide the recorded conversation to City Attorney of Desert Hot Springs. Claimant verbally told him that she did not want the City Attorney to have her recorded doctor/client communications, due to it being privileged information, and privileged under HIPPA law. Union Representative Dale Nowicki wrote Dr. Kalechstein a letter immediately revoking any release of the audio recorded conversation.

On or about June 18, 2011, Claimant received a certified letter from DHSPD stating that she was the focus of an internal affairs investigation being conducted by Commander D. Bressler. The allegations was (on or around October of 2010) Conduct Unbecoming a Police Officer; alleging that Claimant made telephone contact with a member of another law enforcement agency which was annoying, threatening and malicious. This was alleged to have been done in violation of DHSPD Policy Manual Section 340.3.5(aa).

On or about June 27, 2011, Claimant called Commander Bressler and left a voice mail message regarding the investigation.

On or about June 30, 2011, Claimant obtained a reply from Dr. Ari Kalechstein regarding the FFDE, that stated that he referred to letters written by fellow officers, and his examination revealed that Claimant was not presently fit for duty to work as a DHSPD police officer, but that Claimant's condition was treatable.

On or about July 23, 2011, Internal Affairs Investigation Attorney Kasey Castillo from Lackier & Diemmer represented Claimant. They met with Commander Bressler, who audio recorded the interview. Claimant provided Attorney Castillo a copy of her phone bill that showed that Sgt. Gabriela Mendoza had called and harassed her on numerous occasions in October through December of 2010.

31

On or about July 24, 2011, Detective Jim Henson told Claimant that she should resign from DHSPD or take their retirement offer. He stated everyone at the department believed that Claimant would not be able to work. Claimant found this to be a form of intimidation by SCLAFANI by using Henson, indirectly.

On or about August 5, 2011, a notice was sent to Attorney Nowicki that the City will proceed to review its obligations to file non-industrial disability retirement for Claimant. Claimant was never notified.

On or about August 9, 2011, the City allegedly sent a follow up letter to Attorney Nowicki about above intention to file non-industrial disability retirement for Claimant. Claimant was not notified.

On or about August 9, 2011, the City of Desert Hot Springs sent a Notice Of Intent To Disability Retire.

On or about August 29, 2011 a quasi - Skelly Hearing (conference) was held for the Notice Of Intent to File a Non-Industrial PERS Retirement.

On or about August 29, 2011 08/30/11 Claimant sent her response to Chief Williams, advising him that Claimant was able to work and that she disagreed with the City's claims otherwise. She just could not work with SCLAFANI at DHSPD.

On or about September 13, 2011, Claimant received a Notice Of Decision To Recommend Application for Non-Industrial Disability Retirement from the City.

On or about October 3, 2011, Claimant was seen by Worker's Comp Doctor Dr. Lawrence Moss.

On or about October 4, 2011, Claimant was again seen by Worker's Comp Doctor Dr. Lawrence Moss.

On or about October 6, 2011, Claimant received a call from Sgt. Brian Link, who stated he was conducting a locker inspection, and that he would be available during night shift from 10/17/11 thru 10/19/11 for Claimant's DHSPD locker inspection. Claimant went on 10/19/11 for said DHSPD locker inspection. Her lockers had already been opened and articles from locker #1 were all stuffed into Locker #2. Claimant did not give anyone permission to enter her lockers.

On or about October 8, 2011, Claimant received official notification[39] from Assistant City Manager Jason Simpson (via a letter sent via mail 10/6/11) that the City Manager has decided to adopt the recommendations of the Skelly hearing / conference, and that the City would apply for a Non-Industrial Disability Retirement for Claimant on the ground that she was no longer fit for duty as a DHSPD office. The letter also informed Claimant that she had 30 days from the date that she received that letter (dated September 19, 2011, post-dated October 6, 2011 and received by Claimant on October 8, 2011) to appeal the City's decision to apply for a Non-Industrial Disability Retirement for Claimant.

On or about November 7, 2011, Claimant personally met with city clerk requesting a two week extension for said appeal.

On or about November 14, 2011, the City received a response from Dr. Lawrence Moss based on his examination of Claimant, recommending Claimant's return to work.

On or about November 14, 2011, Claimant received mail from her Worker's Comp attorney's office regarding possible unknown file with

---

[39] And first learned.

33

negative letters against and about her that were provided to FFDE and Worker's Comp attorneys. Claimant discovered letters for the first time written against her by fellow officers.

On or about December 19, 2011, Claimant received a call from Sgt. Larry Essex requesting a review of Claimant's taser.

On or about January 23, 2012, Claimant met with FBI Agent Tamara McKen, Assistant U.S. Attorney Cheryl O'Connor about the SCLAFANI criminal trial.

On or about  January 23, 2012, Claimant met with FBI Agent Tamara McKen, FBI Agent Steven Novak, and Assistant U.S. Attorney Steven Arkow.

On or about February 2, 2012, an Investigator for SCLAFANI came to Claimant's residence after she had already expressed concern over not wanting him (Tom Crompton) at her residence.

On or about February 3, 2012, Claimant received a letter from Desert Hot Springs City Manager Jason Simpson, notifying her, among other things that she was now officially separated from the City of Desert Hot Springs: *"This is to notify you that as of October 21, 2011, you were no longer considered to be employed by the City of Desert Hot Springs."*

On or about February 2, 2012, two vehicles attempted to run into Claimant's vehicle while she was picking her daughter up from school.  License plate 6JTJ389. Claimant called Agent Tamara and advised her of what occurred and she felt that her life was being threatened as a form of witness intimidation for the upcoming (2/9/12) federal felony criminal trial of SCLAFANI.

On or about February 3, 2012, Claimant received a letter from Desert Hot Springs City Manager Jason Simpson, notifying her, among other

things that she was now officially separated from the City of Desert Hot Springs: *"This is to notify you that as of October 21, 2011, you Were no longer considered to be employed by the City of Desert Hot Springs."*

On or about February 3, 2012, Claimant's Medical Insurance coverage from the city stopped.

On or about February 6, 2012, Claimant received e-mails and texts from the DHSPD POA and from Officer Paul Tapia, attempting to dissuade her from testifying against SCLAFANI at his upcoming federal criminal trial. This also put Claimant in fear for her life and safety.

On or about February 9, 2012, Claimant reported said e-mails and texts from Officer Tapia, to FBI Agent Tamara McKen.  Claimant was afraid for her safety.

On or about February 13, 2012, Claimant was requested by FBI Agent Tamara to meet in Los Angeles for the SCLAFANI federal criminal trial.

On or about February 13, 2012, Claimant received a call and text from Officer Paul Tapia. She again was afraid for her safety.

On or about February 13, 2012, Claimant sent Assistant City Attorney Jason Simpson notification that she appealed every portion of the notification of her Separation from the City, and Jason Simpson replied that she filed untimely.

On or about February 13, 2012, Claimant was advised by the FBI that SCLAFANI was found guilty on both felony counts of Civil Rights violations.
02/29/11- Received an e-mail from Officer Paul Tapia Sclafani's case.

## PROOF OF SERVICE

I declare that I am employed in the County of Orange, State of California. I am over the age of eighteen years and not a party to the within cause; my business address is 4063 Birch Street, Suite 100, Newport Beach, California 92660.

On March 28, 2012, I served:

**CLAIM FOR MONEY OR DAMAGES AGAINST THE CITY OF DESERT HOT SPRINGS ON BEHALF OF CLAIMANT ANDREA HEATH**

on the interested parties in this action by placing a true copy thereof, enclosed in a sealed envelope, addressed as follows:

> City Clerk's Office
> City of Desert Hot Springs
> 65-950 Pierson Boulevard
> Desert Hot Springs, CA 92240

( ) BY PERSONAL SERVICE

( X ) BY REGULAR U.S. MAIL AND BY CERTIFIED RETURN RECEIPT REQUESTED PARCEL NO.: 7006 2760 0002 4381 3704, I placed each sealed envelope with postage there prepaid, for collection and mailing at Newport Beach, California, following ordinary business practices. I am readily familiar with the practice that in the ordinary course of business, correspondence is deposited in the United Stated Postal Service the same day as it is placed for processing.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. This 28th day of March, 2012, at Newport Beach, California.

Belinda Breznau

36



Search USPS.com or Track Packages

| Quick Tools | | Ship a Package | Send Mail | Manage Your Mail | Shop | Business Solutions |

# Track & Confirm

You entered: 70062760000243813704

**Status: Delivered**

Your item was delivered at 10:29 am on April 02, 2012 in DESERT HOT SPRINGS, CA 92240. Additional information for this item is stored in files offline.

You may request that the additional information be retrieved from the archives, and that we send you an e-mail when this retrieval is complete. Requests to retrieve additional information are generally processed momentarily.

☐ I would like to receive notification on this request



**Find Another Item**

What's your label (or receipt) number?



**LEGAL**
Privacy Policy ›
Terms of Use ›
FOIA ›
No FEAR Act EEO Data ›

**ON USPS.COM**
Government Services ›
Buy Stamps & Shop ›
Print a Label with Postage ›
Customer Service ›
Site Index ›

**ON ABOUT.USPS.COM**
About USPS Home ›
Newsroom ›
Mail Service Updates ›
Forms & Publications ›
Careers ›

**OTHER USPS SITES**
Business Customer Gateway ›
Postal Inspectors ›
Inspector General ›
Postal Explorer ›

Copyright© 2013 USPS. All Rights Reserved.

English          Customer Service          USPS Mobile                                                                     Register / Sign In



Search USPS.com or Track Packages

Quick Tools                          Ship a Package          Send Mail          Manage Your Mail          Shop          Business Solutions

# Track & Confirm

You entered: 70062760000243813704

**Status: Delivered**
Your item was delivered at 10:29 am on April 02, 2012 in DESERT HOT SPRINGS, CA 92240. Additional information for this item is stored in files offline.

You may request that the additional information be retrieved from the archives, and that we send you an e-mail when this retrieval is complete. Requests to retrieve additional information are generally processed momentarily.

I would like to receive notification on this request



**Find Another Item**

What's your label (or receipt) number?



**LEGAL**
Privacy Policy ›
Terms of Use ›
FOIA ›
No FEAR Act EEO Data ›

**ON USPS.COM**
Government Services ›
Buy Stamps & Shop ›
Print a Label with Postage ›
Customer Service ›
Site Index ›

**ON ABOUT.USPS.COM**
About USPS Home ›
Newsroom ›
Mail Service Updates ›
Forms & Publications ›
Careers ›

**OTHER USPS SITES**
Business Customer Gateway ›
Postal Inspectors ›
Inspector General ›
Postal Explorer ›

Copyright© 2013 USPS. All Rights Reserved.

AMENDED

**File With:**
**City Clerk's Office**
**City of Desert Hot Springs**
**65-950 Pierson Blvd.**
**Desert Hot Springs, CA 92240**

**CLAIM FOR MONEY OR
DAMAGES AGAINST
THE CITY OF DESERT
HOT SPRINGS**

RESERVE FOR FILING STAMP

CLAIM NO._____

**Method of delivery office use only:**
☐ US Mail (postmark date: _____ )
☐ Hand –delivered (date: _____ )    ☐ Other (please list: _____ )
☐ Delivery service (please list: _____ )    ☐ Email (date: _____ )

A claim must be presented, as prescribed by the Government Code of the State of California, by the claimant or a person acting on his/her behalf and shall show the following:

**If additional space is needed to provide your information, please attach sheets, identifying the paragraph(s) being answered.**

1.  Name and Post Office address of the Claimant:

    Name of Claimant:  Andrea Heath

    Post Office Address:  67780 Garbino Road, Cathedral City, CA  92234

2.  Post Office address to which the person presenting the claim desires notices to be sent:

    Name of Addressee:  Jerry L. Steering, Esq.   Telephone:  (949)474-1849

    Post Office Address:  4063 Birch Street, Ste. 100, Newport Beach, CA  92660

3.  The date, place and other circumstances of the occurrence or transaction which gave rise to the claim asserted.

    Date of Occurrence:  April 11, 2007 through
    October 21, 2011, inclusive   Time of Occurrence:  N/A

    Location:  65-950 Pierson Blvd., Desert Hot Springs, CA 92240

    Circumstances giving rise to this claim:

    See Exhibit "A" – Attachment to Government Claim For Damages
    By Claimant Andrea Heath.

4.  General description of the indebtedness, obligation, injury, damage or loss incurred so far as it may be known at the time of the presentation of the claim.

    See Exhibit "A" – Attachment To Government Claim For Damages
    By Claimant Andrea Heath.

5.  The name or names of the public employee or employees causing the injury, damage, or loss, if known.

    Anthony Sclafani, Patrick Williams, Kate Singer, Paul Tapia, Radames
    Gill, Gustavo Paiz, David Henderson, Michael Valentich, Rick Daniels,
    Jason Simpson, Ken Perry and Commander Edwin Smith.

6. **If amount claimed totals less than $10,000:**  The amount claimed if it totals less than ten thousand dollars ($10,000) as of the date of presentation of the claim, including the estimated amount of any prospective injury, damage, or loss, insofar as it may be known at the time of the presentation of the claim, together with the basis of computation of the amount claimed.

Amount Claimed and basis for computation:

_____

_____

_____

**If amount claimed exceeds $10,000:**  If the amount claimed exceeds ten thousand dollars ($10,000), no dollar amount shall be included in the claim.  However, it shall indicate whether the claim would be a limited civil case. A limited civil case is one where the recovery sought, exclusive of attorney fees, interest and court costs does not exceed $25,000.  An unlimited civil case is one in which the recovery sought is more than $25,000. (See CCP § 86.)

☐ Limited Civil Case          ☒ Unlimited Civil Case

> **You are required to provide the information requested above in order to comply with Government Code §910.  Additionally, in order to conduct a timely investigation and possible resolution of your claim, the [CITY/AGENCY] requests that you answer the following questions.**

7. Claimant(s) Social Security Number(s):

Available from Claimant's attorney Jerry L. Steering, on request.

8. Claimant(s) Date(s) of Birth:

March 28, 1969

9. Name, address and telephone number of any witnesses to the occurrence or transaction which gave rise to the claim asserted:

Anthony Sclafani, Patrick Williams, Kate Singer, Paul Tapia,

Radames Gill, Gustavo Paiz, David Henderson, Michael Valentich,

Rick Daniels, Jason Simpson, Ken Perry and Commander Edwin Smith

10. If the claim involves medical treatment for a claimed injury, please provide the name, address and telephone number of any doctors or hospitals providing treatment:

Daniel Waston, M.D.

_____

_____

*If applicable, please attach any medical bills or reports or similar documents supporting your claim.*

11. If the claim relates to an automobile accident:

| Claimant(s) Auto Ins. Co.: | Telephone: |
|---|---|
| Address: | |
| | Insurance Policy No.: |
| | |
| Insurance Broker/Agent: | Telephone: |
| Address: | |
| | |
| Claimant's Veh. Lic. No.: | Vehicle Make/Year: |
| Claimant's Drivers Lic. No.: | Expiration: |

*If applicable, please attach any repair bills, estimates or similar documents supporting your claim.*

## READ CAREFULLY

For all accident claims, place on following diagram name of streets, including North, East, South, and West; indicate place of accident by "X" and by showing house numbers or distances to street corners. If City/Agency Vehicle was involved, designate by letter "A" location of City/Agency Vehicle when you first saw it, and by "B" location of yourself or your vehicle when you first saw

City/Agency Vehicle; location of City/Agency vehicle at time of accident by "A-1" and location of yourself or your vehicle at the time of the accident by "B-1" and the point of impact by "X."

NOTE: If diagrams below do not fit the situation, attach hereto a proper diagram signed by claimant.



CURB

SIDEWALK

PARKWAY

SIDEWALK

CURB

**Warning:** Presentation of a false claim is a felony (Penal Code §72). Pursuant to CCP §1038, the City/Agency may seek to recover all costs of defense in the event an action is filed which is later determined not to have been brought in good faith and with reasonable cause.

Signature:                                          Date:  March 30, 2012

Jerry L. Steering,
Attorney For Claimant

Page 3 of 3

EXHIBIT B - 3

# EXHIBIT "A" - ATTACHMENT TO GOVERNMENT CLAIM FOR DAMAGES
# BY CLAIMANT ANDREA HEATH

On or about June 26, 1996 Claimant was hired by the City of Desert Hot Springs as a sworn police officer with the Desert Hot Springs Police Department. Claimant excelled in her duties as a police officer with the Desert Hot Springs Police Department, and enjoyed working in that capacity.

On or about April 11, 2007 Claimant met with FBI Special Agent Steve Novak and Assistant United States Attorney Lamar Baker, and reported to them various violations of the use of unreasonable force upon, and false arrests of, civilians, by several Desert Hot Springs Police Department officers[1], and the cover-up of the same; in violation of 18 U.S.C. §§ 241[2] and 242[3], and in violation of Cal. Penal Code §§

---

[1] Including but not limited to, then Desert Hot Springs Police Department Sergeants Anthony Sclafani and David Henderson.

[2] 18 U.S.C. § 241. If two or more persons conspire to injure, oppress, threaten, or intimidate any person in any State, Territory, Commonwealth, Possession, or District in the free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States, or because of his having so exercised the same;
or
If two or more persons go in disguise on the highway, or on the premises of another, with intent to prevent or hinder his free exercise or enjoyment of any right or privilege so secured - They shall be fined under this title or imprisoned not more than ten years, or both; and if death results from the acts committed in violation of this section or if such acts include kidnapping or an attempt to kidnap, aggravated sexual abuse or an attempt to commit aggravated sexual abuse, or an attempt to kill, they shall be fined under this title or imprisoned for any term of years or for life, or both, or may be sentenced to death.

[3] 18 U.S.C. § 242. Whoever, under color of any law, statute, ordinance, regulation, or custom, willfully subjects any person in any State, Territory, Commonwealth, Possession, or District to the deprivation of any rights, privileges, or immunities secured or protected by the Constitution or laws of the United States, or to different punishments, pains, or penalties, on account of such person being an alien, or by reason of his color, or race, than are prescribed for the punishment of citizens, shall be fined under this title or imprisoned not more than one year, or both; and if bodily injury results from the acts committed in violation of this section or if such acts include the

1

118[4], 127[5], 128[6], 133[7], 134[8], 135[9], 146[10], 149[11], 170[12], 181.1[13], 182(2)[14] and other California criminal statutes involving the beating / torturing

---

use, attempted use, or threatened use of a dangerous weapon, explosives, or fire, shall be fined under this title or imprisoned not more than ten years, or both; and if death results from the acts committed in violation of this section or if such acts include kidnapping or an attempt to kidnap, aggravated sexual abuse, or an attempt to commit aggravated sexual abuse, or an attempt to kill, shall be fined under this title, or imprisoned for any term of years or for life, or both, or may be sentenced to death.

[4] Cal. Penal Code § 118. (a) Every person who, having taken an oath that he or she will testify, declare, depose, or certify truly before any competent tribunal, officer, or person, in any of the cases in which the oath may by law of the State of California be administered, willfully and contrary to the oath, states as true any material matter which he or she knows to be false, and every person who testifies, declares, deposes, or certifies under penalty of perjury in any of the cases in which the testimony, declarations, depositions, or certification is permitted by law of the State of California under penalty of perjury and willfully states as true any material matter which he or she knows to be false, is guilty of perjury.

This subdivision is applicable whether the statement, or the testimony, declaration, deposition, or certification is made or subscribed within or without the State of California.

[5] Cal. Penal Code § 127. Every person who willfully procures another person to commit perjury is guilty of subornation of perjury, and is punishable in the same manner as he would be if personally guilty of the perjury so procured.

[6] Cal. Penal Code § 128. Every person who, by willful perjury or subornation of perjury procures the conviction and execution of any innocent person, is punishable by death or life imprisonment without possibility of parole. The penalty shall be determined pursuant to Sections 190.3 and 190.4.

[7] Cal. Penal Code § 133. Every person who practices any fraud or deceit, or knowingly makes or exhibits any false statement, representation, token, or writing, to any witness or person about to be called as a witness upon any trial, proceeding, inquiry, or investigation whatever, authorized by law, with intent to affect the testimony of such witness, is guilty of a misdemeanor.

[8] Cal. Penal Code § 134. Every person guilty of preparing any false or ante-dated book, paper, record, instrument in writing, or other matter or thing, with intent to produce it, or allow it to be produced for any fraudulent or deceitful purpose, as genuine or true, upon any trial, proceeding, or inquiry whatever, authorized by law, is guilty of felony.

[9] Cal. Penal Code § 135. Every person who, knowing that any book, paper, record, instrument in writing, or other matter or thing, is about to be produced in evidence upon any trial, inquiry, or investigation whatever, authorized by law, willfully destroys or conceals the same, with intent thereby to prevent it from being produced, is guilty of a misdemeanor.

[10] Cal. Penal Code § 146. Every public officer, or person pretending to be a public officer, who, under the pretense or color of any process or other legal authority, does any of the following, without a regular process or other lawful authority, is guilty of a misdemeanor:

2

of persons, the false arrest / false imprisonment of persons, the concealment / destruction of evidence, the framing of persons[15], and associated offenses.

After Claimant provided said above-referenced information to FBI Special Agent Steve Novak and Assistant United States Attorney Lamar Baker, she immediately noticed that she was being treated differently by other officers.  Once Claimant returned to the Desert Hot Springs Police Department station, she noticed that she was being treated differently by the other officers in said department. Claimant noticed that none of her fellow officers were speaking to her, and were making remarks about Claimant "ratting" them out.

In July of 2007 Claimant took time off of work[16] pursuant to the Family Leave Act.

On or about on February 7, 2008 Claimant returned back to work[17] and

---

(a) Arrests any person or detains that person against his or her will.

[11] 149.  Every public officer who, under color of authority, without lawful necessity, assaults or beats any person, is punishable by a fine not exceeding ten thousand dollars ($10,000), or by imprisonment in a county jail not exceeding one year, or pursuant to subdivision (h) of Section 1170, or by both that fine and imprisonment.

[12] At the Desert Hot Springs Police Department. Cal. Penal Code § 170. Every person who maliciously and without probable cause procures a search warrant or warrant of arrest to be issued and executed, is guilty of a misdemeanor.

[13] 118.1.  Every peace officer who files any report with the agency which employs him or her regarding the commission of any crime or any investigation of any crime, if he or she knowingly and intentionally makes any statement regarding any material matter in the report which the officer knows to be false, whether or not the statement is certified or otherwise expressly reported as true, is guilty of filing a false report punishable by imprisonment in the county jail for up to one year, or in the state prison for one, two, or three years. This section shall not apply to the contents of any statement which the peace officer attributes in the report to any other person.

[14] 182.  (a) If two or more persons conspire:

   (1) To commit any crime.

   (2) Falsely and maliciously to indict another for any crime, or to procure another to be charged or arrested for any crime.

[15] Including giving perjured court testimony and conspiring with other officers to do so.

[16] At DHSPD.

[17] At DHSPD.

3

was thereupon demoted to the rank of patrol officer. Claimant was told that her position as an Investigator for the Sexual Assault / Child Abuse Unit had been eliminated, and Claimant's pay was decreased by 5%. Moreover, said Investigator position with the Sexual Assault / Child Abuse Unit, had, in fact, not been eliminated, and had then been given to a new hire non-sworn person with and at the Desert Hot Springs Police Department ("DHSPD".)

Moreover, substantially contemporaneously, DHSPD Sergeant Anthony Sclafani ("SCLAFANI"), was promoted to Administration Sergeant. As Administration Sergeant SCLAFANI was in charge of Patrol, scheduling, training, armory, issuing weapons, hire of new police officers, termination of employee's, vehicles, and ordering supplies.

During that time, although Claimant was a veteran officer with the DHSPD, she was being treated like a newly hired officer. Claimant was told by officers less seasoned and experienced than her, that SCLAFANI directed them to make Claimant take all of the police reports[18], because he felt Claimant needed additional training; something completely untrue.

Also, after Claimant spoke to the Justice Department (as discussed above), she was receiving little to no back-up assistance on her calls for service with the DHSPD. Claimant was even dispatched at times to handle two calls for service at a time, which was highly unusual, and no other DHSPD officer was treated this way.

Claimant responded to numerous high risks calls, such as subjects fighting, domestic violence calls, man with gun calls, robbery calls, suspicious circumstances calls, and no DHSPD back-up officer's would respond to the scene of the call for service. Claimant had to call the DHSPD dispatchers several times to get a back-up officer, and

---

[18] For a call for service by DHSPD.

the back-up officers would take more than the usual time to respond to her calls for back-up; all of this placing Claimant in great danger.

On or about  May 23, 2008 Claimant met SCLAFANI in his office at the DHSPD. He asked Claimant what she had spoken to the FBI about. SCLAFANI was upset and asked Claimant what she had seen of the Angelica Vargas incident[19]. SCLAFANI told Claimant that he didn't think it was right that he was facing going to prison for a *"piece of shit, who was banging on the jail wall."*  SCLANFANI also told Claimant[20] that she should look into applying for a police officer job at another police department; implicitly because of the information of criminal wrongdoing by SCLAFANI, Sgt. David Henderson[21] ("HENDERSON") and other DHSPD officer that Claimant reported to the "Justice Department" (the United States Department of Justice, that includes the United States Attorney's Offices, and the FBI.)

On November 8, 2008, SCLAFANI refused to assist[22] Claimant handle a dangerous call for service (fight and weapons call), and she ended-up having to handle a violent person beating-up another by herself; again placing Claimant at great risk of serious injury to herself.

In December of 2008, Claimant was dispatched to a call for service involving an assault with deadly weapon, with two suspects fighting the hotel owner. Claimant was dispatched as the primary officer and DHSPD Officer Stephen O'Connor was dispatched as the secondary officer. The two of them[23] were just at the DHSPD station before the

---

[19] In that incident, the female DUI arrestee vomited at the DHSPD, and SCLAFANI, along with several other DHSPD officers, took turns kicking, stomping and tasing said female DUI arrestee until she was unconscious and convulsing on the floor of the station, and when she crawled away from the officers, they pepper-sprayed her and continued to torture her.
[20] Several times.
[21] Formerly Lieutenant Henderson; demoted on or about July 1, 2005.
[22] SCLAFANI drove back to the DHSPD station and left Claimant alone to handle the violent call for service.
[23] Claimant and O'Connor.

call. As Claimant drove to the call, she observed Officer O'Connor driving behind her. Claimant got out of her vehicle and observed several subjects fighting outside, near the pool area. Due to multiple subjects fighting, Claimant needed Officer O'Connor's assistance, but Officer Steven O'Conner was nowhere to be found. Claimant kept calling him on the radio to assist her, because of the hotel owner had been beaten unconscious, and Claimant had to apprehend both combative suspects by herself. Claimant asked for help from a citizen nearby because the situation was so volatile and violent. Officer O'Connor purposely delayed assisting Claimant; apparently for the purpose of furthering the acts of retaliation against Claimant for her having provided incriminating information about HENDERSON, SCLAFANI and other DHSPD officers, to the Justice Department. This caused her safety to be in jeopardy, and his response materially delayed the beating victim from receiving badly needed medical attention.

In December of 2008, Claimant was dispatched to a "Shots Fired" call for service by DHSPD. When Claimant arrived at the scene, she observed a vehicle with bullet holes on the driver's door and blood on the front seat of the vehicle. It appeared that there was a possible gunshot victim, and a suspect with unknown whereabouts. Claimant requested additional DHSPD back-up units, but was told that the other DHSPD officers were busy. Claimant received back-up units approximately thirty minutes later; an unusually long amount of response time for such a call. Prior to having told the Justice Department about said criminal conduct by SCLAFANI, HENDERSON and other DHSPD officers, above-referenced, Claimant was never expected to handle that type of dangerous call by herself, and had previously received back-up assistance immediately.

On or about December 14, 2008, Claimant responded to baby death call[24]. When Claimant arrived, SCLAFANI and Officer Brian

---

[24] For a Sudden Infant Death call.

Koahou were already on scene. Officer Koahou did not talk to Claimant at all. This was not normal DHSPD protocol, and in the past Claimant and Officer Koahou had communicated on calls. Officer Koahou also observed Riverside County Fire Department firefighters (including and especially Captain Frank Stewart), at location but no one spoke to Claimant. SCLAFANI spoke to Claimant briefly, but to a minimum. SCLAFANI asked Claimant to stand outside for an insignificant reason, such as to get the address. None of the officers gave Claimant any information about the call, which was abnormal because in the past, these types of calls were Claimant's specialty as an investigator.

This "silent treatment", and the failure of DHSPD officers to arrive as back-up officers to assist Claimant on her calls for service, even very dangerous calls, persisted throughout the remainder of Claimant's employment with the DHSPD while she was still an active duty police officer.

Also in 2008, SCLAFANI was placed in charge of the ordering and maintaining the weapons in the armory. SCLAFANI issued Claimant a Springfield .40 caliber pistol. Claimant immediately started having trouble with her DHSPD pistol qualifications, although she did not have problems with pistol qualifications beforehand. Claimant later found out that she was issued a different pistol from any other DHSPD officer. The pistol that SCLAFANI gave Claimant was larger and heavier than those pistols issued to the other DHSPD officers; an act by SCLAFANI to retaliate against her for providing information to the Department of Justice that incriminated him. This was causing Claimant to not qualify at the shooting range, and because that weapon was a major tool in saving Claimant's life and the lives of others, compromised Claimant's safety.

Thereafter, on or about June 7, 2008, SCLAFANI called Officers Stephen O'Connor and Mike Valentich into his office which was nearby Claimant's location at that time at the DHSPD station. The

7

three of them made horrible and vicious *ad hominem* remarks about Claimant, such as: that Claimant was the dumbest person that he/they knew, that Claimant acted like a bull-dyke, that Claimant was a fat pig, that Claimant smelled bad, and other offensive remarks, including racial epithets; all of which were overheard by Claimant, as she was in the next room. Claimant felt so degraded and humiliated that she gathered her belongings and left DHSPD for the night.

The following morning, June 8, 2008, Claimant related to DHSPD Chief Patrick Williams, what had happened with SCLAFANI, Officer O'Connor and Officer Valentich on June 7, 2008; above-referenced. Chief Williams directed Claimant to call DHSPD Commander Edwin Smith, and to tell him what had occurred.

Claimant called Commander Smith and spoke to him briefly. He asked for Claimant to come into his office within the next several days to talk about the matter, and Claimant did so. Claimant told Commander Smith that she realized that SCLAFANI was upset with her because she had spoken to the Department of Justice about his crimes; including SCLAFANI'S torturing of Jamal White. Commander Smith said that he would talk to SCLAFANI. In fear of retaliation, Claimant explained to him that SCLAFANI had called Claimant into his office recently, and asked her about said FBI / DOJ[25] investigations; above-referenced. Claimant told him that SCLAFANI asked her why would she stand up for a "piece of shit" and not for him. Claimant told Commander Smith that Claimant was not even able to discuss the FBI / DOJ investigations with him at the time. Commander Smith acknowledged that she was not to talk about the FBI / DOJ investigations, and said he would speak to Chief Patrick Williams about it all.

In July of 2009 FBI Special Agent Novak called Claimant and asked her if she could meet him and another FBI Agent in Palm Springs

---

[25] The United States Department of Justice.

soon. Claimant explained to him that she was on medical leave at the time but she would get back to him.

On or about July 23, 2009, Claimant spoke to the (City of Desert Hot Springs) Human Resources Department to ascertain if she was authorized to meet with FBI Special Agent Steve Novak regarding work[26]. Human Resources stated they had spoken to Chief Williams, who said that Claimant should wait until she comes back to work at DHSPD to meet with Special Agent Novak. Claimant post phoned all meetings with FBI at this time, pursuant to said directions by Human Resources.

In August and September of 2009, FBI Special Agent Steve Novak requested that Claimant meet with him at a Federal Building in Los Angeles on October 2, 2009. Claimant was still out on medical leave from work. Claimant asked Special Agent Novak to contact Chief Williams before she met with him, for his approval. Claimant left a voice mail message on Chief William's cell phone, stating that FBI Special Agent Steve Novak was requesting to meet with her.

On or about August 24, 2009, Claimant e-mailed Chief Williams a letter requesting an extension of medical leave, and left a voice message on his cellular phone.

On or about August 25, 2009, Claimant left another message, this time on Chief William's voice mail, to call her back.

On August 27, 2009, DHSPD Sgt. David Henderson was indicted by a federal Grand Jury for one count of violation of 18 U.S.C. § 242; violation of federal constitutional rights under color of authority, for the torturing of Winston Chambers. *United States of America v. David Raymond Henderson*; United States District Court for the Central District of California, Case Number CR 09 00843.

---

[26] The DHSPD.

9

On or about September 30, 2009 Special Agent Steve Novak called Claimant, requesting to meet with her on October 2, 2009 in Los Angeles.

On or about October 01, 2009, Claimant met with Chief Patrick Williams at the DHSPD station in his office. She asked for his permission to take an extended medical leave, because she was having further surgical procedures. She explained to him that FBI Special Agent Steve Novak wanted to meet with her in Los Angeles on October 2, 2009. In response to that statement by Claimant to Chief Patrick Williams, Williams directed Claimant to tell Special Agent Novak that she was unable to drive to Los Angeles, due to her recovery from surgical procedures. Chief Williams directed Claimant to tell Agent Novak that he would either have to wait until Claimant came back to work, or Agent Novak needed to drive to Palm Springs to meet with Claimant. Chief Williams said he had not spoken to Special Agent Novak himself and knew nothing. Chief Williams told Claimant to take her time coming back to work, and that he would expect her to return to work after Christmas 2009.

On or about October l, 2009, pursuant to Chief Williams directions to Claimant, Claimant called and left a telephone message for Special Agent Steve Novak, stating that she had spoken to Chief Patrick Williams, and that either she needed to post phone their meeting, or that he would have to drive to a Palm Springs location to meet with Claimant.

On or about October 5, 2009 FBI Special Agent Steve Novak called Claimant and said he had left a message with the Chief Patrick Williams for Special Agent Novak to meet with Claimant.

On or about October 8, 2009, FBI Special Agent Steve Novak again called Claimant and asked her to meet with him.

10

On or about October 16, 2009, Claimant provided DHS Human Resources and DHSPD Chief Williams with a doctor's note for a longer extension of Claimant's medical leave.

On or about October 20, 2009 Claimant met with FBI Special Agent Steve Novak and Assistant United States Attorney Steve Arkow at the Palm Springs FBI office. FBI Special Agent Novak said he had spoken to Chief Williams on the telephone, and that he had confirmed the meeting with Commander Edwin Smith.

On or about October 21, 2009 Claimant received an e-mail from Chief Patrick Williams. Claimant called Chief Patrick Williams on his cellular phone and spoke to him briefly. Chief Williams said that Claimant did not hold-up her "end of the bargain". Claimant asked Chief Williams what he was talking about, and Chief Williams told Claimant that he did not want Claimant to have met with, or to meet with, the Justice Department.

On or about November 19, 2009 Claimant received a telephone call from Commander Kate Singer to confirm that the date for Claimant's return to work at DHSPD was November 23, 2009. Singer told her to return to duty on that date, but not to wear a police uniform (only civilian clothes) and not to carry her duty weapon until Claimant qualified on the shooting range on November 24, 2009. Commander Kate Singer also told Claimant that she needed to ride in the marked Patrol vehicle with Officer Paul Tapia (an officer for a short amount of time and still on probation status at DHSPD).

On or about November 19, 2009 Claimant returned to work from her medical leave. Claimant followed orders to wear civilian clothes and not to carry her duty weapon, as directed by Commander Singer. While Claimant and DHSPD Officer Tapia responded to a call of Domestic Violence and False Imprisonment call for service (and thereafter), Officer Tapia asked Claimant to start taking police reports. Claimant was approached by citizens and by co-workers, and asked

11

why she was not wearing a police uniform. Claimant felt embarrassed and humiliated, because she had worked with the public and other agencies as a regular sworn police officer for over twelve years by that time.

Claimant was, therefore, placed in dangerous situations by said orders, especially by policing without a police uniform, and by not carrying her duty weapon. This was unacceptable to Claimant, and was another form of continuous harassment of Claimant for telling the Justice Department about the criminal actions of SCLAFANI, HENDERSON and other DHSPD officers.

Claimant asked her on-duty watch commander, DHSPD Sgt. Radames Gil, why she was told not wear a Police Officer's uniform, and not to carry a gun while she was out in the field. Sgt. Gil said that Claimant was on the "hit list", and it did not matter; that she was being targeted to be fired from the DHSPD. DHSPD Sgt. Eddie Cole also told Claimant that the department was looking to fire Claimant, and to demote him, because he too had testified before the Federal Grand Jury that was investigating DHSPD, and for providing incriminating information to the Justice Department regarding the Excessive Use of Force (and other crimes) by SCLAFANI and HENDERSON[27].

November 25, 2009, Claimant arrived at DHSPD to work and wore her uniform even though Commander Singer told her not too. This was embarrassing and humiliating to Claimant in front of her peers and public. This conduct allowed other officers to doubt Claimant's credibility and to destroy her reputation as a long-time experienced police officer.

While Claimant was wearing her police officer uniform, she was immediately questioned by newly appointed Sergeant Gus Paiz why

---

[27] Sgt. Eddie Cole was later demoted from a sergeant to a police officer on Feb. 27, 2010 due to his cooperation with FBI.

12

was she wearing a police officer uniform[28]. Sgt. Paiz said he was told by Commander Singer that Claimant was to shred her old reports all day. While Claimant was doing so, SCLAFANI came in the room and started laughing. He asked her what she was doing, and made comments that Claimant was a Veteran officer and now a paper shredder. SCLAFANI said Claimant was on the" hit list" and that Claimant only needed to be concerned about being "fired", but he had to worry about going to prison and losing his family.

On or about November 29, 2009 Claimant was directed to ride with a newly hired DHSPD Police Officer Paul Tapia for the week. He had been out of Law Enforcement for about one or two years. Claimant was told to observe him on calls by Commander Singer, which was insulting and demeaning, as Claimant had been a long time and experienced police officer with the department, who also achieved a P.O.S.T. Field Training Officer Certificate[29], for many years, and Officer Tapia was a newly hired officer was and still on employee probation[30]. Claimant felt humiliated and embarrassed that she was being treated like a new trainee police officer and was ordered to ride with newly hired Officer Tapia.

On or about December 8, 2009 FBI Special Agent Steve Novak called Claimant regarding her appearance to testify before the Federal Grand Jury that was investigating the DHSPD, and she received a federal

---

[28] Sgt. Paiz was good friends with retired Lieutenant David Henderson and Sgt. Sclafani, both of whom were facing Federal Indictment for the Excessive Use of Force under color of authority; 18 U.S.C. § 242.

[29] Completed / issued 7/21/06.

[30] On or about November 30, 2009 Claimant was approached by Officer O'Connor at the DHSPD station. He told Claimant that he had been off work for approximately three or four months for a medical leave, but when he returned he did not have to ride with anyone. He asked Claimant why she thought she had to drive with Officer Tapia especially since she was a veteran officer of twelve years. This was an example of Claimant being treated differently from other officers that had been off of work in the past creating a hostile work environment.

13

Grand Jury subpoena for her to testify before said Grand Jury. Claimant told him that he needed to contact DHSPD Chief Patrick Williams or Commander Edwin Smith.

On or about December 8, 2009, all DHSPD officers were told to attend an emergency DHSPD Police Officer's Association ("POA") meeting at South of the Border restaurant. When Claimant arrived, SCLAFANI and several of the newly hired DHSPD officer's did not speak to her, and sat on the other side of the restaurant from Claimant. SCLAFANI was in charge of the meeting, and asked Claimant if she thought that it was fair how Claimant was being treated; like a new "Boot"[31].

Officer Tapia ordered food, and verbally / vocally emphasized how he wanted extra *"cheese"*, and kept repeating himself; referring to Claimant being considered a *"rat"* by the DHSPD. SCLAFANI and the other officers laughed with Officer Tapia at his *"cheese"* comments. It appeared that most of the officers were new hired officers, that were on probation with the department. SCLAFANI was in charge of the hiring and firing at DHSPD at this point in time, and Claimant felt intimated by SCLAFANI being in such a position. Claimant later called DHSPD Officer Rex, to voice her concern about being treated poorly by the DHSPD, as he was the POA President. Claimant told him that she was called to testify before the federal Grand Jury on the following day.

On or about December 10, 2009, Claimant testified before a federal Grand Jury that was investigating the DHSPD at the United States Courthouse at 312 North Springs St. Los Angeles, California. Claimant called Commander Edwin Smith after she so testified, and told him that it appeared that the court was taking the allegations against DHSPD seriously. Commander Smith said he would speak to Chief Williams about the matter.

------

[31] A rookie officer.

On or about December 23, 2009, Claimant was on patrol and called into the DHSPD office and she observed SCLAFANI walking out of the same office. Sgt. Paiz told Claimant that Commander Singer told him that she had a problem; that Claimant had not turned in enough reports for the week as a veteran officer. Sgt. Paiz said he explained to her that the shift was at minimum staffing during the week and it was busy. Claimant asked him what report was he referring to, and he said a report that was generated in July of 2009 referring to a robbery report of an Ice Cream vendor. He said the element of the crime was missing on the report. Claimant told him that she was subpoenaed for court on the case about a week ago and that the District Attorney made no mention of any problems with the report. The suspect(s) / defendant(s) were convicted in the case. A few minutes later, DHSPD Detective Larry Essex asked Sgt. Paiz to look over his report before he submitted it for filing with the DA. Detective Essex told him that he always seemed to be missing something. Sgt. Paiz told him he needed to add the first name of subject and time of arrest to his report. Claimaint was treated differently from other officer's and this was a form of discrimination and hostile work environment.

Thereafter, also on or about December 23, 2009, Claimant was placed on a "discipline program" called ("PIP"); Performance Improvement Plan and was given an evaluation for the periods of January 1, 2007 through August 20, 2009; a two year evaluation which Claimant had never received in her tenure at the DHSPD. Claimant was given an evaluation by Sgt. Ken Peary (a newly hired Sergeant, still on probation with the department). Claimant was told that her performance was considered below standards and was placed the PIP for the next 90 days; notwithstanding that Claimant's performance was well above DHSPD standards. Claimant was subjected to this obloquy and humiliation (another adverse employment action), because Chief Williams was upset that Claimant met with the DOJ / FBI against his wishes. The PIP is normally a way the DHSPD "dissects" a police officer, in order to put together enough (bogus)

15

paperwork (personnel file) to terminate the officer, when there are no legitimate grounds to do so.

On or about December 23, 2009 through January 16, 2010, Claimant was sent on high risk calls for service, without back-up, such as traffic stops, parole searches, burglary alarm calls, robbery alarm calls, pedestrian stops, party & loud music calls, subjects fighting, domestic violence calls, etc. Claimant was also "benched" to work on reports in the DHSPD station[32]. Claimant was also demoralized, as her fellow officers were telling her that she was on the *"hit list"* and was going to be fired.

On or about January 17, 2010 through January 29, 2010, Claimant was assigned patrol cars with damaged radio's, and was unable to hear the DHSPD emergency radio traffic. Claimant was also assigned patrol cars that wouldn't start. Claimant had the computer taken out of her patrol vehicle by other DHSPD officers. Claimant was also logged-out of the computer on various times by others. In addition, Claimant was told by Sgt. Paiz that her integrity was being questioned because the DHSPD administration did not believe that Claimant was writing her own police reports, and that Detective Henson wrote her reports for her. This was untrue and was made up by SCLAFANI and his co-conspirators.

On or about January 29, 2010, Claimant met with the DHSPD computer technician, who stated that he could not find a problem with her computer log on and there was no known audit. Claimant felt that she was being harassed by her fellow officers. She was not receiving fair treatment like the other officers.

On or about January 30, 2010, Sgt. Paiz told Claimant that she did not appear to be a team player, and asked her if she felt like she was part of the shift. He gave Claimant a photo copy paper that stated *"team*

---

[32] Taken off patrol duties. Another adverse employment action.

16

*player"*. Claimant explained to Sgt. Paiz how degrading his question was, and as a veteran officer she had never had any complaints of being a team player.

On or about February 4, 2010, Claimant received a subpoena to appear in Indio – Riverside County Superior Court on an embezzlement felony case. Claimant was approached by newly hired District Attorney Brad Braaten. He was laughing and told Claimant that he had received a copy of a documentation of Claimant's performance evaluation, that stated that Claimant was on trainee status. He said he thought it was funny and a joke. Claimant felt humiliated and believed the documentation was sent intentionally to the District Attorney's office; another violation of Claimants right to privacy of her personnel files pursuant to Cal. Gov't Code § 3300 et seq.

On or about February 4, 2010 Claimant returned to the computer station that she had been working on and the other computers were occupied at the time she walked in. Claimant sat down at the computer and observed a Chocolate milk carton (which referred to her; a member of the African-American race). Officer Steinhous said that they could have used Claimant on patrol today to help out. Claimant explained to him that she had been subpoenaed to court.

On or about February 10, 2010, SCLAFANI was indicted by a federal Grand Jury on two counts of violation of 18 U.S.C. § 242; violation of federal constitutional rights under color of authority, for his torturing of Angelica Vargas and Jamal White; *United States of America v. Anthony Sclafani*; United States District Court for the Central District of California, Case Number CR 10 00163. Claimant was a witness for the government in that case, against SCLAFANI, and her statements to the government (DOJ) about SCLAFANI'S conduct resulted[33] in said Indictment.

---

[33] Or at least contributed to.

On or about February 11, 2010 Claimant was called into Commander Singer's office and met with her and Sgt. Paiz. Claimant was told by Commander Singer that she was being placed as a trainee officer and assigned to Officer Tapia (Tapia received a Field Training Certification in January 2010)[34]. This appeared to be another clear sign to Claimant that she was being harassed by the DHSPD Administration and fellow DHSPD officers. Claimant was told that she was going to start like a new trainee, and would go through all of the phases of what a newly hired officer would endure. Commander Singer said she just felt the PIP was not working out for Claimant and the department wanted to give Claimant every opportunity before they had to take other measures.[35]

On or about February 11, 2010, while on "Trainee status" with Officer Tapia ("FTO"[36]), Claimant was asked to sit in the passenger seat while he drove the vehicle to show Claimant how to drive.

On or about February 16, 2010, Officer Tapia told Claimant that he needed to handle calls as if she had no back-up officer available. Claimant told him that was an officer safety issue. He told Claimant that she needed to prove herself and that she had to pretend that there were no officers available. He said she was still on probation so basically he had to do what he had to do. He said that Claimant must

---

[34] Singer had no legitimate examples of said allegations, and it was evident that Claimant was being run out of the DHSPD because of her complaints of criminal conduct to the Justice Department, and because of her having testified before a federal Grand Jury that was investigating allegations of criminal conduct by approximately 8 DHSPD officers; especially and including SCLAFANI and HENDERSON.

[35] Again, this was part of an ongoing conspiracy that included Chief Williams, Commander Singer, Sgt. Sclafani, Sgt. Henderson, and other DHSPD officers to retaliate against Claimant for her complaining to the Justice Department about criminal conduct by approximately 8 DHSPD officers; especially and including SCLAFANI and HENDERSON.

[36] Field Training Officer.

understand what they were doing, and he didn't have a choice in the matter, and that he was just doing what he was told to do regarding Claimant.

On or about February 16, 2010, at a Community Policing Meeting at Tedesco Park, Claimant was speaking to the community about any problems they were having in their neighborhood or businesses. Chief Williams was also present, along with Sgt. Paiz and Officer Steinhous. A member of the community asked Claimant a question, for which, Claimant asked for feedback from Chief Williams. Chief Williams told Claimant directly that she was not to speak to him.

Claimant felt humiliated, because he had been speaking to Officer Steinhouse and Sgt. Paiz just minutes before. About five to ten minutes later, Chief Williams made eye contact with Claimant and got up and left the meeting.

On or about February 18, 2010, Officer Tapia placed Claimant in unsafe situations, by insisting that she conduct traffic stops and vehicle searches by herself. Claimant had to handle all of the high risks calls to the point where she was basically handling all of the calls by herself. At times, Tapia would yell at Claimant; even in front of suspects. Claimant told Tapia that she was more than capable of handling situations, but that she needed to have assistance or she could get harmed. Tapia told Claimant to pretend there was no back-up available. Claimant felt this type of treatment was unsafe for her and for the public. The work environment was unsafe, hostile, a form of retaliation, and was getting worse as each day went on.

Officer Tapia asked Claimant to pretend in the back parking lot that she was a suspect. He told Claimant that he wanted to demonstrate how Claimant should handle a suspect. He asked Claimant to spread her feet apart and proceeded to put handcuffs on her. Claimant told him that she did not see how this was necessary and was very

19

embarrassing in front of the other DHSPD officers. Officer Tapia said that Claimant needed to be more of a bitch.

On or about February 18, 2010, Officer Tapia, Officer Jason Hunter and Claimant were in the report room typing reports. Officer Tapia asked SCLAFANI if he wanted to get some coffee from Starbucks. Sgt. SCLAFANI replied: "No they don't serve coffee in federal prison". SCLAFANI told Officer Tapia that he would have to get use to "jail house coffee", and asked Officer Tapia (by yelling) if he ". . . ever tasted jail house coffee." Claimant felt intimated and that SCLAFANI was directing his conversation towards her, as though it was her fault that SCLAFANI was now facing federal felony criminal charges.[37]

On or about February 22, 2010 DHSPD Detective Jim Henson told Claimant that SCLAFANI approached him earlier that day and asked if Claimant was stressed. SCLAFANI told him the most that Claimant needed to worry about was being fired, but he had to worry about going to prison.

On or about February 23, 2010, Claimant observed a photo copy of a picture of a little girl with her mother reading a book called *"Becoming a Bitch"*. Claimant believed that it was meant for her, and felt harassed by this. The name listed on the bottom was: *ms.cathedralcity.gov/exchange/GMendoza/Inbox/FW:%20Secredt%20 Book...2/20/2010.* Detective Jim Henson came into the DHSPD report room and told Claimant to save the poster because he believed it was meant for her, and that she might need it later. Claimant took possession of the poster and made photo copies.

The police officer, Gabrielle Mendoza, was employed by the city of Cathedral City Police Department ("CCPD") at the time. The city of Desert Hot Springs Police Department paid for two officers contracted from CCPD. Officer Mendoza was one of the officers. Officer Mendoza

---

[37] For torturing Angelica Vargas and Jamal White.

harrassed Claimant on about five occasions, which was only a small portion of the harassment that she endured since making a report to FBI about SCLAFANI and other DHSPD officers.

On or about February 26, 2010, DHSPD Detective Jim Henson told Claimant that SCLAFANI had called his cellular phone and told him that he needed some type of bail money for the federal charges against him, above-referenced, and he needed some collateral.

On or about March 1, 2010 Claimant spoke to FBI Special Agent Steve Novak regarding the retaliation / treatment that she was enduring at work. She expressed her concern over her job because she was told almost daily by her fellow officers that she was on the "list" to be fired.

On or about March 7, 2010 Sgt. Paiz offered overtime hours to several new hire officers, but not to Claimant, who Paiz told was not eligible for overtime hours, because she was considered a trainee; notwithstanding the fact that she was the most senior officer with DHSPD 1996. This was another example of hostile work environment and Claimant was denied working any overtime (loss of money). In the past years, Claimant had always worked many shifts of overtime and was never denied until now.

On or about March 7, 2010 SCLAFANI told Officer Tapia that he wanted to meet with Claimant in his back office. Claimant met with SCLAFANI, who was very aggravated. He said while he was recently driving home from work and got a telephone call from his attorney. The attorney told him he was being indicted for criminal charges and needed to turn himself in within the next thirty days. SCLAFANI asked Claimant what she told the FBI about his involvement with the female arrestee (referring to Angelica Vargas.) SCLAFANI said Claimant couldn't have seen anything because nothing happened. SCLAFANI stated all Claimant needed to worry about was being fired, but he had to worry about being sent to prison. The conversation continued to

21

the point where SCLAFANI said he had a trainee once that did not listen properly when it came to shooting techniques. He said he later found out the trainee had been shot and killed because he didn't take his gun out fast enough. SCLAFANI said he did not want to see that happen to Claimant. SCLAFANI suggested to Claimant that she take a stress leave, and think about retiring. SCLAFANI was influencing other officers and administration to threaten Claimant's employment and safety.

On or about March 9, 2010, at a Training hosted by Riverside County Sheriff's Department for Perishable Skills Training, Officer Phillip Weigle (DHSPD officer), the other officers in the class said they heard Claimant was a veteran officer and had been placed as Trainee. Claimant was so humiliated and embarrassed; it appeared that Claimant's reputation as a police officer was sabotaged and tarnished.

On or about March 9, 2010, Claimant attended training the second day at the Ben Clark Training Center. She received a text message from Sgt. Gil telling her it was urgent for her to come back. He said that Claimant's trainee observations needed to be signed again because he had to change the wording. He said the administration wanted him to use stronger language. He again reminded Claimant that she was on the list to be fired. This was another threat of Claimant's employment ending.

Also that day, Claimant called SCLAFANI on his cellular phone. She asked for him to work it out so that the hostility and retaliation would stop. SCLAFANI said that Claimant should consider taking a stress leave and to use his name or Officer Tapia's name for the stress complaint. He said he wasn't worried about it and to do what Claimant needed, in order to survive. In the conversation that took place it appeared that SCLAFANI had no intentions of stopping or backing off so that Claimant could go to work as she normally had the previous years. It appeared out of control.

22

On or about March 17, 2010, DHSPD Officer Raul Sandoval was assigned as Claimant's F.T.O. (new hire on probationary period and received F.T.O. certificate January of 2010). Claimant was dispatched to a call of a possible man with a gun. The dispatcher advised the suspect was carrying possibly a rifle, walking with three to four other males subjects dressed in dark clothing. The suspects were last seen near the vacant field of Pierson/ Mission Lakes.

While enroute to the call, Officer Sandoval told Claimant to explain to him what she was going to do. Claimant told him she was going to set up with other units and check the area. He asked Claimant if she was going to take her handgun out. Claimant said "No", that she was going to take the AR-15 rifle out of the vehicle. She looked at the AR-15 rifle that was locked in the gun rack in the vehicle as usual but she discovered there were no bullets and the entire magazine was missing from the rifle. Claimant asked Officer Sandoval where the bullets were to the rifle. Officer Sandoval said he stored them tucked in the side panel of the driver's door. At that point, Claimant felt that her life was being threatened and her safety was in danger. Claimant observed another police unit arrive to the scene. The officer never stopped to make contact and continued driving by Claimant. It was fortunate at the time, that Claimant did not come into any contact with an armed suspect but the situation was a clear sign that she was being retaliated against, and working in a hostile environment.

On or about  March 17, 2010, Claimant had been called in the office by SCLAFANI to inspect her gun. This was unusual because in the history of her employment, Claimant was never asked by SCLAFANI to keep inspecting her gun. This appeared to Claimant to be another form of continued harassment and retaliation by SCLAFANI. Claimant was not quite sure why SCLAFANI continued to ask to look at her gun. Claimant  did not trust him or what he was capable of by this point.

EXHIBIT B - 26

On or about  March 18, 2010 Claimant called FBI Special Agent Novak's cellular phone number regarding her employment being threatened, and that she needed to meet with him. Special Agent Novak said that he would call her back with a date to meet. Also on that same day, Claimant texted SCLAFANI on his cellular phone, requesting the retaliation to stop. Claimant met with SCLAFANI and Sgt. Gil was present.  A short time later, Claimant told them that she had spoken to the FBI about the retaliation that she was receiving at work.

Claimant told SCLAFANI that she believed that she was being retaliated against because of her testimony before the federal Grand Jury that Indicted SCLAFANI. SCLAFANI denied having any involvement in the threats that she was receiving regarding her employment.  On the same date, March 18, 2010, Claimant was called into the DHSPD office to meet with Commander Singer and Sgt. Gil. Commander Singer said that Claimant's fellow officers reported to her that she had officer safety issues. Commander Singer said it appeared that Claimant lacked confidence, and referred to a call regarding an evaluation of 5150 WIC - elderly female. Commander Singer said Claimant took too long on the call. She said she received complaints from Claimant's fellow officers that she had officer safety issues, because her searching techniques of suspects were outdated. Claimant had never had any prior complaints in the past twelve years of her employment with DHSPD of any officer safety issues. She was not able to give Claimant any valid examples of Officer Safety issues that involved Claimant. Commander Singer said she was sending Claimant to an Officer's Survival course at the San Bernardino Sheriff's Training Center; training that was set-up by SCLAFANI.

Thereafter, Claimant was also notified that she was being sent to attend a Requalification Academy with Orange County Sheriff's Department. The course was designed for person's who needed to renew their POST certificate. Claimant did not fall into that category because she had an Advanced Post Certificate. Commander Singer

said if Claimant passed the academy, that she would then have a meeting with herself and Chief Williams to ascertain if Claimant was able to keep her employment with the city of Desert Hot Springs. Claimant asked her on what grounds was Chief Williams looking to fire her. Commander Singer said she could get "rid" of Claimant because of her attitude. Claimant apologized to her and told her that she very much needed her job. This was the last day (March 18, 2010) that Claimant had worked as a police officer on patrol for DHSPD, and due to the ongoing harassment and retaliation, and continued threats of being fired, Claimant believed that her only alternative at that point was to take a stress disability leave as, SCLAFANI had suggested; above-referenced. Claimant was afraid that she was going to be fired for an invalid reason, and if she continued working there (DHSPD) under the conditions described above, that her personal safety was unreasonably at risk. Claimant reasonably believed that said continued harassment / retaliation being perpetrated against her may also result in Claimant being killed or seriously injured while performing her police duties. She could not continue to function under these conditions, and became terribly stressed-out[38] from the continuous acts of harassment / retaliation; above-described.

Accordingly, at that time, Claimant contacted Dr. Daniel Watson, and took a leave of absence due to mental and emotional distress / stress; especially being afraid for her personal safety.

On or about March 22, 2010, Claimant called Commander Smith via cellular phone and told him that she had another appointment to meet with FBI Special Agent Steve Novak. He directed Claimant to call Commander Kate Singer and advise her, which Claimant did.

---

[38] And, with SCLAFANI still at DHSPD, reasonably scared that SCLAFANI and his co-conspirators may just get Claimant killed on duty.

On or about  March 22, 2010, said FBI meeting was cancelled per Special Agent Novak. He stated he was working on a confidential detail at the time.

On or about March 29, 2010 Claimant was seen by her physician, Dr. Daniel Watson. Claimant expressed her concerns of feeling unsafe at work; especially because of SCLAFANI. Dr. Watson placed Claimant on medical disability at that time, as he felt that Claimant was not safe (under her working conditions, above-described), and that she was mentally unable to work under said above-referenced working conditions (i.e. continued acts of harassment and retaliation, including setting-up Claimant to be killed or injured, such as for lack of officer back-ups.)

On or about March 29, 2010 Claimant received a text from Sgt. Gil, stating it was urgent that she call him. He told Claimant that Chief Williams told him that she was not to meet with the FBI on this date (March 29, 2010)  because she was not able to work (disability leave.) Claimant called Special Agent Novak and passed on the details of what Chief Williams told her. Claimant cancelled the meeting.

On or about March 29, 2010 Claimant made a Worker's Compensation claim with DHS Human Resources.  SCLAFANI was assigned as Claimant's Training Supervisor, and he was leading the charge to get Claimant out of the DHSPD.

On or about  April 6, 2010, then Retired DHSPD Sgt. David Henderson and SCLAFANI surrendered on their federal Indictments; above-referenced.

On or about  April 15, 2010, Commander Smith called Claimant and stated that Claimant was subpoenaed for court, and to contact DDA Roderick.

On or about  April 17, 2010, DHSPD Officer Jim Henson told Claimant
that SCLAFANI called his cellular phone and told him that Chief
Williams waived the Administrative Leave rules and stated even
though he (SCLAFANI) was placed on Administrative Leave he was
permitted to contact any co-workers and fellow officers that he
desired to contact. Claimant felt intimated and terrified that SCLAFANI
was calling her boyfriend (Henson) who was at her house.

On or about May 15, 2010, Claimant had a Worker's Compensation
appointment rescheduled, due to short notice and being out of town.
Claimant was requested to meet with Dr. Strong when she came to
Palm Springs which was rescheduled with Worker's Compensation
official Danny Fernandez

On or about  July 7, 2010, Claimant had a Worker's Compensation
examination scheduled appointment. Claimant went to Dr. Strong's
office, and met with the receptionist ("Olivia") at Dr. Barbara Strong's
office. Claimant was told that someone had cancelled her
appointment. Claimant explained to Dr. Strong that she did not cancel
the appointment. Dr. Strong said she would not be able to see
Claimant since someone had cancelled her appointment for that date.

On or about  July 7, 2010, Claimant called the office of Dr. Strong and
spoke to the receptionist; Olivia. She stated according to her records
Danny Fernandez from Worker's Comp had cancelled her
appointment. This was without Claimant's knowledge. Claimant  then
spoke to Mr. Fernandez on or about that date. Mr. Fernandez stated
the City of DHS had obtained an attorney and that Claimant would
have to wait until the attorney scheduled a doctor's appointment for
her.

On or about  August 30, 2010, DHSPD Commander Smith called
Claimant and stated that he needed to meet Claimant to give Claimant
paperwork that was needed for IPD. Claimant met him in DHS at the 7-

27

11 store.  He stated if Claimant was to meet at the station it would cause a lot of chaos at that time.

On or about September 6, 2010, Claimant was directed to fax paperwork to Commander Smith for IPD.

On or about September 9, 2010, Claimant met with Internal Affairs Investigator Jeff Love at Lackier & Diemmer, in their Upland, California office, to make a formal complaint against SCLAFANI regarding Claimant's hostile work environment (retaliation and harassment.)

On or about September 20, 2010, Claimant was contacted by Commander Smith, who called and stated that he needed to meet with Claimant regarding a records download for her taser.

On or about  September 9, 2010, Claimant met with Commander Smith at the DHSPD and provided him with her taser.

On or about  September 29, 2010, Claimant observed David Henderson and his girlfriend, Laura Scully, at Walmart, about 8:30 am. After walking around Claimant observed Scully following her down several isles of the store. Claimant then observed a male subject that resembled Henderson (possible a relative) following Claimant on every isle of the store and out of the store into the parking lot. Claimant observed Henderson's truck parked in the parking lot with him sitting in the driver's seat. Claimant felt afraid for her safety and called her boyfriend Jim Henson. He was currently at work (DHSPD). Claimant then called her daughter's father, Kendall Johnson, to meet Claimant, because she was afraid for her safety; especially in light of the sadistic and depraved David Henderson following her, which he did. Claimant then drove nearby because she observed a motor cycle police officer. Claimant parked her vehicle and did not notice Henderson's vehicle at that time.

On or about  October 20, 2010, Claimant received a call from Commander Smith regarding IPD paperwork.

On or about  November 10, 2010, Claimant called CCPD Captain Conner and advised him that she was receiving annoying and harassing phone calls from Officer G. Mendoza (in violation of CPC 653(m.) Claimant explained that she was already going through a difficult situation and was home from DHSPD. Captain Conner said that he would call her in the office and advise her that she was going to be listed as a suspect and myself as a victim, and at this time Claimant was non-desirous of prosecution, but told him she needed to stop calling her or Claimant would file a criminal complaint against her.

On or about  November 23, 2010, Claimant  received a call from 760-200-9431. Unknown caller hung up the phone. Claimant called Jim Henson and told him to tell Officer Mendoza to stop calling Claimant.

On or about  November 29, 2010, Claimant  received a call from a restricted number. Claimant recognized the caller's voice as Officer G. Mendoza. She asked someone what the deal was. Then she screamed "Fuck where my car is "and hung up the phone. Claimant called Jim Henson and advised him about her calling Claimant and told him to tell her to stop harassing Claimant.

On or about  December 1, 2010, Claimant called Officer Eddie Cole and explained that Officer G. Mendoza was calling her on a regular basis and was harassing Claimant. Claimant asked him if he could talk to her and tell her to stop calling or she was going to seriously report her harassing Claimant.

In December of 2010, Officer Mendoza was hired full time at Desert Hot Springs Police Department as a Sergeant.

EXHIBIT B - 32

On or about  January 1, 2011, FBI Special Agent Novak called Claimant advised her that the court dates were rescheduled for Sgt. Sclafani and/ David Henderson for March 29, 2011.

On or about  February 7, 2011, DHSPD Detective Jim Henson said he was advised that he had to meet with Commander Bressler and Sgt. Perry on February 9, 2011. He was nervous because he thought he was going to be retaliated against because he and Claimant were continuing to date.

On or about  February 9, 2011 Detective Jim Henson told Claimant that during the meeting that Commander Bressler asked him if he and Claimant were still dating. Henson said Commander Bressler also asked him about SCLAFANI'S court date coming up; he wanted to make sure there was no "off duty" issues with the stress.

On or about  February 2, 2011, SCLAFANI returned to work at DHSPD after the federal Indictment on both counts of Civil Rights Violations had issued.

On or about  March 1, 2011, Dr. Job Lopez wrote Claimant a letter to return to work. Claimant sent a copy to Human Resources.

On or about  March 2, 2011, Detective Jim Henson gave Claimant  a large envelope that he stated Sgt. Peary told him to give to Claimant. Claimant observed a letter from POA regarding a meeting for officers currently working at DHSPD to attend. Claimant felt this was done to intimidate her.

On or about  March 10, 2011,  Dr. David Kauss wrote Claimant a letter to return to work, but to have no contact with SCLAFANI.

On or about March 14, 2011, Dr. Daniel Watson wrote Claimant a letter to return to work at DHSPD, but to have no contact with SCLAFANI due to fear of safety.

On or about March 23, 2011, 03/23/11 Claimant contacted Human Resources (Letty Gallegos-Gallardo,) who stated that she received the letter but stated she wasn't sure if the Police Department could accommodate her.

On or about April 25, 2011, Claimant again met with FBI Special Agent Novak, Assistant U.S. Attorney Steven Arkow and Assistant U.S. Attorney Cheryl O'Connor at the United States Courthouse. Claimant expressed her concerns that SCLAFANI was working at the Police Department while Claimant was being denied to go back to work for DHSPD.

On or about April 28, 2011, Claimant attended a FFDE with Dr. Ari Kalechstein. Dr. Kalechstein stated he had been provided letters from fellow officers against her. Dr. Kalechstein audio recorded the entire session and stated he was going to provide the recorded conversation to City Attorney of Desert Hot Springs. Claimant verbally told him that she did not want the City Attorney to have her recorded doctor/client communications, due to it being privileged information, and privileged under HIPPA law. Union Representative Dale Nowicki wrote Dr. Kalechstein a letter immediately revoking any release of the audio recorded conversation.

On or about June 18, 2011, Claimant received a certified letter from DHSPD stating that she was the focus of an internal affairs investigation being conducted by Commander D. Bressler. The allegations was (on or around October of 2010) Conduct Unbecoming a Police Officer; alleging that Claimant made telephone contact with a member of another law enforcement agency which was annoying, threatening and malicious. This was alleged to have been done in violation of DHSPD Policy Manual Section 340.3.5(aa).

On or about June 27, 2011, Claimant called Commander Bressler and left a voice mail message regarding the investigation.

31

On or about June 30, 2011, Claimant obtained a reply from Dr. Ari Kalechstein regarding the FFDE, that stated that he referred to letters written by fellow officers, and his examination revealed that Claimant was not presently fit for duty to work as a DHSPD police officer, but that Claimant's condition was treatable.

On or about July 23, 2011, Internal Affairs Investigation Attorney Kasey Castillo from Lackier & Diemmer represented Claimant. They met with Commander Bressler, who audio recorded the interview. Claimant provided Attorney Castillo a copy of her phone bill that showed that Sgt. Gabriela Mendoza had called and harassed her on numerous occasions in October through December of 2010.

On or about July 24, 2011, Detective Jim Henson told Claimant that she should resign from DHSPD or take their retirement offer. He stated everyone at the department believed that Claimant would not be able to work. Claimant found this to be a form of intimidation by SCLAFANI by using Henson, indirectly.

On or about August 5, 2011, a notice sent to Attorney Nowicki that the City will proceed to review its obligations to file non-industrial disability retirement for Claimant. Claimant was never notified.

On or about August 9, 2011, the City allegedly sent a follow up letter to Attorney Nowicki about above intention to file non-industrial disability retirement for Claimant. Claimant was not notified.

On or about August 9, 2011, the City of Desert Hot Springs sent a Notice Of Intent To Disability Retire.

On or about August 29, 2011 a quasi - Skelly Hearing (conference) was held for the Notice Of Intent to File a Non-Industrial PERS Retirement.

On or about  August 29, 2011 08/30/11 Claimant sent her response to Chief Williams, advising him that Claimant was able to work and that she disagreed with the City's claims otherwise. She just could not work with SCLAFANI at DHSPD.

On or about  September 13, 2011, Claimant received a Notice Of Decision To Recommend Application for Non-Industrial Disability Retirement from the City.

On or about  October 3, 2011, Claimant was seen by Worker's Comp Doctor Dr. Lawrence Moss.

On or about  October 4, 2011, Claimant was again seen by Worker's Comp Doctor Dr. Lawrence Moss.

On or about  October 6, 2011, Claimant received a call from Sgt. Brian Link, who stated he was conducting a locker inspection, and that he would be available during night shift from 10/17/11 thru 10/19/11 for Claimant's DHSPD locker inspection. Claimant went on 10/19/11 for said DHSPD locker inspection. Her lockers had already been opened and articles from locker #1 were all stuffed into Locker #2. Claimant did not give anyone permission to enter her lockers.

On or about October 12, 2011, Claimant received official notification[39] from Assistant City Manager Jason Simpson (via a letter sent via certified mail 10/6/11) that the City Manager had decided to adopt the recommendations of the Skelly hearing / conference, and that the City would apply for a Non-Industrial Disability Retirement for Claimant on the ground that she was no longer fit for duty as a DHSPD office. The letter also informed Claimant that she had 30 days from the date that she received that letter (dated September 19, 2011, post-dated October 6, 2011 and received by Claimant on October 12, 2011) to

---

[39] And first learned.

appeal the City's decision to apply for a Non-Industrial Disability Retirement for Claimant.

On or about November 7, 2011, Claimant personally met with city clerk requesting a two week extension for said appeal.

On or about November 14, 2011, the City received a response from Dr. Lawrence Moss based on his examination of Claimant, recommending Claimant's return to work.

On or about November 14, 2011, Claimant received mail from her Worker's Comp attorney's office regarding possible unknown file with negative letters against and about her that were provided to FFDE and Worker's Comp attorneys. Claimant discovered letters for the first time written against her by fellow officers.

On or about December 19, 2011, Claimant received a call from Sgt. Larry Essex requesting a review of claimant's taser.

On or about January 23, 2012, Claimant met with FBI Agent Tamara McKen, Assistant U.S. Attorney Cheryl O'Connor about the SCLAFANI criminal trial.

On or about January 23, 2012, Claimant met with FBI Agent Tamara McKen, FBI Agent Steven Novak, and Assistant U.S. Attorney Steven Arkow.

On or about February 2, 2012, an Investigator for SCLAFANI came to Claimant's residence after she had already expressed concern over not wanting him (Tom Crompton) at her residence.

On or about February 2, 2012, two vehicles attempted to run into Claimant's vehicle while she was picking her daughter up from school. License plate 6JTJ389. Claimant called Agent Tamara and advised her of what occurred and she felt that her life was being

34

threatened as a form of witness intimidation for the upcoming (2/9/12) federal felony criminal trial of SCLAFANI.

On or about  February 3, 2012, Claimant received a letter from Desert Hot Springs City Manager Jason Simpson, notifying her, among other things that she was now officially separated from the City of Desert Hot Springs: *"This is to notify you that as of October 21, 2011, you Were no longer considered to be employed by the City of Desert Hot Springs."*

On or about February 3, 2012, Claimant's Medical Insurance coverage from the city stopped.

On or about February 6, 2012, Claimant received e-mails and texts from the DHSPD POA and from Officer Paul Tapia, attempting to dissuade her from testifying against SCLAFANI at his upcoming federal criminal trial. This also put Claimant in fear for her life and safety.

On or about February 9, 2012, Claimant reported said e-mails and texts from Officer Tapia, to FBI Agent Tamara McKen. Claimant was afraid for her safety.

On or about February 13, 2012, Claimant was requested by FBI Agent Tamara to meet in Los Angeles for the SCLAFANI federal criminal trial.

On or about February 13, 2012, Claimant received a call and text from Officer Paul Tapia.  Claimant again was afraid for her safety.

On or about February 13, 2012, Claimant sent Assistant City Attorney Jason Simpson notification that she appealed every portion of the notification of her Separation from the City, and Jason Simpson replied that she filed untimely.

On or about February 29, 2012, Claimant was advised by the FBI that SCLAFANI was found guilty on both felony counts of Civil Rights violations.

Accordingly, Claimant now makes her Amended Claim for Damages for all of the damages and injuries shown above, for, *inter alia*, wrongful termination, violation of California Labor Code § 1102.5, workplace retaliation and harassment, whistleblower retaliation, violations of the Peace Officers Bill of Rights Act, and other claims shown above, all under California state law.

EXHIBIT B - 40

## PROOF OF SERVICE

I declare that I am employed in the County of Orange, State of California. I am over the age of eighteen years and not a party to the within cause; my business address is 4063 Birch Street, Suite 100, Newport Beach, California 92660.

On March 30, 2012, I served:

**AMENDED LAIM FOR MONEY OR DAMAGES AGAINST THE CITY OF DESERT HOT SPRINGS ON BEHALF OF CLAIMANT ANDREA HEATH**

on the interested parties in this action by placing a true copy thereof, enclosed in a sealed envelope, addressed as follows:

City Clerk's Office
City of Desert Hot Springs
65-950 Pierson Boulevard
Desert Hot Springs, CA 92240

( ) BY PERSONAL SERVICE

( X ) BY REGULAR U.S. MAIL AND BY CERTIFIED RETURN RECEIPT REQUESTED PARCEL NO.: 7006 2760 0002 4381 3957, I placed each sealed envelope with postage there prepaid, for collection and mailing at Newport Beach, California, following ordinary business practices. I am readily familiar with the practice that in the ordinary course of business, correspondence is deposited in the United Stated Postal Service the same day as it is placed for processing.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. This 30th day of March, 2012, at Newport Beach, California.

_____
Belinda Breznau

English        Customer Service        USPS Mobile                                                                Register / Sign In



Search USPS.com or Track Packages

Quick Tools                Ship a Package        Send Mail        Manage Your Mail        Shop        Business Solutions

# Track & Confirm

GET EMAIL UPDATES    [ PRINT DETAILS ]

| YOUR LABEL NUMBER | SERVICE | STATUS OF YOUR ITEM | DATE & TIME | LOCATION | FEATURES |
|---|---|---|---|---|---|
| 70062760000243813957 | | Delivered | April 02, 2012, 10:29 am | DESERT HOT SPRINGS, CA 92240 | Certified Mail™ |
| | | Arrival at Unit | March 31, 2012, 7:47 am | DESERT HOT SPRINGS, CA 92240 | |
| | | Processed through USPS Sort Facility | March 31, 2012, 1:13 am | SAN BERNARDINO, CA 92403 | |

## Check on Another Item

What's your label (or receipt) number?

[ Find ]

| LEGAL | ON USPS.COM | ON ABOUT.USPS.COM | OTHER USPS SITES |
|---|---|---|---|
| Privacy Policy › | Government Services › | About USPS Home › | Business Customer Gateway › |
| Terms of Use › | Buy Stamps & Shop › | Newsroom › | Postal Inspectors › |
| FOIA › | Print a Label with Postage › | Mail Service Updates › | Inspector General › |
| No FEAR Act EEO Data › | Customer Service › | Forms & Publications › | Postal Explorer › |
| | Site Index › | Careers › | |

Copyright© 2013 USPS. All Rights Reserved.

EXHIBIT "C"

STATE OF CALIFORNIA          ARNOLD SCHWARZENEGGER, Governor

DEPARTMENT OF INDUSTRIAL RELATIONS

## DIVISION OF LABOR STANDARDS ENFORCEMENT
LEGAL SECTION
320 W. 4th Street, Suite 430
Los Angeles, CA  90013
Tel.: (213) 897-1511
Fax: (213) 897-2877

David Lawrence Bell, *Staff Attorney*

July 2, 2007

Melanie Rasic Savarese, Esq.
Savarese Law Firm
37 West Sierra Madre Boulevard
Sierra Madre California 91024

      Re:    *Sierra Schoonard v. Diamond Bar Montessori*

Dear Ms. Savarese:

I have been instructed to respond to your June 14, 2007, letter to Hearing Officer Martha Huerta, regarding exhaustion of administrative remedies in the above-referenced case. As we discussed over the telephone, to the extent you intend to raise a common law claim of wrongful termination in violation of public policy, as expressed in Labor Code section 1102.5 or Health and Safety Code section 1596.881, you are correct that exhaustion of remedies is not required prior to raising such a claim in a civil action. *See Leibert v. Transworld Systems, Inc.* (1995) 32 Cal.App.4th 1693, 1706.

With respect to a statutory claim under Health and Safety Code section 1596.881, there is no real authority regarding exhaustion of remedies with the Labor Commissioner. Although Section 1596.881 does establish specific timelines for the Labor Commissioner's investigation of such claims, it is not clear whether a court would require your client to exhaust those remedies before proceeding on a statutory claim under Section 1596.881 in a civil action.

As you know, several *federal* courts have held that Labor Code section 1102.5 requires exhaustion of remedies before the Labor Commissioner prior to commencing a statutory claim in a civil action. (*See Neveu v. City of Fresno* (E.D.Cal. 2005) 392 F.Supp.2d 1159, 1179-1180; *Guttierez v. RWD Technologies* (E.D.Cal. 2003) 279 F.Supp.2d 1223, 1225-1228; *Fenters v. Yosemite Chevron* (E.D.Cal.) 2006 WL 2016536, *21-23; *Romaneck v. Deutsche Asset Mangagement* (N.D.Cal.) 2006 WL 2385327, *6-7.)

These federal courts all base their determination that Section 1102.5 requires exhaustion before the Labor Commissioner upon the California Supreme Court's decision in *Campbell v. Regents of the Univ. of California* (2005) 35 Cal.4th 311, 333. *Campbell*, however, did not explicitly rule that Section 1102.5 requires exhaustion of the Labor Commissioner's procedures. Rather, *Campbell* held that a former employee of the Regents of the University of California was required to exhaust the Regents *internal* administrative process for handling whistleblowing claims before filing a civil action for violations of Section 1102.5.

There is some disagreement, even on the federal bench, concerning whether litigants who

wish to pursue a statutory claim under Section 1102.5 must first exhaust before the Labor Commissioner. For example, Judge Morrison, of the U.S. District Court for the Eastern District of California has ruled that "[t]o the extent that *Neveu* interprets *Campbell* as requiring that remedies before the Labor Commissioner must necessarily be exhausted as a prerequisite to suit under § 1102.5, this Court disagrees."

There are no published state court opinions addressing whether the Labor Commissioner's procedures must be exhausted prior to raising a statutory claim under Section 1102.5 in court. In *Murray v. Oceanside Unified School Dist.* (2000) 79Cal.App.4th 1338, 1359-1360, the court held that compliance with the procedure established by Labor Code section 98.7 was not required before an employee could pursue a statutory claim under former Labor Code section 1102.1. In reliance on the *Murray* case, the California Court of Appeal for the Fourth District, in an unpublished opinion, held that Section 1102.5 did not require exhaustion before the Labor Commissioner. *See Cates v. Division of Gambling and Control* (2007) 2007 WL 702229, *11.

The DLSE's position is that the wiser course is not to require exhaustion of Labor Code section 98.7 procedures prior to raising a statutory claim in a civil action.

Labor Code section 98.7 sets forth a statutory scheme whereby any person may file a complaint with the Labor Commissioner if that person believes that he or she as been discharged or otherwise discriminated against in violation of any law under the jurisdiction of the Labor Commissioner. The provision explicitly provides that filing with the Labor Commissioner is discretionary on the part of an aggrieved employee, who "*may* file a complaint" with the Labor Commissioner within six months of the alleged adverse action. The Labor Commissioner is charged with investigating such discrimination complaints and issuing a report and determination of his or her findings. Subsection(c) of Labor Code section 98.7 provides that if the Labor Commissioner makes a finding of discrimination and the employer does not comply with the Labor Commissioner's Determination, then the Labor Commissioner "shall" bring an action in an appropriate court against the employer. In other words, the decision of the Labor Commissioner is not self-executing, but requires the Labor Commissioner to bring an action in court to enforce its findings if and when an employer refuses to comply with the Labor Commissioner's determination. If the Labor Commissioner finds in favor of the employee, the employee is free to pursue his or her claim in court.

Unlike the procedures at issue in *Campbell*, the Labor Commissioner's procedures under Section 98.7 are not quasi-judicial in nature. An employee, for example, will not be able to challenge an adverse finding by the Labor Commissioner in a writ of administrative mandate under Code of Civil Procedure section 1094.5. The ultimate issue in a DLSE investigation pursuant to Section 98.7 is whether or not the Labor Commissioner is going to bring a civil action to enforce the relevant statutory provision. In light of the large volume of retaliation claims processed by the DLSE, it does not make any sense to require a complainant, who is represented by counsel, and is ready and able to bring a claim in court, to file a claim with the Labor Commissioner.

The Legislature appears to have recognized this fact in its enactment of the Private

2

Attorneys General Act (Labor Code section 2699), which provides a procedure for private litigants to enforce certain provisions of the Labor Code. Section 2699.3 contains an exhaustion provision, but it merely requires the litigant to give written notice to the Labor Workforce Development Agency, which then must decide whether or not it intends to investigate the alleged violation. Labor Code section 2699.5 lists the Labor Code sections subject to the procedures described in Section 2699.3, and it includes Section 1102.5.[1]

Since you are seeking to pursue both a common law claim for wrongful termination (which you are free to pursue directly without exhaustion of remedies) and statutory claims under Labor Code section 1102.5 and Health and Safety Code section 1596.881, in the interest of judicial economy and to preserve scarce resources, it is the DLSE's position that you are free to proceed in civil court on those claims, and the DLSE will not, therefore, pursue an investigation in this matter.

If you have any questions or need any further assistance, feel free to call me.

Very truly yours,

_____

DAVID LAWRENCE BELL
Attorney for the Labor Commissioner

---

[1] Labor Code section 2699 provides that the procedures described therein apply "[n]otwithstanding any other provision of law ...." Such language by the Legislature indicates an intent to override all contrary law. *Caliber Bodyworks, Inc. v. Superior Court* (2005) 134 Cal.App.4th 365, 383, n.17.

EXHIBIT "D"



**A MEMORANDUM OF UNDERSTANDING BETWEEN THE CITY OF DESERT HOT SPRINGS**

**AND EMPLOYEES ASSIGNED TO CLASSIFICATIONS REPRESENTED**

**BY**

**CITY OF DESERT HOT SPRING POLICE OFFICERS' ASSOCIATION (DHSPOA)**

**JANUARY 1, 2009 THROUGH DECEMBER 31, 2011**

EXHIBIT D - 1

**MEMORANDUM OF UNDERSTANDING BETWEEN THE CITY OF DESERT HOT SPRINGS AND THE DESERT HOT SPRINGS POLICE OFFICERS ASSOCIATION (DHSPOA).**

FOR THE CITY:                                        DHSPOA

Rick Daniels, City Manager                           Merritt Rex, President DHSPOA

Kim Valente, Human Resources Director                Radames Gil, Board Member

ATTEST:

                                                     Tony Sclafani, Board Member

Jerryl Soriano, Interim City Clerk

Approved by the Desert Hot Springs City Council on December 16, 2008, by Resolution No. 2008-97.

EXHIBIT D - 2

**RESOLUTION NO. 2008-97**

**A RESOLUTION OF THE CITY COUNCIL OF THE CITY OF DESERT HOT SPRINGS APPROVING THE MEMORANDUM OF UNDERSTANDING BETWEEN THE CITY AND THE DESERT HOT SPRINGS POLICE OFFICERS ASSOCIATION**

**WHEREAS,** the City of Desert Hot Springs, a charter city in the State of California, was incorporated in September 1963; and

**WHEREAS,** the City desires to promote and maintain an environment of positive employee and labor relations; and

**WHEREAS,** pursuant to the provisions of the Meyers-Milias-Brown Act (section 3500 et seq., Government Code), representatives of and the City Manager of the City of Desert Hot Springs and the Desert Hot Springs Police Officers Association have met and covered in good faith regarding wages, hours and other terms and conditions of employment; in an attempt to reach a Memorandum of Understanding (MOU); and

**WHEREAS,** the Desert Hot Springs Police Officers Association and the representatives of and the City Manager have reached agreement with respect to matters herewith jointly set forth, and have developed a written understanding of such matters for the purpose of presenting it to the City Council of the City of Desert Hot Springs for its determination.

**Now, therefore, be it resolved,** that the attached Memorandum of Understanding shall be effective as stated therein; and

**PASSED AND ADOPTED** by the City Council of the City of Desert Hot Springs at a regular meeting duly held on the sixteenth day of December, 2008, by the following vote:

AYES, and in favor thereof, Councilmembers: *Baker; Betts; Matas; Schmidt; Mayor Parks*

**NAYS,** Councilmembers:      0

**ABSENT,** Councilmembers:      0

**ABSTAINING,** Councilmembers:      0

ATTEST:

_____
Jerryl Soriano, Interim City Clerk

APPROVED AS TO FORM:

_____
Ruben Duran, City Attorney

APPROVED:

_____
Yvonne Parks, Mayor

EXHIBIT D - 3

## TABLE OF CONTENTS

ARTICLE I: RECOGNITION
SECTION 1 – ADMINISTRATION................................................................. 4
SECTION 2 – UNION RIGHTS ................................................................... 4

ARTICLE II: COMPENSATION
SECTION 1 – SALARY ............................................................................ 5
SECTION 2 – SALARY ADVANCEMENT....................................................... 5
SECTION 3 – ACTING DUTY PAY .............................................................. 5
SECTION 4 – WORKDAY ......................................................................... 6
SECTION 5 – OVERTIME COMPENSATION .................................................. 6
SECTION 6 – HOLIDAY COMPENSATION .................................................... 7
SECTION 7 – CALLBACK.......................................................................... 7
SECTION 8 – PAY PERIODS ..................................................................... 7
SECTION 9 – UNIFORM/EQUIPMENT ALLOWANCE........................................ 7
SECTION 10 – COURT PAY....................................................................... 7
SECTION 11 – POST CERTIFICATE COMPENSATION/EDUCATIONAL INCENTIVE........... 8
SECTION 12 – ASSIGNMENT PAY ............................................................. 8
SECTION 13 – RESIDENCY REQUIREMENT................................................. 9
SECTION 14 – BILINGUAL PAY/SIGN LANGUAGE PAY ................................... 9
SECTION 15 – REIMBURSEMENT FOR DAMAGED PERSONAL ITEMS ............... 9

ARTICLE III: EMPLOYEE PERFORMANCE
SECTION 1 – PERFORMANCE EVALUATION................................................. 9
SECTION 2 – PROBATIONARY STATUS..................................................... 10
SECTION 3 – PROMOTIONAL STATUS...................................................... 10

ARTICLE IV: BENEFITS
SECTION 1 – HEALTH INSURANCE .......................................................... 10
SECTION 2 – LIFE INSURANCE............................................................... 10
SECTION 3 – PUBLIC EMPLOYEE'S RETIREMENT SYSTEM (CalPERS) ............ 11
SECTION 4 – DEFERRED COMPENSATION PROGRAMS ................................ 11
SECTION 5 – STATE DISABILITY INSURANCE (SDI)..................................... 11
SECTION 6 - EMPLOYEE ASSISTANCE PROGRAM (EAP) ............................. 11

ARTICLE V: LEAVES
SECTION 1 – ANNUAL LEAVE ................................................................. 11
SECTION 2 – COMPENSATORY LEAVE ..................................................... 12
SECTION 3 – HOLIDAY LEAVE ................................................................ 13
SECTION 4 – BEREAVEMENT LEAVE ....................................................... 13
SECTION 5 – WORKER'S COMPENSATION LEAVE ...................................... 13
SECTION 6 – MILITARY LEAVE ............................................................... 14
SECTION 7 – LEAVE OF ABSENCE WITHOUT PAY/FAMILY MEDICAL LEAVE................. 14
        ACT/CALIFORNIA FAMILY RIGHTS ACT
SECTION 8   TRAINING LEAVE ............................................................... 14
SECTION 9 – TIME OFF FOR VOTING ....................................................... 14
SECTION 10- CATASTROPHIC LEAVE DONATION....................................... 15

ARTICLE VI: LAYOFF
SECTION 1 – PREREQUISITE FOR LAYOFF ............................................... 16
SECTION 2 – ORDER OF LAYOFF............................................................ 16
SECTION 3 – VOLUNTARY DEMOTION ..................................................... 16
SECTION 4 – RECALL........................................................................... 17

EXHIBIT D - 4

DHSPOA

2

ARTICLE VII: NON-DISCRIMINATION ............................................................................ 17

ARTICLE VIII: HEALTH AND SAFETY
   SECTION 1 – SAFETY RESPONSIBILITIES .......................................................... 17

ARTICLE IX: DISCIPLINE AND DISCHARGE
   SECTION 1 – JUST CAUSE ................................................................................ 18
   SECTION 2 – REPRESENTATION........................................................................ 18

ARTICLE X: GRIEVANCE PROCEDURE
   SECTION 1 – GRIEVANCE DEFINED................................................................... 18
   SECTION 2 – INFORMAL DISCUSSION OF GRIEVANCE ..................................... 18
   SECTION 3 – FORMAL GRIEVANCE PROCEDURE ............................................. 18
   SECTION 4 – NON-DEPARTMENTAL GRIEVANCES ........................................... 20
   SECTION 5 – REPRISALS .................................................................................. 20

ARTICLE XI: APPEAL PROCEDURES
   SECTION 1 – REQUEST FOR DISCIPLINARY HEARING....................................... 20
   SECTION 2 – SCHEDULING OF DISCIPLINARY HEARING ................................... 20
   SECTION 3 – HEARING OFFICER ...................................................................... 20
   SECTION 4 – REPRESENTATION AT DISCIPLINARY HEARING ........................... 21
   SECTION 5 – BURDEN OF PROOF AND EVIDENCE ........................................... 21
   SECTION 6 – CONDUCT OF DISCIPLINARY HEARING........................................ 21
   SECTION 7 – HEARING OFFICER'S DECISION................................................... 21
   SECTION 8 – EFFECTS OF CERTAIN DISCIPLINARY ACTIONS ......................... 21

ARTICLE XII: CITY RIGHTS
   SECTION 1 – EXCLUSIVE MANAGEMENT RIGHTS AND AUTHORITY ............... 22

ARTICLE XIII: MODIFICATION AND DURATION
   SECTION 1 – SEVERABILITY.............................................................................. 22
   SECTION 2 - DURATION..................................................................................... 23

ARTICLE XIV: DHSPOA RESPONSIBILITIES
   SECTION 1 – SERVICE TO THE COMMUNITY .................................................... 23

ARTICLE XVI: DEFINITION OF TERMS
   SECTION 1 – ACTING DUTY .............................................................................. 23
   SECTION 2 – CLASSIFICATION.......................................................................... 23
   SECTION 3 – WORKDAY .................................................................................... 23
   SECTION 4 – DEPARTMENT HEAD..................................................................... 24
   SECTION 5 – EMPLOYEE................................................................................... 24
   SECTION 6 – FULL-TIME.................................................................................... 24
   SECTION 7 – IMMEDIATE FAMILY....................................................................... 24
   SECTION 8 – LEAVE.......................................................................................... 24
   SECTION 9 – MANAGEMENT.............................................................................. 24
   SECTION 10 – POSITION ................................................................................... 24
   SECTION 11 – PREVAILING RATE ...................................................................... 24
   SECTION 12 – SENIORITY ................................................................................. 24

APPENDIX A ............................................................................................................. 25

APPENDIX B ............................................................................................................. 26

EXHIBIT D - 5

**ARTICLE I**
**RECOGNITION**

**SECTION 1 - ADMINISTRATION**

1.1   The City of Desert Hot Springs (hereinafter the "City") recognizes the City of Desert Hot Springs Police Officers' Association (hereinafter "DHSPOA"), in all matters concerning wages, hours and working conditions.

1.2   This Memorandum of Understanding (MOU) is all encompassing and supersedes all previous Memoranda of Understanding entered into between the City and DHSPOA.

1.3   It is agreed that this Memorandum of Understanding (MOU) was negotiated pursuant to Chapter 10 (Section 3500 et. Seq.) of Division 4, Title 1 of the Government Code and pursuant to Resolution No. 2006-82 Employer – Employee Relations Resolution of the City of Desert Hot Springs.

1.4   The DHSPOA recognizes the City Manager and/or designee as the exclusive representative of the City for purposes of executing this MOU.

1.5   The City and the DHSPOA agree to make a good faith effort to ensure that all rules, policies and procedures are uniformly and consistently applied to all employees subject to this MOU.

**SECTION 2 – UNION RIGHTS**

2.1   The City agrees to provide a payroll deduction plan for members of the DHSPOA with respect to union dues.

2.2   DHSPOA has the sole and exclusive right to have union dues deducted by the City for all employees in this bargaining unit.

2.3   The City shall, without charge, pay to DHSPOA upon deduction, all sums so deducted from the wages of employees within this bargaining unit.

2.4   The DHSPOA has been recognized by the City as the majority representative of an employee representations unit consisting of permanent and probationary full-time, employees with the following classifications of:

Police Officer                                Corporal
Police Sergeant

2.5   Any new, full time, sworn classification, approved by the City Council, whose position is supervisorial in nature, shall be represented by DHSPOA.

2.6   A designated DHSPOA steward shall be granted permission, during the course of a work day, to meet, confer with, and/or represent an employee on any/all matters within the scope of this Memorandum of Understanding (MOU).

2.7   Steward leave shall be paid time, if granted during a normal business day.

2.8   Under no circumstances shall the City grant overtime, in either paid or compensatory form, for steward leave.

## ARTICLE II
## COMPENSATION

### SECTION 1 – SALARY

1.1   The City agrees to increase the salary ranges assigned to the DHSPOA by 10% effective January 1, 2009, by 5% effective January 1, 2010, and 5% January 1, 2011.

### SECTION 2 – SALARY ADVANCEMENT

2.1   Salary advancement shall mean a pay rate increase given to an employee, contingent upon an overall rating of "Meets Job Requirements" or better on an annual performance evaluation, within the pay range established for the employee's classification.

2.2   An employee's step increase shall be effective on the employee's merit date.  If a department has not submitted a signed performance evaluation by the employee's merit date, a step increase shall automatically be processed by the City's Human Resources Department.

2.3   The City shall retain the flexibility to hire employees with exceptional skills, experience or qualifications at a pay rate above the Step A.

2.4   The City's full time pay range consists of five (5) merit steps, A through E.  The first step (A) shall require at least twelve (12) months performance at the designated step before eligibility for a merit increase.  The last four (4) steps (B through E) shall require at least twelve months performance at the designated step before eligibility for a merit increase to the next step through the final step (E).

2.5.1   The City Manager may accelerate merit step advances for employees based upon exceptional performance, as recommended and documented by the Chief of Police.

2.6   The City and DHSPOA agree to meet no later than December 31, 2009, as a re-opener, to discuss wages.

### SECTION 3 – ACTING DUTY PAY

3.1   The City Manager may appoint an employee to acting duty status to perform the duties of a higher classification that is a vacant or newly created classification.

3.2   An employee may serve in acting duty status only until such time as the City Manager makes a regular appointment to the classification or until such time as the incumbent employee returns to work.

3.3   An acting duty appointment may be effective for a period of thirty (30) days.  The City Manager may extend an acting duty appointment at his/her discretion.

3.4   An employee appointed to acting duty status shall be paid a pay rate not less than the minimum pay rate in the pay range for the acting duty classification, and such acting duty pay rate shall be at least five percent (5%) more than the employee's prevailing pay rate immediately prior to acquiring acting duty status.

3.5   An employee shall not be paid more than the maximum pay rate in the pay range for the acting duty classification.

## EXHIBIT D - 7

3.6   While serving in acting duty status, the employee shall continue to be eligible to receive any pay adjustments or advancements granted to the employee's permanent classification.

3.7     An employee appointed to acting duty status shall receive acting duty pay immediately upon assuming the acting duty position, provided the duration of the assignment is at least a scheduled work shift.

3.8     An employee has the right to refuse any acting duty assignment, without justification, as upon submittal of such in writing to the City Manager.

3.9     An employee appointed to acting duty status can discontinue the acting duty assignment by notifying the immediate supervisor in writing one (1) week in advance of the employee's intention to return to regular status.

3.10     An employee may be removed from acting duty status after serving in the acting assignment for one (1) workweek, at any time, at the discretion of the City Manager.

## SECTION 4 – WORKDAY

4.1     Employees assigned the classifications Police Officer, Police Sergeant and Corporal shall work schedules which include 3/12 + 8 work schedules, (patrol), 9/80 schedules, 4/10 special assignment duty.

4.2.1     The Chief of Police or designee, upon approval by the City Manager, shall reserve the right to change the standard work period in the event a member of the bargaining unit is assigned to administrative duties; a special assignment is required in order to facilitate the operations of the department; and/or departmental staffing is impacted due to budget reductions or departmental vacancies.

4.2.2     During the employee's work day, he or she is expected to devote his or her full time in the performance of his or her assigned duties. No employee shall engage in any outside employment, enterprise, or remunerated activity without prior notification and approval by the Chief of Police or designee.

4.2.3     Employees unable to report to work must notify their immediate supervisor (Watch Commander) not later than two (2) hours before work is scheduled to begin.

## SECTION 5 – OVERTIME COMPENSATION

5.1     Employees are eligible to receive overtime, in either paid or compensatory form, but no employee shall work overtime unless authorized in advance to do so by the Chief of Police or designee.

5.2     Employees shall receive overtime paid at one and one-half (1½) times their prevailing pay rate, or compensatory leave time, credited at one and one half (1½) hours for the overtime work performed in excess of their designated work day or as follows:

      a.   Work performed in excess of excess of eight (8) hours in a workday in a five (5) day work week;

      b.   Work performed in excess of ten (10) hours in a workday in a four (4) day work week;

      c.   Work performed in excess of twelve (12) hours in a day;

      d.   Work performed in excess of forty (40) hours in a workweek.

### EXHIBIT D - 8

5.3     The DHSPOA and City agree to meet no later than December 31, 2009, as a re-opener, to discuss the process and practice of current overtime calculations.

**SECTION 6 - HOLIDAY COMPENSATION**

6.1     Members represented by the Desert Hot Springs Police Officers Association, in lieu of all City recognized holidays, shall be paid 5.08 hours per pay period at their straight time hourly rate, and shall not be included for the purposes of overtime calculations.

**SECTION 7 – CALLBACK**

7.1     Employees called back to work after having completed a normal work shift, or those called out during scheduled days off, shall receive a minimum of four hours of overtime compensation.

7.2     Overtime compensation shall commence at the time an employee reaches the location(s) where he/she has been directed to report.

7.3     Calls to begin a regularly scheduled work shift more than one hour prior to the start time of the scheduled shift shall be deemed callbacks.

7.4     Calls to return to work that are received more than one hour after the regularly scheduled end of a shift shall be deemed a callback.

7.5     Telecommunication contacts, initiated by the City after the completion of the employee's workshift, shall be deemed a callback if, and only if, such contacts require a response exceeding 15 minutes.

**SECTION 8 – PAY PERIODS**

8.1     The compensation due all Employees shall be paid on a bi-weekly basis.

**SECTION 9 – UNIFORM/EQUIPMENT ALLOWANCE**

9.1     Regular, full-time police personnel required to maintain uniforms and equipment in the performance of their duties shall receive a monetary allowance of one hundred dollars ($100.00) per month payable on a quarterly basis.

9.2     Allowance may be used to acquire and maintain the specific departmental uniform in a neat and proper manner, including any and all officer equipment, uniform supplies or weapons.

        Upon requested justification by the employee, the City shall supply a new uniform no more than once each calendar year.  This determination shall be made by the Police Chief, upon approval by the City Manager.

9.3     Newly appointed , sworn personnel shall be issued departmental standard service items at City expense.

9.4     All safety equipment required by law and furnished by the City shall be maintained by the City and shall remain the property of the City.

**SECTION 10 – COURT PAY**

10.1    The City shall compensate employees as follows:

        a.  For actual court appearance during non-duty hours, four (4) hours minimum of overtime compensation, at time and one-half (1½) rate.

**EXHIBIT D - 9**

10.2    Overtime compensation, in either paid or compensatory form, shall be at the election of the employee.

10.3    Court appearance within one (1) hour prior to or after the employee's regularly scheduled workday shall be paid at the time and one-half (1½) rate. The hourly court minimum does not apply.

10.4    Employees, placed on standby by the court, shall receive a minimum of two (2) hours overtime compensation at the time and one-half (1½) rate. An additional two hours will be paid if the employee is held over for the court's second session of the day.

10.5    Should an employee on callback, pursuant to Section 7, be called to court, then Section 10 of this article shall apply, and overtime shall be paid in accordance with that Section.

## SECTION 11 – POST CERTIFICATE COMPENSATION/EDUCATIONAL INCENTIVE

11.1    Employees who attain professional P.O.S.T. certificates for their position shall be paid a percentage in addition to their base pay in the following amounts:

            P.O.S.T. Intermediate Certificate – 5% of monthly salary
            P.O.S.T. Advanced Certificate – 5% of monthly salary
            P.O.S.T. Supervisory Certificate – 5% of monthly salary
                    (cumulative maximum of ten percent {10%}

11.2    Employees who attain a qualified educational degree in the field of police sciences or similar field as approved by the City Manager shall be paid a percentage in addition to their base pay in the following amounts:

            Associate degree or equivalent  - 2.5% of monthly salary
            Bachelor's degree                 - 5% of monthly salary
            Master's degree                   - 5% of monthly salary
                    (cumulative maximum of seven and one-half percent {7.5%})

The educational degree must be obtained from an educational institution that has been accredited and recognized by the USDOE and/or the CHEA.

11.3    The DHSPOA and City agree to meet no later than December 31, 2009, as a re-opener, to discuss the educational and POST incentive schedules.

11.4    Tuition Incentive:  The City shall reimburse employees for actual expenses upon successful completion of the class or classes not covered by other sources. The class or classes must be related to the employee's position and provide direct benefit to the City. Advance approval of the course must be obtained in order to be covered by reimbursement. The City will reimburse the employee for fifty percent (50%) of the incurred costs of tuition, books and fees, subject to a fiscal maximum of $1,000, and a lifetime maximum of $3,000.

## SECTION 12 – ASSIGNMENT PAY

12.1    Assignment pay for certain additional duties of an employee's existing classification may be warranted.

12.2    Special assignment duties and responsibilities include these associated with Field Training Officer; K-9 Officer; Motorcycle Officer; School Resource Officer, Detective, Detective Sergeant. The Police Chief may designate other special assignment duties and responsibilities and authorize the assignment pay.

EXHIBIT D - 10

12.3    Employees assigned such duties shall receive assignment pay at 5% of the employee's prevailing pay rate per month.  The assignment pay shall cease when the employee is not assigned such duties.

12.4    The Chief of Police or designee may assign an employee, utilizing a selection method exclusively at his/her discretion.

12.5    Employees assigned to those classifications in Section 12.2 may be removed at the discretion of the Chief of Police or designee, upon approval by the City Manager and, unless specifically stated as such, removal of the assignment is not punitive in nature.

**SECTION 13 – RESIDENCY REQUIREMENT/COMPENSATION**

13.1    All POA members who are full time residents within the City shall receive an additional $100.00 per month paid on a quarterly basis.  A list of members who are residents and qualify shall be provided on a quarterly basis to the Payroll Department.

13.2    The DHSPOA and the City agree to meet no later than December 31, 2009, as a re-opener, to discuss potential City Housing Assistance programs to facilitate residency within the City.

**SECTION 14—BILINGUAL/AMERICAN SIGN LANGUAGE PAY**

14.1    The City shall implement a bilingual pay program under which a maximum of eight (8) DHSPOA members shall be entitled to premium pay of five percent (5%) over their regular base salary for their services as bilingual personnel.  In order to be eligible for such premium pay, successful passing of an examination must occur.  The Police Department will work with Human Resources to develop such an exam to determine verbal and reading proficiencies.  Those members who are currently receiving the bilingual incentive shall be grandfathered.

**SECTION 15 – REIMBURSEMENT FOR DAMAGED PERSONAL ITEMS**

15.1    The City recognizes that certain items or personal property may become damaged during the course of regular police duties.

15.2    The City shall consider replacement of any such items, on a case by case basis, upon recommendation by the Chief of Police, provided that such damage occurs while said officer is in the performance of his/her police duties.

**ARTICLE III**
**EMPLOYEE PERFORMANCE**

**SECTION 1 – PERFORMANCE EVALUATION**

1.1    A written performance evaluation shall be completed within thirty (30) days prior to the employee's merit date.

1.2    The performance evaluation shall be in a form approved by the City Manager, and shall be signed by the employee, the employee's supervisor, Chief of Police, Human Resources Director and City Manager.

1.3    Each employee's performance evaluation shall be discussed with the employee.

**SECTION 2 – PROBATIONARY STATUS**

EXHIBIT D - 11

2.1    Initial appointments to a position shall be subject to a probationary period of eighteen (18) months for academy graduates with no Basic POST, 12 months for lateral transfers

2.2     The probationary period may be extended by the Chief of Police, upon approval of the City Manager, for a period not to exceed six (6) months, should the Chief of Police find that conditions warrant such an extension.

2.3     During the probationary period, the employee may be terminated at any time, without cause and without the right of appeal.  Written notice of release shall be furnished by the Chief of Police.

## SECTION 3 – PROMOTIONAL STATUS

3.1     Promotional appointments shall be tentative and subject to a probationary period of twelve (12) months.

3.2     The probationary period may be extended for a period of six (6) months, should the Chief of Police find that conditions warrant such an extension.

3.3     During the promotional probationary period, or any extension thereof, the employee may be reduced to previous rank in the promotional-appointed position by the Chief of Police without cause, notice of hearing or appeal.

3.4     The Chief of Police or the employee's immediate supervisor, prior to the expiration of the probationary period or any extension thereof, shall serve written notice of such action upon the employee.

**ARTICLE IV**
**BENEFITS**

## SECTION 1 – HEALTH INSURANCE

1.1     The City shall provide employees with the option of purchasing health insurance for each full-time employee and eligible dependents.

1.2     The City shall provide each employee $850 per month toward the optional purchase of medical, dental and vision coverage or the employee may elect to contribute all or a part of the $850 toward the City's deferred compensation program.

1.3     Spouse, domestic partner and dependent coverage shall continue to be available as provided through the City's plan.

## SECTION 2 – LIFE INSURANCE

2.1     The City agrees to provide each full-time employee with group term life insurance coverage in the amount of $50,000 subject to the eligibility requirements of the insurance carrier.

## SECTION 3 – PUBLIC EMPLOYEE'S RETIREMENT SYSTEM (CalPERS)

3.1     On April 1, 2008, the City amended the contract with CalPERS to the 3% @ 50 retirement formula for all safety members.  The DHSPOA and City agree to meet no later than December 31, 2009, as a re-opener, to discuss Retirement Health Savings Accounts as an additional benefit. The City shall enroll and pay the normal contribution rate required to be paid by all probationary and permanent full-time employees under the 3% @ 50 retirement benefit plan.

EXHIBIT D - 12

**SECTION 4 – DEFERRED COMPENSATION PROGRAMS**

4.1     The City shall offer deferred compensation programs (457 plans) to employees in the DHSPOA as a voluntary employee election.

**SECTION 5 – STATE DISABILITY INSURANCE (SDI)**

5.1     The City shall enroll employees in the State disability program.

**SECTION 6 – EMPLOYEE ASSISTANCE PROGRAM (EAP)**

6.1     The City shall offer Employee Assistance Program in categories to include marriage, family/relationship problems, alcohol/drug abuse, legal matters, financial and credit problems, child care consultation and elder care.

6.2     Services shall be provided as defined in the EAP pamphlet on file with the City's Human Resources Department.

6.3     The City shall pay the premium amount on behalf of the employee and family.

### ARTICLE V
### LEAVES

**SECTION 1 – ANNUAL LEAVE**

1.1     Annual leave shall be defined as the periods of approved absence with pay from regularly scheduled work. Employees shall be credited with 13.85 hours of annual leave per pay period, which shall immediately vest following each full pay period worked. Employees cannot accrue more than seven hundred fifty (750) hours of annual leave.

        Annual leave cannot be used during the first six (6) months of employment. If an employee is terminated for any reason, unused accumulated annual leave will be paid to him or her in one lump sum, at base salary rates.

1.2     Employees are encouraged to use their accrued annual leave for vacation. An employee who fails to submit a vacation request to his or her supervisor, or to sign up for vacation time during any twelve month period may be assigned by the Police Chief, or designee, to use annual leave for a vacation.

1.3     Use for Illness and/or Injury: Employees may use annual leave to receive their regular pay when they are absent from work because of an illness or injury. An employee who is absent because of an illness or injury and who seeks to use accrued annual leave may be required to submit a written statement describing his or her illness or injury, which then must be approved by the Police Chief, or designee, before the Employee is eligible to use annual leave for an illness or injury.

        If an absence because of illness or disability extends beyond three (3) consecutive workdays, or if an Employee has used annual leave because of an illness or injury for more than four (4) unverified days in a calendar year, the Employee may be required to submit a physician's written certification (release to return to work) to the Police Chief ,or designee, before the Employee is eligible to use annual leave to receive compensation for an illness or injury.

        An employee may be required to take physical examinations at periodic intervals while using annual leave for an illness or injury from a physician designated and paid for by the City.

EXHIBIT Examinations 88

1.4     Cashing Out Accrued Annual Leave: Upon four (4) weeks advanced written notice to the City's Payroll Department, an Employee may cash out accrued, unused annual leave, at current salary rates.  No Employee may cash out annual leave hours more than twice per fiscal year.  Such cash outs shall be permitted twice per fiscal year.  Should an additional cash out be requested on an emergency basis it must meet the hardship definition as determined by the Internal Revenue Service.  POA to identify the 2 months cash outs to occur.  *MARCH and SEPTEMBER.* The maximum number of hours that may be cashed out at any time shall be eighty (80) hours; however, an employee may not cash out hours that would result in his or her accumulated annual leave to drop below eighty (80) hours for a total of 160 hours per fiscal year.

1.5     Semi Annual Review of Annual Leave Accumulations:  In March and September of each year, the City shall review each Employees; annual leave accumulation.  The City shall pay Employees for those accrued hours in excess of five hundred (580) and adjust the affected Employees' annual leave accumulation back to five hundred (580) hours.

1.6     Effect of Absence on Annual Leave Crediting:  An absence due to a vacation, illness, injury or other approved paid leave of absence shall not affect accumulations for annual leave.  Employees who are on an unpaid leave of absence shall not accumulate annual leave during such an absence.

1.7     Unpaid Leave: An employee who has been in the service of the City continuously for one (1) year and has completed his or her probationary period successfully, may be allowed a leave of absence without pay to attend to his or her private affairs or other matters by submitting a written request to the City Manager.   The City Manager shall have the discretion to approve/disapprove such request.  The length of the leave of absence shall be approved by the City Manager but in no event to exceed four (4) months without City Council approval.

## SECTION 2 – COMPENSATORY LEAVE

2.1     Reasonable requests for use of compensatory leave shall not be denied.

2.2     Employees shall not use less than one (1) hour of compensatory leave at any one time.

2.3     Employees may use compensatory leave in conjunction with any other authorized paid leave with approval of the supervisor and Police Chief.

2.3     An employee may carry to the next calendar year a maximum of one hundred sixty (160) hours of compensatory leave.  Exceptions to this policy may be approved by the City Manager, upon recommendation of the Police Chief.

2.4     When an employee separates from the City service for any reason, the employee shall be compensated for any accrued compensatory leave at the employee's rate of pay at the date of separation.

## SECTION 3 – HOLIDAY LEAVE

3.1     . The City shall provide employees holiday pay as stated in Article II "Compensation", Section 6.

## SECTION 4 – BEREAVEMENT LEAVE

4.1     Employees shall be entitled to a maximum of three (3) work days of paid bereavement leave per incident.

4.2     Eligibility for bereavement leave shall apply to the death of immediate family members, as defined herein.

EXHIBIT D 4

## SECTION 5 – WORKERS' COMPENSATION LEAVE

5.1     The City shall provide employees with work related disability leave as defined herein.

5.2     Employees substantially disabled by bodily injury, or sickness in the course and scope of employment shall be paid their regular pay rate to a maximum of twelve months (4850 pay) from the date of disability causing the employee to be of work, or until the City's workers compensation administrator terminates temporary disability either by means of a lump sum settlement or a disability retirement, whichever occurs first.

5.3     The City shall make all reasonable efforts to provide employees with modified duty assignments as needed.

5.5     During the time the employee is substantially disabled, the employee shall continue to accrue annual leave and seniority for purposes of pay adjustments or advancements.

## SECTION 6 – MILITARY LEAVE

6.1     The City shall grant military leave to employees as provided in the California Military and Veterans Code Sections 389 through 295.4.

6.2     Employees on ordered military leave shall receive monthly salary and benefits based upon the following schedule:

   a.   3 months of continued salary and benefits for 1-5 years of service.

   b.   6 months of continued salary and benefits for 6-15 years of service.

   c.   12 months of continued salary and benefits for 16 or more years of service.

## SECTION 7 – LEAVE OF ABSENCE WITHOUT PAY/ FAMILY MEDICAL LEAVE ACT/ CALIFORNIA FAMILY RIGHTS ACT

7.1     The City has the authority to grant or deny an employee's request for leave of absence from work without pay, except that the City shall not unreasonably deny a request for unpaid leave due to the medical disability of the employee or a member of his/her immediate family.

7.2     An employee on an unpaid leave for 61 days or more shall not accrue seniority for that portion of the leave over 60 days.  After the expiration of the unpaid leave, the employee shall be assigned to his / her former classification.

7.3     Probationary employees are not eligible for unpaid leaves of absence, except as required by law.  The employee requesting the leave shall state in writing the reasons for the request.  In all cases, the City Manager shall retain exclusive authority for approving such leave and its duration.  The employee shall have no appeal rights with respect to this decision.

7.4     . The City shall comply with the Family Medical Leave Act of 1993 in all respects.

7.5     The City shall comply with the California Family Rights Act of 1993 in all respects.

## SECTION 8 – TRAINING LEAVE

8.1     The City, may grant, subject to operational needs, a maximum of forty (40) hours of paid leave per fiscal year for employees who attend law enforcement training at their own expense.  This leave shall not be deducted from any other leave due the employee.

EXHIBIT D - 15

8.2     All training requests shall be authorized by the Police Chief or designee, upon approval by the City Manager.

8.3     Duty days and Required Days Office (RDO's) will be adjusted to accommodate the training schedule.

## SECTION 9 – TIME OFF FOR VOTING

9.1     The City shall provide employees with time off for voting.

9.2     When an employee claims not to have sufficient time outside of working hours to vote at a statewide election, the employee may, without loss of pay, with the approval of supervisor, use working hours which enable the employee to vote. The supervisor may not authorize an employee to use more than two (2) hours from work with pay for voting.

9.3.1   The authorized time for voting shall be at the beginning or end of work period only,or whichever allows the employee the most time for voting and the least time away from work. If the employee knows or has reason to believe that time off for voting shall be necessary on election day, the employee must notify his/her supervisor of that fact at least two (2) days in advance.

## SECTION 10 – CATASTROPHIC LEAVE DONATION (from old MOU)

10.1    Circumstances may arise where an Employee or the Employee's immediate family may suffer an unforeseen event, which may have a catastrophic effect on the Employee and/or the Employee's family.  Under such a circumstance the Employee may request leave donation from fellow Employees under the following procedures:

   10.1.1   Employee's Own Personal Extended Illness.  An employee who is suffering from a serious illness or a serious injury is eligible for short term disability insurance and may have annual leave donated to cover the difference between payments received from the disability insurance provider and the Employees full salary and to cover the cost of any insurance plan provided by the City.

   10.1.2   Serious Illness or Injury of a Member of the Employee's Immediate Family.  An Employee whose immediate family member is suffering from a serious illness or injury may have annual leave donated to provide him/her with time off from work to care for that family member.  Said donated leave will be used to continue the Employee on payroll until said leave is exhausted.

   10.1.3   Leave Donation Eligibility Procedures:

            The Employee seeking leave donation must have exhausted all available annual leave and compensatory time.

            The Employee must submit a request for leave donation to the Human Resources Department for review and approval of the City Manager or designee.  The Employee will be required to provide medical documentation for the need of this leave donation.

   10.1.4   Leave Donation Procedures

            The donation of leave is voluntary and is irrevocable once donated.

            Employees wishing to donate leave will submit to the Human Resources Department an authorization for transfer of leave Form

EXHIBIT D pm16

Employees may donate accrued annual leave in excess of 96 hours, with a maximum donation of one ten (10) or twelve (12) hour shift, as appropriate.

The donated leave will be put in to a "Catastrophic Leave" account and can only be used for the purposes identified.

Donated leave will be credited to the "Catastrophic Leave" account at the Employee's hourly rate of pay or the donating Employee's rate of pay, whichever is less. In no case shall the total amount of leave exceed: ten (10) hours of annual leave per donee who works a ten (10) hours shift; or, twelve (12) hours of annual leave per donee who works a twelve (12) hour shift.

Any time remaining in an Employee's "Catastrophic Leave" account upon return to work will be transferred to a "Catastrophic Leave Bank" for use by other Employees who qualify under the provisions of this Section. The "Catastrophic Leave Bank" will have a cap of 320 hours. Any remaining leave in excess of 320 hours will be converted to a cash value and placed in a fund for an Em0lyees program to be determined at a later date.

In no case will an Employee be able to convert the donated leave to cash or be paid for any remaining balance of donated leave.

All donations will be maintained as confidential information.

### ARTICLE VI
### LAYOFF

## SECTION 1 – PREREQUISITE FOR LAYOFF

1.1   When, as a result of a reduction in workforce (RIF), it becomes necessary to initiate a layoff of employees affected by this MOU, the following conditions, contained within this Section, shall be prerequisite to such a layoff:

1.2   All non-classified part-time, temporary, seasonal and/or recurrent and probationary employees working in the class shall have been released from the class first.

1.3   All employees in the class have been given the opportunity to seek lateral transfer to existing vacant positions. Such transfer requests shall not be denied except for just cause. The employee shall be required to meet the minimum standards of the class.

1.4   Management shall meet and consult with the representative of DHSPOA on alternative courses of action to avoid such layoff.

1.5   Notice of actual layoff shall be given no less than forty-five (45) calendar days before the date of implementation.

1.6   Notice of layoff shall include: classification where layoff is to occur; seniority list by total continuous City seniority of employees in the affected class; list of current vacancies in all classes represented by this MOU.

1.7   Separate notice to any employee in the class who has two (2) or more below standard evaluations within the preceding three (3) years.

## SECTION 2 – ORDER OF LAYOFF             EXHIBIT D - 17

2.1     Employees who have two (2) or more below standard annual evaluations within the preceding three (3) years shall be laid off first.

2.2     Next layoff shall occur on the basis of City-wide seniority, the least senior employee based on total continuous employment shall be laid off first and any subsequent layoff shall proceed to the next, least senior employee.

2.3     Where the total and continuous employment of two (2) employees are of the same length, the seniority shall be decided by drawing lots.

## SECTION 3 – VOLUNTARY DEMOTION

3.1     An employee affected by a Reduction in Force (RIF) may choose voluntary demotion to avoid layoff.

3.2     Such voluntary demotion may be to a lower or equal class of previous standing or to a lower or equal class in the same occupational grouping.

3.3     If the voluntary demotion causes a layoff in the lower or equal class, such layoff shall follow the provisions of this Article.

3.4     In no event can an employee displace someone with more seniority, except as permitted by Section 2.1 of this Article.

## SECTION 4 – RECALL

4.1     Employees who laterally transfer, take a voluntary demotion or are affected by a Reduction in Force pursuant to the provisions of this Article, shall have their names placed on a recall list for the classification of original standing.

4.2     Such a list shall be inverse order of layoff, lateral transfer or demotion.

4.3     The recall list shall be maintained by the City Manager and shall be used when any vacancy for that class is to be filled.

4.4     The list shall be maintained until all names have been offered an opportunity for recall or at the end of one (1) year, whichever occurs first.

4.5     The appointing authority shall offer appointment to the first name on said list. If the individual accepts, he/she shall be appointed within sixty (60) days.

4.6     The employee may be required to take all applicable examination to ensure that the employee is capable of performing the duties of the class.

4.7     The individual shall be required to meet the minimum standards of the class. Employee's laid off while on probation must serve a new probationary period following re-employment.

EXHIBIT D - 18

## ARTICLE VII
## NON-DISCRIMINATION

The City shall not discriminate in the treatment of an employee on the basis of race, color, religious creed, gender, political party or activity, national origin, sexual orientation, age, marital status, ancestry, medical condition (cancer related), pregnancy, or pregnancy related conditions, physical or mental disability, DHSPOA activity or DHSPOA membership.

## ARTICLE VIII
## HEALTH AND SAFETY

### SECTION 1 – SAFETY RESPONSIBILITIES

1.1     The City and the DHSPOA shall make a good faith effort to provide and maintain a safe and healthful place of employment.

1.2     Employees shall perform their assigned duties safely using the practices, means, methods, operations, and processes prescribed by law, occupational safety or health standard, City safety order, or safety rules and regulations.  Employees shall report any unsafe practices, equipment or hazardous conditions promptly to their immediate supervisor.

1.3     The City shall not require nor permit any employee to enter in any employment or job site which is not reasonably safe and healthful.

1.4     The City shall not discipline any employee for refusing to perform tasks in the performance of which any law, occupational safety or health standard, or safety order would be violated, and if such violation would create a real hazard to the individual employee.

## ARTICLE IX
## DISCIPLINE AND DISCHARGE

### SECTION 1 – JUST CAUSE

1.1     An employee may be suspended without pay, demoted or discharged for just cause.

1.2     Discipline may be achieved through a permanent or temporary decrease in a step without any loss of work by the employee.

1.3     A step decrease shall not affect the employee's merit date.

1.4     Employees, other than probationary, shall have the right of appeal pursuant to Article X of this MOU.

### SECTION 2 – REPRESENTATION

2.1     Employees may be represented by a DHSPOA representative, legal counsel or a representative of their choice at pre-disciplinary conferences and/or post-disciplinary appeal hearings.  Nothing in this section is intended to grant any pre-termination protections or other property rights to employees who are deemed "at will" employees under the City's Personnel Rules or under applicable law.

### EXHIBIT D - 19

2.2     Notwithstanding references in this Article, the Police Officers' Bill of Rights shall apply to any/all Public Safety employees represented by this MOU.

## ARTICLE X
## GRIEVANCE PROCEDURE

### SECTION 1 – GRIEVANCE DEFINED

1.1　　Grievance shall be defined as a complaint by an employee that there has been a violation of this MOU.

1.2　　The employee, or employees bringing such a claim, shall state in writing, the manner in which the violation affects their wages, hours, working conditions, or job security as specified in this MOU.

### SECTION 2 – INFORMAL DISCUSSION OF GRIEVANCE

2.1　　When an employee has a complaint, the employee and/or the employee's designated representative shall first informally discuss the matter with the employee's immediate supervisor within ten (10) working days from the incident or decision generating the grievance.

2.2　　If after discussion with the immediate supervisor, the complaint has not been satisfactorily resolved, the employee and/or employee's designated representative shall have the right to discuss the complaint with the supervisor's immediate superior.

2.3　　If after such a discussion, the complaint has not been satisfactorily resolved, the employee shall have the right to file a formal, written grievance.

### SECTION 3 – FORMAL GRIEVANCE PROCEDURE

3.1　　A formal grievance process shall be used to resolve an employee's complaint not satisfactorily resolved through Section 2 of this Article.

3.2　　An employee shall have the right to present a formal grievance, in writing, within five (5) working days after an unsuccessful resolution of the informal grievance with the immediate supervisor and the immediate supervisor's superior.

3.3　　All formal grievances shall state in writing the violation of this MOU and the manner in which it affects the employee's wages, hours, working conditions or job security.

3.4　　The formal grievance shall be presented to the employee's supervisor, who shall discuss the grievance with the employee and/or the employee's designated representative, within five (5) working days after receipt of the formal grievance.

3.5　　Within ten (10) working days of this discussion, the supervisor shall render a written decision regarding its merits.

3.6　　If the supervisor's decision does not satisfactorily resolve the complaint, the employee and/or employee's designated representative may present the formal grievance to the City's designated Employee Relations Officer.

3.7　　The grievance shall be considered resolved and no further review of the subject matter of the grievance shall be permitted under this Article when the employee does not seek further review of the grievance within ten (10) working days after the receipt of the decision of the supervisor.

3.8　　Failure of the supervisor to render a written decision on the grievance within five (5) working days constitutes a decision denying the grievance.

EXHIBIT D - 20

3.9     When the employee presents a formal grievance to the designated Employee Relations Officer, the Employee Relations Officer shall discuss the grievance with the employee and/or the employee's designated representative.

3.10    Within ten (10) working days after receipt of the formal grievance, the Employee Relations Officer shall render a written decision regarding its merits.

3.11    If the decision of the Employee Relations Officer does not resolve the complaint, the employee and/or the employee's designated representative may present the formal grievance to the City Manager.

3.12    The grievance shall be considered resolved, and no further review of the subject matter of the grievance shall be permitted when the employee does not seek further review of the grievance within ten (10) working days after receipt of the decision of the Employee Relations Officer.

3.13    When the employee presents a formal grievance to the City Manager, the City Manager shall discuss the grievance with the employee and/or the employee's designated representative.

3.14    Within ten (10) working days after receipt of the grievance, the City Manager shall render a written decision regarding its merits.

3.15    The decision of the City Manager shall resolve the grievance and no further review of the subject matter of the grievance shall be permitted within the City's administrative procedures.

3.16    Should the City Manager fail to render a written decision within ten (10) working days, the employee may consider the administrative procedures completed and file for redress of grievances.

3.17    If the decision of the City Manager does not resolve the grievance to the employee's satisfaction, the employee, may seek redress of grievances through regular legal channels.

SECTION 4 – NON-DEPARTMENTAL GRIEVANCES

4.1     Grievances resulting from decisions or actions outside the departmental chain-of-command shall be initiated first at the department from which a complaint generates, and shall follow the procedures as detailed in Section 2 and 3 of this Article.

4.2     When the grievance involves an action or decision of the Human Resources Director, the grievance shall be informally discussed with the Human Resources Director.  If the informal discussion does not satisfactorily resolve the grievance, the formal grievance procedure detailed in Section 3 will be initiated with the Human Resources Director and/or City Manager, as appropriate.

SECTION 5 – REPRISALS

5.1     The City shall not institute any reprisals against any employee or designated representative resulting from the use of the grievance procedure.

5.2     The City Manager may designate a third party to serve as the final reviewer for employee grievances.

EXHIBIT D - 21

## ARTICLE XI
## APPEAL PROCEDURES

### SECTION 1 – REQUEST FOR DISCIPLINARY HEARING

1.1     A non-probationary employee, who believes he or she has been suspended, or demoted without alleged just cause shall have the right to appeal the imposition of that disciplinary action.

1.2      When an employee or a representative, or the employee's legal counsel requests a disciplinary hearing, the request shall be in writing, signed by the employee, and presented to the Employee Relations Officer within ten (10) days after the notification date of the imposition of the disciplinary action.  Any such request shall be addressed to the Employee Relations Officer and shall identify the subject matter of the appeal, the grounds for the appeal, and the relief desired by the employee.

1.3     Unless requested to be open to public by the employee all disciplinary hearings shall be conducted in private.

1.4     If the employee fails to request a disciplinary hearing within the prescribed time, the employee shall have waived the right to a hearing and all rights to further appeal of the disciplinary action.

### SECTION 2 – SCHEDULING OF DISCIPLINARY HEARING

2.1     The City shall schedule any disciplinary hearing within a reasonable time after the filing of the employee's request, considering the availability of a hearing officer, the convenience of the employee and the witnesses, if any.

### SECTION 3 – HEARING OFFICER

3.1     The City Manager shall serve as the hearing officer for disciplinary hearings except that the City Manager may authorize a designee to serve as the hearing officer for any disciplinary hearing that does not involve termination.

3.2     The hearing officer shall be a neutral third party for appeals involving termination.

  a.   The hearing officer shall be selected from a list of five (5) names submitted by an outside source mutually agreed upon by the City and DHSPOA.

  b.   The selection process shall consist of the City and DHSPOA alternately striking a name from the list until one name remains which will be the appointed hearing officer. A coin toss shall determine which side initiates the above mentioned process.

  c.   The cost for the hearing officer shall be shared equally by the City and DHSPOA.

### SECTION 4 – REPRESENTATION AT DISCIPLINARY HEARING

4.1     The employee may appear at the disciplinary hearing personally, may be represented by DHSPOA, by legal counsel, or a representative of his / her choice.

4.2     The employee and the City shall have the right to produce and confront witnesses, and to present any relevant oral or documentary evidence.

### SECTION 5 – BURDEN OF PROOF AND EVIDENCE

EXHIBIT D - 22

5.1     The City shall have the burden of proof at the disciplinary hearing and shall be required to prove the charges against the employee by a preponderance of the evidence.

5.2     The disciplinary hearing shall be conducted according to the technical rules of evidence.

**SECTION 6 – CONDUCT OF DISCIPLINARY HEARING**

6.1     The conduct of the disciplinary hearing shall be under the control of the hearing officer with due regard for the rights and privileges of both parties.

6.2     During the examination of a witness, the hearing officer may exclude from the hearing, any and all witnesses.

6.3     The hearing officer shall have the power to issue subpoenas to compel the attendance of witnesses or the production of documents.

6.4     Disciplinary hearings shall be recorded.

**SECTION 7 – HEARING OFFICER'S DECISION**

7.1     Within thirty (30) calendar days after the disciplinary hearing, the hearing officer shall issue a written decision containing findings of fact and conclusions of law.

7.2     The hearing officer shall have the authority to affirm, revoke or reduce the disciplinary action imposed against the employee.

7.3     The hearing officer's decision constitutes a final and binding resolution of any disciplinary action and no further appeal shall be permitted

**SECTION 8 – EFFECTS OF CERTAIN DISCIPLINARY ACTIONS**

8.1     The provisions of the Police Officer's Bill of Rights (California Government Code Sections 3300-3313) and other applicable State laws and court decisions shall determine the effects of any disciplinary action taken with respect to employees represented by this Memorandum of Understanding.

**ARTICLE XII**
**CITY RIGHTS**

**SECTION 1 – EXCLUSIVE MANAGEMENT RIGHTS AND AUTHORITY**

1.1     The City shall retain the exclusive right to manage and direct the performance of City services and the work force performing such services.

1.2     The following matters shall be within the exclusive management authority of the City.

        a.     Determine issues of public policy;

        b.     Determine and change the facilities, methods, means and personnel by which City operations are to be conducted;

        c.     Expand or diminish City services;

        d.     Determine and change the number of locations, relocations, and types of operations and the processes and materials to be employed in providing all City services, including but not limited to the right to contract or outsource any work or operation;

EXHIBIT D - 23

e.  Determine the size and composition of the work force, to assign work to employees in accordance with requirements as determined by the City, and to establish and change work assignments;

f.  Determine job classifications;

g.  Appoint, transfer, promote, demote, and lay off employees for lack of work or financial resources;

h.  Initiate disciplinary action;

i.  Determine policies, procedures, and standards for selection, training and promotion of employees;

j.  Establish employee standards, including but not limited to quality and quality standards;

k.  Maintain the efficiency of governmental operations;

l.  Exercise complete control and discretion over its organization, and the technology of performing its work and services;

m.  Establish reasonable work and safety rules and regulations in order to maintain the efficiency and economy desirable in the performance of City services; and

n.  Determine any and all necessary actions to carry out its mission in emergencies.

1.3   The exclusive decision making authority of the City and its management on matters involving City rights and authority shall not, in any way, directly or indirectly, be subject to the grievance procedure.

## ARTICLE XIII
## MODIFICATION AND DURATION

### SECTION 1 – SEVERABILITY

1.1   Notwithstanding any other provisions of this MOU, in the event that any Article, Section, or Subsection of this MOU shall be declared invalid by any court or by any State or Federal law or regulation, or should a decision by any court or any State of Federal law or regulation diminish the benefits provided by this MOU, or impose additional obligations on the City, the City shall meet and confer on the affected Article, Section or Subsection.

1.2   In such event, all other Articles, Sections or Subsections of this MOU not affected shall continue in full force and effect.

### SECTION 2 – DURATION

2.1   This MOU shall be binding on the City and the DHSPOA when approved and adopted by both parties.

2.2   Except as otherwise provided herein this MOU shall be in full force and effect from January 1, 2009 and shall remain in full force and effect to and including December 31, 2011.

EXHIBIT D - 24

## ARTICLE XIV
## DHSPOA RESPONSIBILITIES

**SECTION 1 – SERVICE TO THE COMMUNITY**

1.1    Recognizing the crucial role of law enforcement in the preservation of the public health, safety, and welfare of a free society, the DHSPOA agrees that it will take all reasonable steps to cause the employees represented by this MOU, individually and collectively, to perform all police duties as determined by the City Manager.

1.2    The DHSPOA, therefore, agrees that there shall be no interruption of these services for any cause whatsoever by the employees it represents; nor shall there by any concerted failure by them to report for duty; nor shall they absent themselves from their work or abstain, in whole or in part, from the full, faithful, and proper performance of all the duties of their employment.

1.7    The DHSPOA, further agrees that it shall not encourage any strikes, sit-down, stay-ins, slow-downs, speed-up, stoppages of work, malingering or any acts that interfere in any manner or to any degree with the continuity of the police services.

1.8    DHSPOA employee, participating in any conduct, prohibited by this article, shall be subject to discipline, up to and including termination.


**ARTICLE XVI**
**DEFINITION OF TERMS**

**SECTION 1 – ACTING DUTY**

The temporary assignment of an employee to a higher paid classification to perform the major, essential duties of the classification.

**SECTION 2 – CLASSIFICATION**

A position or positions that describes the duties, responsibilities and qualifications for that classification.

**SECTION 3 – WORKDAY**

A calendar day of 24 hours.

**SECTION 4 – DEPARTMENT HEAD**

An individual assigned to management or supervisory positions designated as a department head by the City Manager.

**SECTION 5 – EMPLOYEE**

An individual compensated through the City payroll and appointed to one of the classifications listed in Appendix A.

**SECTION 6 – FULL-TIME**

The work period of an employee in the classified service in a classification approved by the City Council to work 40 hours in a designated work week.

EXHIBIT D - 25

**SECTION 7 – IMMEDIATE FAMILY**

Shall include an employee's spouse, domestic partner as defined by law, children, parents, brothers, sisters, grandparents, grandchildren, parents-in-law, brothers-in-law, sisters-in-law, sons-in-law, daughters-in-law, the employee's spouse's children or any relative, including a foster child, living in the immediate household.

**SECTION 8 – LEAVE**

An authorized absence from work.

**SECTION 9 – MANAGEMENT**

An employee assigned to classifications by the City Manager, responsible for the supervision or management of department(s), division (s) or program(s).

**SECTION 10 – POSITION**

The duties and responsibilities assigned to an employee within a classification.

**SECTION 11 – PREVAILING RATE**

The base pay rate within a pay range paid to an employee for the performance of the duties of a classification.

**SECTION 12 – SENIORITY**

A status acquired by an employee based on the employee's period of continuous service in job class for the City.

EXHIBIT D - 26

## APPENDIX A

Positions affected by this Memorandum of Understanding include:

POLICE OFFICER
POLICE CORPORAL
POLICE SERGEANT

**APPENDIX B**
**SALARY SCHEDULE**
**EFFECTIVE JANUARY 1, 2009**

| TITLE | Step A | Step B | Step C | Step D | Step E: |
|---|---|---|---|---|---|
| Police Officer Range P47 | $55,609 | $58,389 | $61,309 | $64,374 | $67,594 |
| Police Corporal Police Detective Range P49 | $58,103 | $61,008 | $64,059 | $67,261 | $70,623 |
| Police Sergeant Range P57 | $72,623 | $76,254 | $80,067 | $84,070 | $88,274 |

EXHIBIT D - 28