Jerry L. Steering; SBN 122509
LAW OFFICE OF JERRY L. STEERING
4063 Birch Street
Suite 100
Newport Beach, CA 92660
(949) 474-1849
(949) 474-1883 Fax
jerrysteering@yahoo.com

Attorney for plaintiffs Kendall M. Johnson, as *guardian ad litem*
for his minor daughter, J.M.J., and Dominic Heath

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| KENDALL M. JOHNSON, as *guardian ad litem* for his minor daughter, J.M.J., and DOMINIC HEATH,<br><br>    Plaintiffs,<br><br>    vs.<br><br>CITY OF DESERT HOT SPRINGS, ANTHONY SCLAFANI, PATRICK WILLIAMS, EDWIN SMITH, KATE SINGER, JASON SIMPSON, RICK DANIELS, GABRIELLA MENDOZA, GUSTAVO PAIZ, PAUL TAPIA, STEVEN O'CONNOR and DOES 1 through 10, inclusive,<br><br>    Defendants. | CASE NO. CV12-02318 PSG (OPx) (Consolidated with Case No. EDCV15-01999-PSG (DTBx))<br><br>COMPLAINT FOR DAMAGES FOR VIOLATION OF FEDERAL CONSTITUTIONAL RIGHTS UNDER COLOR OF STATE LAW [42 U.S.C. § 1983] CLAIM FOR LOSS OF PARENT-CHILD RELATIONSHIP (U.S. CONST. AMEND. 14); RIGHTS TO FREEDOM OF SPEECH / TO PETITION GOVERNMENT FOR REDRESS OF GRIEVANCES (U.S. CONST. AMEND. 1), AND CALIFORNIA STATE LAW CLAIMS FOR RETALIATION FOR REPORTING CRIMINAL CONDUCT (CAL. LABOR CODE § 1102.5), WRONGFUL TERMINATION, VIOLAION OF CAL. GOV'T CODE § 3300 et seq., AND INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS, |

CONSOLIDATED COMPLAINT FOR DAMAGES

1

)  **UNITED STATES DISTRICT**

_____ )  **JUDGE PHILIP S. GUTIERREZ**

**COME NOW** the plaintiffs and show this honorable court the following:

## JURISDICTIONAL ALLEGATIONS

1.   As this action is brought under 42 U.S.C. § 1983 this court has jurisdiction over this case under its federal question jurisdiction pursuant to 28 U.S.C. §1331.

2.   As the incidents complained of in this action occurred in the County of Riverside, State of California, within the territorial jurisdiction of this court, venue properly lies in this court pursuant to 28 U.S.C. § 1391(b)(2).

3.   As plaintiff's claims brought under California state law arise out of the same transactions and occurrences, and out of a common nucleus of operative facts as the plaintiff's federal questions claims, this court has jurisdiction over the plaintiff's California State law claims under its Supplemental Jurisdiction; 28 U.S.C. § 1367, and otherwise pursuant to *Mine Workers v. Gibbs*, 383 U.S. 715 (1966).

## GENERAL ALLEGATIONS

4.   Plaintiffs' decedent, Andrea Heath, who died on October 8, 2013, was a natural person who, at all times complained of in this action, resided

CONSOLIDATED COMPLAINT FOR DAMAGES

in the County of Riverside, State of California; within the territorial

jurisdiction of this court. Andrea Heath was the natural and legal

mother of plaintiffs J.M.J. and DOMINIC HEATH.

5.     Plaintiff  DOMINIC HEATH is the natural and legal son of plaintiffs'

decedent Andrea Heath, and is a natural person who, at all times

complained of in this action, resided in the County of Riverside, State

of California. DOMINIC HEATH is a successor-in-interest to his late

mother; Andrea Heath.

6.     Plaintiff KENDALL M. JOHNSON is the legal and natural father and

*guardian ad litem* for plaintiff minor J.M.J., who is the natural and

legal daughter of plaintiffs' decedent Andrea Heath. Both KENDALL

M. JOHNSON and J.M.J. are natural persons who, at all times

complained of in this action, resided in The County of Riverside, State

of California. J.M.J. is a successor-in-interest to her late mother;

Andrea Heath.

7.     Defendant City Of Desert Hot Springs, hereinafter referred to as

"CITY", is a municipal entity, located within the County of Riverside,

State of California; within the territorial jurisdiction of this court.

8.     Defendant ANTHONY SCLAFANI, hereinafter referred to as

"SCLAFANI," was at all times complained of in this action, a

CONSOLIDATED COMPLAINT FOR DAMAGES

Sergeant and full time paid sworn police officer with the City Of Desert Hot Springs Police Department (hereinafter referred to as "DHSPD"). At all times complained of herein, SCLAFANI was an individual person acting under the color of state law, and was acting pursuant to his authority as a Sergeant with DHSPD, and was acting in the course of and within the scope of his employment with the CITY.

9.   Defendant Patrick Williams, hereinafter referred to as "WILLIAMS", is, and was at all times complained of in this action, the Chief of Police of DHSPD, and a full time paid sworn police officer with DHSPD.  At all times complained of herein, WILLIAMS was an individual person acting under the color of state law, and was acting pursuant to his authority as the Chief of Police of DHSPD, and was acting in the course of and within the scope of his employment with the CITY.

10.   Moreover, at all times complained of herein, WILLIAMS was a top and final policy making official for the DHSPD, as the highest ranking police officer with that entity.

11.   Defendant Edwin Smith, hereinafter referred to as "SMITH," is, and was at all times complained of in this action, a Commander and full

CONSOLIDATED COMPLAINT FOR DAMAGES

4

time paid sworn police officer with DHSPD. At all times complained of herein, SMITH was an individual person acting under the color of state law, and acting pursuant to his authority as a Commander with DHSPD, and was acting in the course of and within the scope of his employment with the CITY. SMITH was also a high ranking policy making official for the DHSPD.

12.   Defendant Kate Singer, hereinafter referred to as "SINGER," is, and was at all times complained of in this action, a Commander and full time paid sworn police officer with DHSPD. At all times complained of herein, SINGER was an individual person acting under the color of state law, and acting pursuant to her authority as a Commander with DHSPD, and was acting in the course of and within the scope of her employment with the CITY. SINGER was also a high ranking policy making official for the DHSPD.

13.   Defendant Jason Simpson, hereinafter referred to as "SIMPSON," is, and was at all times complained of in this action, the Acting and/or Assistant City Manager of defendant CITY. Moreover, during a substantial portion of the times and dates complained of in this action, SIMPSON, was acting City Manager for CITY, and as policymaker and final decision maker for CITY. At all times complained of herein,

CONSOLIDATED COMPLAINT FOR DAMAGES

SIMPSON was an individual person acting under the color of state law, acting pursuant to his authority as Acting and/or Assistant City Manager with DHSPD, and was acting in the course of and within the scope of his employment with the CITY.

14.    Defendant Rick Daniels, hereinafter referred to as "DANIELS," is, and was at all times complained of in this action, the City Manager of defendant CITY, and was a policymaker and final decision maker for CITY. At all times complained of herein, DANIELS was an individual person, acting under the color of state law, acting pursuant to his authority as City Manager, and was acting in the course of and within the scope of his employment with the CITY.

15.    Defendant Gabriella Mendoza, hereinafter referred to as "MENDOZA," is, and was at all times complained of in this action, a Sergeant and full time paid sworn police officer with DHSPD. At all times complained of herein, MENDOZA was an individual person acting under the color of state law, acting pursuant to her authority as a Sergeant with DHSPD, and was acting in the course of and within the scope of her employment with the CITY.

16.    Defendant Gustavo Paiz, hereinafter referred to as "PAIZ," is, and was at all times complained of in this action, a Sergeant and full time

paid sworn police officer with DHSPD. At all times complained of herein, PAIZ was an individual person, acting under the color of state law, acting pursuant to his authority as a Sergeant with DHSPD, and was acting in the course of and within the scope of his employment with the CITY.

17.    Defendant PAUL TAPIA, hereinafter referred to as "TAPIA," is, and was at all times complained of in this action, a full time paid sworn police officer with DHSPD. At all times complained of herein, TAPIA was an individual person, acting under the color of state law, acting pursuant to his authority as a Sergeant with DHSPD, and was acting in the course of and within the scope of his employment with the CITY.

18.    Defendant STEVEN O'CONNOR, hereinafter referred to as "O'CONNOR" is, and was at all times complained of in this action, a full time paid sworn police officer with DHSPD. At all times complained of herein, O'CONNOR was an individual person, acting under the color of state law, acting pursuant to his authority as a police officer with DHSPD, and was acting in the course of and within the scope of his employment with the CITY.

19.    DOES 1 through 5, inclusive, are police officers and/or supervisors and/or some other public officer / public official with and for CITY who were acting under the color of state law and in the course of and within the scope of his employment with the CITY.

20.    DOES 6 through 10, inclusive, are police officers and/or supervisors and/or CITY officials and/or some other public officer / public official with and for CITY

21.    At all times complained of herein, all of said natural defendants created and were acting pursuant to, the customs, policies, usages and practices of the  CITY for, *inter alia*: 1) retaliating against persons for exercising their first amendment right to freedom of speech / right to petition for redress of grievances; 2) retaliating against persons for testifying before federal and state Grand Juries, trials and depositions about police misconduct by DHSPD officers, 3) retaliating against persons for exercising their first amendment right to petition the government for redress of grievances, such as complaining to police / law enforcement authorities about police misconduct by DHSPD officers, and by retaliating against persons for truthfully testifying at depositions in lawsuits brought against other DHSPD police officers and other personnel.

CONSOLIDATED COMPLAINT FOR DAMAGES

22.   Accordingly, defendant CITY is liable for plaintiff's injuries complained of in this action.

23.   In addition to the above and foregoing, defendants SCLAFANI, O'CONNOR, WILLIAMS, SMITH, SINGER, SIMPSON, DANIELS,  MENDOZA, PAIZ, TAPIA and said DOE defendants were acting  pursuant to a conspiracy, agreement and understanding and common plan and scheme with others to deprive plaintiff of her federal and state law constitutional and statutory rights as described below, and acted in conspiratorial, joint and concerted action to so deprive the plaintiff of her constitutional and statutory rights as set forth below; all in violation of 42 U.S.C. § 1983, and otherwise in violation of California state law.

24.   Said conspiracy / agreement / understanding / plan / scheme / joint action / concerted action, above-referenced, was a legal cause of the violation of the plaintiff's constitutional and statutory rights, as set forth below.

**<ins>FIRST CAUSE OF ACTION</ins>**
**<ins>VIOLATION OF 42 U.S.C. § 1983</ins>**
**Violation Of First Amendment Right To**
**Freedom Of Speech**
**(Against all defendants)**

25.   Plaintiffs hereby reallege and incorporate by reference the allegations set forth in paragraphs 1 through 24, inclusive, above, as if set forth in full herein.

26.   On or about June 26, 1996 plaintiffs' decedent, Andrea Heath, was hired by the City of Desert Hot Springs as a sworn police officer with the Desert Hot Springs Police Department. Plaintiff excelled in her duties as a police officer with the Desert Hot Springs Police Department, and enjoyed working in that capacity.

27.   On or about February 25, 2005, Andrea Heath witnessed defendant DHSPD Sgt. Anthony Sclafani ("SCLAFANI"), beat and torture a DHSPD arrestee named Angelica Vargas at the DHSPD[1]. Moreover, throughout her employment with DHSPD, prior to and after that date, Andrea Heath witnessed several other DHSPD police officers falsely arrest, beat, tase, pepper-spray and otherwise torture detainees and arrestees.

28.   Thereafter, on or about April 11, 2007 Andrea Heath met with FBI[2] Special Agent Steve Novak and Assistant United States Attorney Lamar Baker, and reported to them various violations of the use of

[1] In a nutshell, SCLAFANI and other DHSPD officers beat, kicked, tased and pepper-sprayed a handcuffed DUI arrestee at the DHSPD station.
[2] The United States Department of Justice; Federal Bureau of Investigation.

CONSOLIDATED COMPLAINT FOR DAMAGES

10

unreasonable force upon, and false arrests of, civilians, by several

Desert Hot Springs Police Department officers[3], and the cover-up of

the same; in violation of  18 U.S.C. §§ 241[4] and 242[5], and in violation

of Cal. Penal Code §§ 118[6], 127[7], 128[8], 133[9], 134[10], 135[11], 146[12],

---

[3] Including but not limited to, then Desert Hot Springs Police Department Sergeants Anthony Sclafani and David Henderson.

[4] 18 U.S.C. § 241. If two or more persons conspire to injure, oppress, threaten, or intimidate any person in any State, Territory, Commonwealth, Possession, or District in the free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States, or because of his having so exercised the same; or If two or more persons go in disguise on the highway, or on the premises of another, with intent to prevent or hinder his free exercise or enjoyment of any right or privilege so secured - They shall be fined under this title or imprisoned not more than ten years, or both; and if death results from the acts committed in violation of this section or if such acts include kidnapping or an attempt to kidnap, aggravated sexual abuse or an attempt to commit aggravated sexual abuse, or an attempt to kill, they shall be fined under this title or imprisoned for any term of years or for life, or both, or may be sentenced to death.

[5] 18 U.S.C. § 242. Whoever, under color of any law, statute, ordinance, regulation, or custom, willfully subjects any person in any State, Territory, Commonwealth, Possession, or District to the deprivation of any rights, privileges, or immunities secured or protected by the Constitution or laws of the United States, or to different punishments, pains, or penalties, on account of such person being an alien, or by reason of his color, or race, than are prescribed for the punishment of citizens, shall be fined under this title or imprisoned not more than one year, or both; and if bodily injury results from the acts committed in violation of this section or if such acts include the use, attempted use, or threatened use of a dangerous weapon, explosives, or fire, shall be fined under this title or imprisoned not more than ten years, or both; and if death results from the acts committed in violation of this section or if such acts include kidnapping or an attempt to kidnap, aggravated sexual abuse, or an attempt to commit aggravated sexual abuse, or an attempt to kill, shall be fined under this title, or imprisoned for any term of years or for life, or both, or may be sentenced to death.

[6] Cal. Penal Code § 118.  (a) Every person who, having taken an oath that he or she will testify, declare, depose, or certify truly before any competent tribunal, officer, or person, in any of the cases in which the oath may by law of the State of California be administered, willfully and contrary to the oath, states as true any material matter which he or she knows to be false, and every person who testifies, declares, deposes, or certifies under penalty of perjury in any of the cases in which the testimony, declarations, depositions, or certification is permitted by law of the State of California under penalty of perjury and willfully states as true any material matter which he or she knows to be false, is guilty of perjury.

  This subdivision is applicable whether the statement, or the testimony, declaration, deposition, or certification is made or subscribed within or without the State of California.

CONSOLIDATED COMPLAINT FOR DAMAGES

11

149[13], 170[14], 181.1[15], 182(2)[16] and other California criminal statutes

involving the beating / torturing of persons, the false arrest / false

---

[7] Cal. Penal Code § 127.  Every person who willfully procures another person to commit perjury is guilty of subornation of perjury, and is punishable in the same manner as he would be if personally guilty of the perjury so procured.

[8] Cal. Penal Code § 128.  Every person who, by willful perjury or subornation of perjury procures the conviction and execution of any innocent person, is punishable by death or life imprisonment without possibility of parole. The penalty shall be determined pursuant to Sections 190.3 and 190.4.

[9] Cal. Penal Code § 133.  Every person who practices any fraud or deceit, or knowingly makes or exhibits any false statement, representation, token, or writing, to any witness or person about to be called as a witness upon any trial, proceeding, inquiry, or investigation whatever, authorized by law, with intent to affect the testimony of such witness, is guilty of a misdemeanor.

[10] Cal. Penal Code § 134.  Every person guilty of preparing any false or ante-dated book, paper, record, instrument in writing, or other matter or thing, with intent to produce it, or allow it to be produced for any fraudulent or deceitful purpose, as genuine or true, upon any trial, proceeding, or inquiry whatever, authorized by law, is guilty of felony.

[11] Cal. Penal Code § 135.  Every person who, knowing that any book, paper, record, instrument in writing, or other matter or thing, is about to be produced in evidence upon any trial, inquiry, or investigation whatever, authorized by law, willfully destroys or conceals the same, with intent thereby to prevent it from being produced, is guilty of a misdemeanor.

[12] Cal. Penal Code § 146.  Every public officer, or person pretending to be a public officer, who, under the pretense or color of any process or other legal authority, does any of the following, without a regular process or other lawful authority, is guilty of a misdemeanor:
  (a) Arrests any person or detains that person against his or her will.

[13] 149.  Every public officer who, under color of authority, without lawful necessity, assaults or beats any person, is punishable by a fine not exceeding ten thousand dollars ($10,000), or by imprisonment in a county jail not exceeding one year, or pursuant to subdivision (h) of Section 1170, or by both that fine and imprisonment.

[14] At the Desert Hot Springs Police Department. Cal. Penal Code § 170. Every person who maliciously and without probable cause procures a search warrant or warrant of arrest to be issued and executed, is guilty of a misdemeanor.

[15] 118.1.  Every peace officer who files any report with the agency which employs him or her regarding the commission of any crime or any investigation of any crime, if he or she knowingly and intentionally makes any statement regarding any material matter in the report which the officer knows to be false, whether or not the statement is certified or otherwise expressly reported as true, is guilty of filing a false report punishable by imprisonment in the county jail for up to one year, or in the state prison for one, two, or three years. This section shall not apply to the contents of any statement which the peace officer attributes in the report to any other person.

[16] 182.  (a) If two or more persons conspire:
  (1) To commit any crime.
  (2) Falsely and maliciously to indict another for any crime, or to procure another to be charged or arrested for any crime.

CONSOLIDATED COMPLAINT FOR DAMAGES

12

imprisonment of persons, the concealment / destruction of evidence, the framing of persons[17], and associated offenses.

29.   After Andrea Heath provided said above-referenced information to FBI Special Agent Steve Novak and Assistant Unites States Attorney Lamar Baker, she immediately noticed that she was being treated differently by other DHSPD police officers and other personnel. Andrea Heath noticed that none of her fellow officers were speaking to her, and were making remarks, to her and in her presence about Andrea Heath "ratting" them out.

30.   In July of 2007 Andrea Heath took time off of work[18] pursuant to the California Family Leave Act.

31.   Thereafter, pursuant to a conspiracy to cause the termination of the plaintiff from her position as a police officer with the DHSPD, SCLAFANI, WILLIAMS, SMITH, SINGER, SIMPSON, DANIELS, MENDOZA, O'CONNOR, PAIZ, TAPIA and said DOE defendants, engaged in acts of harassment, humiliation, making false complaints about the Andrea Heath, and deliberately failed to back Andrea Heath up in the field; jeopardizing the Andrea Heath's life, and causing her to fear for her life.

[17] Including giving perjured court testimony and conspiring with other officers to do so.
[18] At DHSPD.

CONSOLIDATED COMPLAINT FOR DAMAGES

13

32.     On or about on February 7, 2008 Andrea Heath returned back to work[19] and was thereupon demoted to the rank of patrol officer, from her rank as "Investigator". This demotion was purely retaliatory conduct for Andrea Heath complaining to federal law enforcement officials about said above-referenced conduct by DHSPD officers; especially SCLAFANI and former DHSPD Lieutenant David Henderson ("HENDERSON".)

33.     Plaintiff was told that her position as an Investigator for the Sexual Assault / Child Abuse Unit had been eliminated, and Andrea Heath's pay was decreased by 5%. Moreover, said Investigator position with the Sexual Assault / Child Abuse Unit, had, in fact, not been eliminated, and had been given to a new hire non-sworn person with and at the Desert Hot Springs Police Department ("DHSPD".)

34.     Moreover, substantially contemporaneously, DHSPD Sergeant Anthony Sclafani ("SCLAFANI"), was promoted to Administrative Sergeant.

35.     As Administrative Sergeant SCLAFANI was in charge of Patrol, scheduling, training, armory, issuing weapons, hire of new police officers, termination of employee's, vehicles, and ordering supplies.

---

[19] At DHSPD.

CONSOLIDATED COMPLAINT FOR DAMAGES

36.     During that time, although Andrea Heath was a veteran officer with the DHSPD, she was being treated like a newly hired officer. Plaintiff was told by officers less-seasoned and experienced than her, that SCLAFANI directed them to make Andrea Heath take all of the police reports[20], because he felt Andrea Heath needed additional training; something completely untrue.

37.     Also, after Andrea Heath spoke to the Justice Department (as discussed above), she was receiving little to no back-up assistance on her calls for service with the DHSPD. Andrea Heath was even dispatched at times to handle two calls for service at a time, which was highly unusual, and no other DHSPD officer was treated this way.

38.     Andrea Heath responded to numerous high risks calls, such as subjects fighting, domestic violence calls, man with gun calls, robbery calls, suspicious circumstances calls, and no DHSPD back-up officer's would respond to the scene of the call for service; notwithstanding the fact that the Andrea Heath had routinely received such back-up officer response to her calls for back-up prior to her complaining about criminal misconduct by SCLAFANI and other DHSPD police

---

[20] For a call for service by DHSPD.

CONSOLIDATED COMPLAINT FOR DAMAGES

15

officers. Andrea Heath had to call the DHSPD dispatchers several

times to get a back-up officer, and the back-up officers would take

more than the usual time to respond to her calls for back-up; all of this

placing Andrea Heath in great danger.

39.    On or about May 23, 2008 Andrea Heath met SCLAFANI in his

office at the DHSPD. He asked Andrea Heath what she had spoken to

the FBI about. SCLAFANI was upset and asked Andrea Heath what

she had seen of the Angelica Vargas incident[21]. SCLAFANI told

Andrea Heath that he didn't think it was right that he was facing going

to prison for a *"piece of shit, who was banging on the jail wall."*

40.    SCLANFANI also told Andrea Heath[22] that she should look into

applying for a police officer job at another police department;

implicitly because of the information of criminal wrongdoing by

SCLAFANI, Sgt. David Henderson[23] ("HENDERSON") and other

DHSPD officers that Andrea Heath reported to the "Justice

---

[21] In that incident, the female DUI arrestee vomited at the DHSPD, and SCLAFANI, along with several other DHSPD officers, took turns kicking, stomping and tasing said female DUI arrestee until she was unconscious and convulsing on the floor of the station, and when she crawled away from the officers, they pepper-sprayed her and continued to torture her. SCLAFANI was convicted of felony violation of 18 U.S.C. § 242 for torturing Angelica Vargas and Jamal White, and is presently awaiting sentencing.
[22] Several times.
[23] Formerly Lieutenant Henderson; demoted on or about July 1, 2005.

CONSOLIDATED COMPLAINT FOR DAMAGES

16

Department" (the United States Department of Justice, that includes the United States Attorney's Offices, and the FBI.)

41.   On November 8, 2008, SCLAFANI refused to assist[24] Andrea Heath in handling a dangerous call for service (a fight and weapons call), and she ended-up having to handle a violent person beating-up another by herself; again placing Plaintiff at great risk of serious injury to herself.

42.   In December of 2008, Andrea Heath was dispatched to a call for service involving an assault with deadly weapon, with two suspects fighting the hotel owner. Andrea Heath was dispatched as the primary officer and DHSPD Officer O'CONNOR was dispatched as the secondary officer.

43.   The two of them[25] were just at the DHSPD station before the call. As Andrea Heath drove to the call, she observed O'CONNOR driving behind her. Andrea Heath got out of her vehicle and observed several subjects fighting outside, near the pool area.

44.   Due to multiple subjects fighting, Andrea Heath needed O'CONNOR'S assistance, but O'CONNOR was nowhere to be found.

---

[24] SCLAFANI drove back to the DHSPD station and left Plaintiff alone to handle the violent call for service.

[25] Plaintiff and O'Connor.

CONSOLIDATED COMPLAINT FOR DAMAGES

17

Andrea Heath kept calling him on the radio to assist her, because of the hotel owner had been beaten unconscious, and Andrea Heath had to apprehend both combative suspects by herself.

45.   Andrea Heath asked for help from a citizen nearby because the situation was so volatile and violent.

46.   O'CONNOR purposely delayed assisting Andrea Heath; apparently for the purpose of furthering the acts of retaliation against Plaintiff for her having provided incriminating information about HENDERSON, SCLAFANI and other DHSPD officers, to the Justice Department[26].

47.   This caused her safety to be in jeopardy, and his response materially delayed the beating victim from receiving badly needed medical attention.

48.   In December of 2008, Andrea Heath was dispatched to a "Shots Fired" call for service by DHSPD. When Andrea Heath arrived at the scene, she observed a vehicle with bullet holes on the driver's door and blood on the front seat of the vehicle. It appeared that there was a possible gunshot victim, and a suspect with unknown whereabouts.

49.   Andrea Heath requested additional DHSPD back-up units, but was told that the other DHSPD officers were busy.

---

[26] Pursuant to a conspiracy among and between Officer O'Connor, the defendants to this action, and other DHSPD officers and personnel.

CONSOLIDATED COMPLAINT FOR DAMAGES

18

50.   Plaintiff received back-up units approximately thirty minutes later; an unusually long amount of response time for such a call, and an amount of time that again, placed Andrea Heath in great jeopardy of suffering great bodily injury; scaring Andrea Heath severely.

51.   Prior to having told the Justice Department about said criminal conduct by SCLAFANI, HENDERSON and other DHSPD officers, above-referenced, Andrea Heath was never expected to handle that type of dangerous call by herself, and had previously routinely received back-up assistance immediately.

52.   On or about December 14, 2008, Andrea Heath responded to a baby death call[27].

53.   When Andrea Heath arrived, SCLAFANI and Officer Brian Koahou were already on scene. Officer Koahou did not talk to Plaintiff at all; another act of retaliation for Plaintiff exposing criminal misconduct by SCLAFANI and other DHSPD officers; an act of retaliation done pursuant to a conspiracy between Officer Koahou, O'CONNOR, SCLAFANI, and the other defendants to this action, as well as other DHSPD officers. This was not normal DHSPD protocol, and in the past Plaintiff and Officer Koahou had communicated on calls.

---

[27] A "Sudden Infant Death" call.

CONSOLIDATED COMPLAINT FOR DAMAGES

19

54.   Officer Koahou also observed Riverside County Fire Department firefighters (including and especially Captain Frank Stewart), at location but no one spoke to Andrea Heath[28].

55.   SCLAFANI spoke to Andrea Heath briefly, but to a minimum. SCLAFANI asked Andrea Heath to stand outside for an insignificant reason, such as to get the address.

56.   None of the officers gave Andrea Heath any information about the call, which was abnormal, because in the past, these types of calls were Andrea Heath's specialty as an Investigator.

57.   This "silent treatment", and the failure of DHSPD officers to arrive as back-up officers to assist Andrea Heath on her calls for service, even very dangerous calls, persisted throughout the remainder of Andrea Heath's employment with the DHSPD while she was still an active duty police officer.

58.   Also in 2008, SCLAFANI was placed in charge of the ordering and maintaining the weapons in the armory.

59.   SCLAFANI issued Andrea Heath a Springfield .40 caliber pistol.

---

[28] An act of retaliation done pursuant to a conspiracy between Officer Koahou, Officer O'Connor, SCLAFANI, and the other defendants to this action, as well as other DHSPD officers.

CONSOLIDATED COMPLAINT FOR DAMAGES

60.     Andrea Heath immediately started having trouble with her DHSPD
        pistol qualifications, although she did not have problems with pistol
        qualifications beforehand.

61.     Andrea Heath later found out that she was issued a different pistol
        from any other DHSPD officer. The pistol that SCLAFANI gave
        Andrea Heath was larger and heavier than those pistols issued to the
        other DHSPD officers; an act by SCLAFANI to retaliate against her
        for providing information to the Department of Justice that
        incriminated him.

62.     This was causing Andrea Heath to not qualify at the shooting range,
        and because that weapon was a major tool in saving Andrea Heath's
        life and the lives of others, compromised Andrea Heath's safety.

63.     Thereafter, on or about June 7, 2008, SCLAFANI called Officers
        O'CONNOR and Mike Valentich into his office which was nearby
        Andrea Heath's location at that time at the DHSPD station.

64.     The three of them made horrible and vicious *ad hominem* and racist
        remarks about Andrea Heath, such as: that Andrea Heath was the
        dumbest person that he/they knew, that Andrea Heath acted like a
        "bull-dyke", that Andrea Heath was a "fat pig", that Andrea Heath
        smelled bad, and other offensive remarks, including racial epithets

directed against black persons of African descent; all of which were overheard by Andrea Heath, as she was in the next room.

65.  Moreover, said statements were made by said defendants / officers, in a manner in which said officers / defendants knew that Andrea Heath would hear them, and were made by the defendants to retaliate against her for complaining about their crimes against civilians to federal law enforcement officials, by causing her severe emotional distress, as did the other acts of retaliation complained of herein; above and below.

66.  Andrea Heath felt so degraded and humiliated from said statements that she gathered her belongings and left DHSPD for the night.

67.  The following morning, June 8, 2008, Andrea Heath related to DHSPD Chief Patrick Williams, what had happened with SCLAFANI, O'CONNOR and Officer Valentich on June 7, 2008; above-referenced.

68.  Chief Williams directed Andrea Heath to call DHSPD Commander Edwin Smith, and to tell him what had occurred.

69.  Andrea Heath called Commander Smith and spoke to him briefly. He asked for Andrea Heath to come into his office within the next several days to talk about the matter, and Andrea Heath did so.

70.     Andrea Heath told Commander Smith that Andrea Heath realized that SCLAFANI and the other defendants to this action were upset with her, because she had spoken to the Department of Justice about SCLAFANI'S torturing of Angela Vargas and of Jamal White.

71.     Commander Smith said that he would talk to SCLAFANI.

72.     In fear of further retaliation, Andrea Heath explained to him that SCLAFANI had called Andrea Heath into his office recently, and asked her about said FBI / DOJ[29] investigations; above-referenced. Plaintiff told him that SCLAFANI asked her why would she stand up for a "piece of shit" and not for him.

73.     Andrea Heath told Commander Smith that Andrea Heath was not even able to discuss the FBI / DOJ investigations with her at the time.

74.     Commander Smith acknowledged that she was not to talk about the FBI / DOJ investigations, and said he would speak to Chief Patrick Williams about it all.

75.     In July of 2009 FBI Special Agent Novak called Andrea Heath and asked her if she could meet him and another FBI Agent in Palm Springs, California about DHSPD misconduct / criminal actions.

---

[29] The United States Department of Justice.

CONSOLIDATED COMPLAINT FOR DAMAGES

76.   Andrea Heath explained to him that she was on medical leave, and, therefore, could not (was not permitted) to meet with him at that time, but that she would get back to him about meeting with him on some future date.

77.   On or about July 23, 2009, Andrea Heath spoke to the (City of Desert Hot Springs) Human Resources Department to ascertain if she was authorized to meet with FBI Special Agent Steve Novak regarding work[30].

78.   DHS Human Resources stated they had spoken to Chief Williams, who said that Andrea Heath needed to wait until she comes back to work at DHSPD to meet with Special Agent Novak, and that Andrea Heath was not to do so until she was back at work.

79.   Andrea Heath postponed all meetings with FBI at this time, pursuant to said directions by Human Resources.

80.   In August and September of 2009, FBI Special Agent Steve Novak requested that Andrea Heath meet with him at a Federal Building in Los Angeles on October 2, 2009. Andrea Heath was still out on medical leave from work. Andrea Heath asked Special Agent Novak to contact Chief Williams before she met with him, for his approval.

---

[30] The DHSPD.

CONSOLIDATED COMPLAINT FOR DAMAGES

81.  Andrea Heath left a voice mail message on Chief William's cell phone, stating that FBI Special Agent Steve Novak was requesting to meet with her.

82.  On or about August 24, 2009, Andrea Heath emailed Chief Williams a letter requesting an extension of medical leave, and left voice message on his cellular phone.

83.  On or about August 25, 2009, Andrea Heath left another message, this time on Chief William's voice mail, to call her back.

84.  On August 27, 2009, DHSPD Sgt. David Henderson was indicted by a federal Grand Jury for one count of violation of 18 U.S.C. § 242; violation of federal constitutional rights under color of authority, for the torturing of Winston Chambers. *United States of America v. David Raymond Henderson*; United States District Court for the Central District of California, Case Number CR 09 00843.

85.  On or about September 30, 2009 Special Agent Steve Novak called P Andrea Heath, requesting to meet with her on October 2, 2009 in Los Angeles.

86.  On or about October 1, 2009, Andrea Heath met with Chief Patrick Williams at the DHSPD station in his office.

CONSOLIDATED COMPLAINT FOR DAMAGES

87.   She asked for his permission to take an extended medical leave, because she was having further surgical procedures.

88.   She explained to him that FBI Special Agent Steve Novak wanted to meet with her in Los Angeles on October 2, 2009.

89.   In response to that statement by Andrea Heath to Chief Patrick Williams, Williams directed Andrea Heath to tell Special Agent Novak that she was unable to drive to Los Angeles, due to her recovery from surgical procedures; something untrue that Chief Williams told Andrea Heath to tell to the FBI.

90.   Chief Williams directed Andrea Heath to tell Agent Novak that he would have to wait until Andrea Heath came back to work for her to go to meet with him.

91.   Chief Williams said he had not spoken to Special Agent Novak himself and knew nothing about any such meeting between Agent Novak and the Andrea Heath.

92.   Chief Williams told Andrea Heath to take her time coming back to work, and that he would expect her to return to work after Christmas 2009.

93.   On or about October l, 2009, pursuant to Chief Williams directions to Andrea Heath, Andrea Heath called and left a telephone message for

Special Agent Steve Novak, stating that she had spoken to Chief Patrick Williams, and that she needed to postpone their meeting.

94.    On or about October 5, 2009 FBI Special Agent Steve Novak called Andrea Heath and said he had left a message with the Chief Patrick Williams for Special Agent Novak to meet with Andrea Heath.

95.    On or about October 8, 2009, FBI Special Agent Steve Novak again called Andrea Heath and asked her to meet with him.

96.    On or about October 16, 2009, Andrea Heath provided DHS Human Resources and DHSPD Chief Williams with a doctor's note for a longer extension of Andrea Heath's medical leave.

97.    Notwithstanding Chief Williams' directive to Andrea Heath to not meet with the FBI / Justice Department until she was back on active status at DHSPD, on or about October 20, 2009 Andrea Heath nonetheless met with FBI Special Agent Steve Novak and Assistant United States Attorney Steve Arkow.

98.    On or about October 21, 2009 Andrea Heath received an e-mail from Chief Patrick Williams.

99.    Andrea Heath called Chief Patrick Williams on his cellular phone and spoke to him briefly.

CONSOLIDATED COMPLAINT FOR DAMAGES

100. Chief Williams said that Andrea Heath did not hold-up her "end of the bargain".

101. Chief Williams told Andrea Heath that he did not want Andrea Heath to have met with, or to meet with, the FBI / Justice Department, and scolded her for doing so.

102. On or about November 19, 2009 Andrea Heath received a telephone call from Commander Kate Singer to confirm that the date for Andrea Heath's return to work at DHSPD on November 23, 2009. SINGER told her to return to duty on that date, but not to wear a police uniform (only civilian clothes), and not to carry her duty weapon until Andrea Heath qualified on the shooting range on November 24, 2009.

103. SINGER also told Andrea Heath that she needed to ride in the marked Patrol vehicle with Officer Paul Tapia (an officer for a short amount of time and still on probation status at DHSPD.)

104. On or about November 19, 2009 Andrea Heath returned to work from her medical leave. Andrea Heath followed orders to wear civilian clothes and not to carry her duty weapon, as directed by Commander Singer.

105. While Andrea Heath and DHSPD Officer Tapia responded to a call of Domestic Violence and False Imprisonment call for service (and

thereafter), Officer Tapia asked Andrea Heath to start taking police reports. Andrea Heath was approached by citizens and by co-workers, and asked why she was not wearing a police uniform.

106.    Andrea Heath felt embarrassed and humiliated, because she had worked with the public and other agencies as a regular sworn police officer for over twelve years by that time. This embarrassment and humiliation was another form of retaliation against the Andrea Heath by CITY / DHSPD officials, for Andrea Heath complaining to federal law enforcement authorities about misconduct / crimes against civilians by SCLAFANI and other DHSPD officers / officials.

107.    Andrea Heath was, therefore, placed in dangerous situations by said orders; especially by policing without a police uniform or duty weapon. This was unacceptable to Andrea Heath, and was another form of continuous harassment of Andrea Heath for telling the FBI / Justice Department about the criminal actions of SCLAFANI, HENDERSON and other DHSPD officers, and the cover-up and tolerance of said criminal conduct, by high ranking DHSPD and other CITY officials (i.e. the defendants to this action.)

108.    Andrea Heath asked her on-duty watch commander, DHSPD Sgt. Radames Gil, why she was told not wear a Police Officer's uniform,

and not to carry a gun while she was out in the field. Sgt. Gil said that Andrea Heath was on the "hit list", and it did not matter; that she was being targeted to be fired from the DHSPD for her exposing misconduct / crimes by DHSPD officers.

109. DHSPD Sgt. Eddie Cole also told Andrea Heath that the department was looking to fire Andrea Heath, and to demote him, because he too had testified before the Federal Grand Jury that was investigating DHSPD, and for providing incriminating information to the Justice Department regarding the Excessive Use of Force (and other crimes) by SCLAFANI and HENDERSON[31].

110. November 25, 2009, Andrea Heath arrived at DHSPD to work and wore her DHSPD police uniform, even though SINGER told her not to do so.

111. This was embarrassing and humiliating to Andrea Heath in front of her peers and public.

112. This conduct allowed other officers to doubt Andrea Heath's credibility and to destroy her reputation as a long-time experienced police officer.

---

[31] Sgt. Eddie Cole was later demoted from a sergeant to a police officer on Feb. 27, 2010 due to his cooperation with FBI.

CONSOLIDATED COMPLAINT FOR DAMAGES

113.    While Andrea Heath was wearing her police officer uniform, she was immediately questioned by newly appointed Sergeant Gus Paiz why was she wearing a police officer uniform[32].

114.    Sgt. Paiz said he was told by Commander Singer that Andrea Heath was to shred her old reports all day. While Andrea Heath was doing so, SCLAFANI came in the room and started laughing. He asked Plaintiff what she was doing, and made comments that Plaintiff was a Veteran officer, and now, a paper shredder. SCLAFANI said Andrea Heath was on the "hit list" and that Andrea Heath only needed to be concerned about being "fired", but he had to worry about going to prison and losing his family.

115.    On or about November 29, 2009 Andrea Heath was directed to ride with a newly hired DHSPD Police Officer Paul Tapia for the week. He had been out of law enforcement for about one or two years.

116.    Andrea Heath was told to observe him on calls by SINGER, which was insulting and demeaning[33], as Andrea Heath had been a police officer in good standing with the department, who also achieved a

---

[32] Sgt. Paiz was good friends with retired Lieutenant David Henderson and Sgt. Sclafani, both of whom were facing Federal Indictment for the Excessive Use of Force under color of authority; 18 U.S.C. § 242.

[33] A further act of retaliation.

CONSOLIDATED COMPLAINT FOR DAMAGES

P.O.S.T[34]. Field Training Officer Certificate[35], for many years, and Officer Tapia was newly hired officer was and still on employee probation[36].

117. Andrea Heath felt humiliated and embarrassed that she was being treated like a new trainee police officer and was ordered to ride with newly hired Officer Tapia.

118. On or about December 8, 2009 FBI Special Agent Steve Novak called Andrea Heath regarding her appearance to testify before the Federal Grand Jury that was investigating the DHSPD, and she received a federal Grand Jury subpoena for her to testify before said Grand Jury.

119. Andrea Heath told him that he needed to contact DHSPD Chief Patrick Williams or Commander Edwin Smith before doing so, as she had previously gotten in trouble with Chief Williams for meeting with said federal law enforcement officials against his directions.

---

[34] California Department of Justice; Peace Officers Standards on Training.
[35] Completed / issued 7/21/06.
[36] On or about November 30, 2009 Plaintiff was approached by Officer O'Connor at the DHSPD station. He told Plaintiff that he had been off work for approximately three or four months for a medical leave, but when he returned he did not have to ride with anyone. He asked Plaintiff why she thought I had to drive with Officer Tapia especially since I was a veteran officer of twelve years. This was an example of Plaintiff being treated differently from other officers that had been off of work in the past creating a hostile work environment.

CONSOLIDATED COMPLAINT FOR DAMAGES

120.  On or about December 8, 2009, all DHSPD officers were told to attend an emergency DHSPD Police Officer's Association ("POA") meeting at South of the Border restaurant.

121.  When Andrea Heath arrived, SCLAFANI and several of the newly hired DHSPD officer's did not speak to her, and sat on the other side of the restaurant from Andrea Heath.

122.  SCLAFANI was in charge of the meeting, and asked Andrea Heath if she thought that it was fair how Andrea Heath was being treated; like a new "Boot"[37].

123.  Officer Tapia ordered food, and verbally / vocally emphasized how he wanted extra *"cheese"*, and kept repeating himself; referring to Andrea Heath being considered a *"rat"* by the DHSPD.

124.  SCLAFANI and the other officers laughed with Officer Tapia at his *"cheese"* comments. It appeared that most of the officers were new hired officers, that were on probation with the department.

125.  SCLAFANI was in charge of the hiring and firing at DHSPD at this point in time, and Andrea Heath felt intimated by SCLAFANI being in such a position. Andrea Heath later called DHSPD Officer Rex, to

---

[37] A rookie officer.

CONSOLIDATED COMPLAINT FOR DAMAGES

33

voice her concern about being treated poorly by the DHSPD, as he was the POA President.

126. Andrea Heath told him that she was called to testify before the federal Grand Jury on the following day.

127. On or about December 10, 2009, Andrea Heath testified before a federal Grand Jury that was investigating the DHSPD at the United States Courthouse at 312 North Spring Street, Los Angeles, California.

128. Andrea Heath called Commander Edwin Smith after she so testified, and told him that it appeared that the court was taking the allegations against DHSPD seriously. Commander Smith said he would speak to Chief Williams about the matter.

129. On or about December 23, 2009, Andrea Heath was on patrol and called into the DHSPD office and she observed SCLAFANI walking out of the same office.

130. Sgt. Paiz told Andrea Heath that SINGER told him that she had a problem; that Andrea Heath had not turned in enough reports for the week as a veteran officer.

131. Sgt. Paiz said he explained to her that the shift was at minimum staffing during the week and it was busy. Andrea Heath asked him

what report was he referring to, and he said a report that was generated in July of 2009 referring to a robbery report of an Ice Cream vendor. He said the element of the crime was missing on the report. Andrea Heath told him that she was subpoenaed for court on the case about a week ago and that the District Attorney made no mention of any problems with the report. The suspect(s) / defendant(s) were convicted in the case.

132.   A few minutes later, Detective Larry Essex asked Sgt. Paiz to look over his report before he submitted it for filing with the DA. Detective Essex told him that he always was missing something. Sgt. Paiz told him he needed to add the first name of subject and time of arrest to his report.

133.   Andrea Heath was treated differently from other officers, and this was a form of retaliation, discrimination and hostile work environment.

134.   Thereafter, also on or about December 23, 2009, Andrea Heath was placed on a "discipline program" called "PIP"; Performance Improvement Plan, and was given an evaluation for the periods of January 1, 2007 through August 20, 2009; a two year evaluation which Andrea Heath had never received in her tenure at the DHSPD.

135.   Andrea Heath was given an evaluation by Sgt. Ken Peary (a newly hired Sergeant, still on probation with the department.)

136.   Andrea Heath was told that her performance was considered below standards[38] and was placed the PIP for the next 90 days; notwithstanding that Andrea Heath's performance was well above DHSPD standards.

137.   Andrea Heath was subjected to this obloquy and humiliation (another adverse employment action / retaliation), because Chief Williams was upset that Andrea Heath met with the DOJ / FBI against his wishes. The "PIP" is normally a way the DHSPD "dissects" a police officer, in order to put together enough (bogus) paperwork (personnel file) to terminate the officer, when there are no legitimate grounds to do so.

138.   On or about December 23, 2009 through January 16, 2010, Andrea Heath  was sent on high risk calls for service, without back-up, such as traffic stops, parole searches, burglary alarm calls, robbery alarm calls, pedestrian stops, party & loud music calls, subjects fighting, domestic violence calls, etc.

---

[38] Which it was not.

CONSOLIDATED COMPLAINT FOR DAMAGES

36

139.   Andrea Heath was also "benched"[39] to work on reports in the DHSPD station[40]. Andrea Heath was also demoralized, as her fellow officers were telling her that she was on the *"hit list"* and was going to be fired.

140.   On or about January 17, 2010 through January 29, 2010, Andrea Heath was assigned patrol cars with damaged radio's, and was unable to hear the DHSPD emergency radio traffic.

141.   Andrea Heath was also assigned patrol cars that wouldn't start. Andrea Heath had the computer taken out of her patrol vehicle by other DHSPD officers. Andrea Heath was also logged-out of the computer on various times by others. In addition, Andrea Heath was told by Sgt. Paiz that her integrity was being questioned because the DHSPD administration did not believe that Andrea Heath was writing her own police reports, and that Detective Henson wrote her reports for her.

142.   This was untrue and was made up by SCLAFANI and his co-conspirators; the other defendants to this action along with other DHSPD officers.

---

[39] Placed on office duty, rather field duty or patrol functions.
[40] Taken off patrol duties. Another adverse employment action.

CONSOLIDATED COMPLAINT FOR DAMAGES

143.  On or about January 29, 2010, Andrea Heath met with the DHSPD computer technician, who stated that he could not find a problem with her computer log on and there was no known audit. Andrea Heath felt that she was being harassed by her fellow officers. She was not receiving fair treatment like the other officers.

144.  On or about January 30, 2010, Sgt. Paiz told Andrea Heath that she did not appear to be a team player, and asked her if she felt like she was part of the shift. He gave Andrea Heath a photo copy paper that stated *"team player"*. Andrea Heath explained to Sgt. Paiz how degrading his question was, and as a veteran officer she had never had any complaints of being a team player.

145.  On or about February 4, 2010, Andrea Heath received a subpoena to appear as a witness for an Indio – Riverside County Superior Court on an embezzlement felony case. Andrea Heath was approached by new hired District Attorney Brad Braaten. He was laughing and told Andrea Heath that he had received a copy of a documentation of Andrea Heath's performance evaluation, that stated that Plaintiff was on trainee status. He said he thought it was funny and a joke. Andrea Heath felt humiliated and believed the documentation was sent intentionally to the District Attorney's office; another violation of

Andrea Heath right to privacy in their personnel files pursuant to Cal. Gov't Code § 3300 *et seq.*

146.    On or about February 4, 2010 Andrea Heath returned to the computer station that she had been working on and the other computers were occupied at the time she walked in. She sat down at the computer and observed a Chocolate milk carton (which referred to Andrea Heath; a member of the African-American race.) Officer Steinhous said that they could have used Andrea Heath on patrol today to help out. Andrea Heath explained to him that she had been subpoenaed to court.

147.    On or about February 10, 2010, SCLAFANI was indicted by a federal Grand Jury on two counts of violation of 18 U.S.C. § 242; violation of federal constitutional rights under color of authority, for his torturing of Angelica Vargas and Jamal White; *United States of America v. Anthony Sclafani*; United States District Court for the Central District of California, Case Number CR 10 00163. Andrea Heath was a witness for the government in that case, against SCLAFANI, and her statements to the government (DOJ) about SCLAFANI'S conduct resulted[41] in said Indictment.

---

[41] Or at least contributed to.

CONSOLIDATED COMPLAINT FOR DAMAGES

39

148. On or about February 11, 2010 Andrea Heath was called into SINGER'S office and met with her and Sgt. Paiz.

149. Andrea Heath was told by SINGER that she was being placed as a trainee officer and assigned to Officer Tapia (Tapia received a Field Training Certification in January 2010)[42].

150. This appeared to be another clear sign to Andrea Heath that she was being retaliated against and harassed by the DHSPD Administration and fellow DHSPD officers.

151. Andrea Heath was told that she was going to start like a new trainee, and would go through all of the phases of what a newly hired officer would endure. Commander Singer said she just felt the PIP was not working out for Andrea Heath and the department wanted to give Plaintiff every opportunity before they had to take other measures.[43]

---

[42] Singer had no legitimate examples of said allegations, and it was evident that Plaintiff was being run out of the DHSPD because of her complaints of criminal conduct to the Justice Department, and because of her having testified before a federal Grand Jury that was investigating allegations of criminal conduct by approximately 8 DHSPD officers; especially and including SCLAFANI and HENDERSON.
[43] Again, this was part of an ongoing conspiracy that included Chief Williams, Commander Singer, Sgt. Sclafani, Sgt. Henderson, and other DHSPD officers to retaliate against Plaintiff for her complaining to the Justice Department about criminal conduct by approximately 8 DHSPD officers; especially and including SCLAFANI and HENDERSON.

CONSOLIDATED COMPLAINT FOR DAMAGES

40

152.   On or about February 11, 2010, while on "Trainee status" with Officer Tapia ("FTO"[44]), Plaintiff was asked to sit in the passenger seat while he drove the vehicle to show Andrea Heath how to drive.

153.   On or about February 16, 2010, Officer Tapia told Andrea Heath that he needed to handle calls as if she had no back-up officer available. Andrea Heath told him that was an officer safety issue. He told Andrea Heath that she needed to prove herself and that she had to pretend that there were no officers available. He said she was still on probation so basically he had to do what he had to do. He said that Andrea Heath must understand what they were doing, and he didn't have a choice in the matter, and that he was just doing what he was told to do regarding Andrea Heath.

154.   On or about February 16, 2010, at a Community Policing Meeting at Tedesco Park, Andrea Heath was speaking to the community about any problems they were having in their neighborhood or businesses. Chief Williams was also present, along with Sgt. Paiz and Officer Steinhous. A member of the community asked Andrea Heath a question, for which, Andrea Heath asked for feedback from Chief

---

[44] Field Training Officer.

Williams. Chief Williams told Andrea Heath directly that she was not to speak to him.

155.  Andrea Heath felt humiliated, because he had been speaking to Officer Steinhouse and Sgt. Paiz just minutes before. About five to ten minutes later, Chief Williams made eye contact with Andrea Heath and got up and left the meeting.

156.  On or about February 18, 2010, Officer Tapia placed Andrea Heath in unsafe situations, by insisting that she conduct traffic stops and vehicle searches by herself. Andrea Heath had to handle all of the high risks calls to the point where she was basically handling all of the calls by herself.

157.  At times, Tapia would yell at Andrea Heath; even in front of suspects. Andrea Heath told Tapia that she was more than capable of handling situations, but that she needed to have assistance or she could get harmed. Tapia told Andrea Heath to pretend there was no back-up available. Andrea Heath felt this type of treatment was unsafe for her and for the public. The work environment was unsafe, hostile, a form of retaliation, and was getting worse as each day went on.

158.  Officer Tapia asked Andrea Heath to pretend in the back parking lot that she was a suspect. He told Andrea Heath that he wanted to

demonstrate how Andrea Heath should handle a suspect. He asked Andrea Heath to spread her feet apart and proceeded to put handcuffs on her. Andrea Heath told him that she did not see how this was necessary and was very embarrassing in front of the other DHSPD officers. Officer Tapia said that Andrea Heath needed to be more of a bitch.

159. On or about February 18, 2010, Officer Tapia, Officer Jason Hunter and Andrea Heath were in the report room typing reports. Officer Tapia asked SCLAFANI if he wanted to get some coffee from Starbucks. Sgt. SCLAFANI replied: "No they don't serve coffee in federal prison".

160. SCLAFANI told Officer Tapia that he would have to get use to "jail house coffee", and asked Officer Tapia (by yelling) if he ". . . ever tasted jail house coffee."

161. Andrea Heath felt intimated, and that SCLAFANI was directing his conversation towards her, as though it was her fault that SCLAFANI was now facing federal felony criminal charges.[45]

162. On or about February 22, 2010 DHSPD Detective Jim Henson told Andrea Heath that SCLAFANI approached him earlier that day and

---

[45] For torturing Angelica Vargas and Jamal White.

CONSOLIDATED COMPLAINT FOR DAMAGES

43

asked if Andrea Heath was stressed. SCLAFANI told him the most that Andrea Heath needed to worry about was being fired, but he had to worry about going to prison.

163. On or about February 23, 2010, Andrea Heath observed a photo copy of a picture of a little girl with her mother reading a book called *"Becoming a Bitch"*. Andrea Heath believed that it was meant for her, and felt harassed by this. The name listed on the bottom was: *ms.cathedralcity.gov/exchange/GMendoza/lnbox/FW:%20Secredt%20 Book...2/20/2010.* Detective Jim Henson came into the DHSPD report room and told Andrea Heath to save the poster because he believed it was meant for her, and that she might need it later. Andrea Heath took possession of the poster and made photo copies.

164. Defendant Gabrielle Mendoza, was employed by the city of Cathedral City Police Department ("CCPD") as a police officer at the time.

165. The city of Desert Hot Springs Police Department paid for two officers contracted from CCPD. Officer Mendoza was one of the officers.

166. Officer Mendoza harrassed Andrea Heath on about five occasions, which was only a small portion of the harassment that she endured

CONSOLIDATED COMPLAINT FOR DAMAGES

44

since making a report to FBI about SCLAFANI and other DHSPD officers.

167. On or about February 26, 2010, DHSPD Detective Jim Henson told Andrea Heath that SCLAFANI had called his cellular phone and told him that he needed some type of bail money for the federal charges against him, above-referenced, and he needed some collateral.

168. On or about March 1, 2010 Andrea Heath spoke to FBI Special Agent Steve Novak regarding the retaliation / treatment that she was enduring at work. She expressed her concern over her job because she was told almost daily by her fellow officers that she was on the "list" to be fired.

169. On or about  March 7, 2010 Sgt. Paiz offered overtime hours to several new hire officers, but not to Andrea Heath, who Paiz told was not eligible for overtime hours, because she was considered a trainee; notwithstanding the fact that she was the most senior officer with DHSPD.

170. This was another example of retaliation / hostile work environment / adverse employment action, and Andrea Heath was denied working any overtime (loss of money.)

CONSOLIDATED COMPLAINT FOR DAMAGES

171. In her past years at DHSPD, Andrea Heath had always worked many shifts of overtime and was never denied until now.

172. On or about March 7, 2010 SCLAFANI told Officer Tapia that he wanted to meet with Andrea Heath in his back office.

173. Andrea Heath met with SCLAFANI, who was very aggravated. He said while he was recently driving home from work and got a telephone call from his attorney. The attorney told him he was being indicted for criminal charges and needed to turn himself in within the next thirty days.

174. SCLAFANI asked Andrea Heath what she told the FBI about his involvement with the female arrestee (referring to Angelica Vargas). SCLAFANI said that Andrea Heath couldn't have seen anything because nothing happened; something not true.

175. SCLAFANI stated all Andrea Heath needed to worry about was being fired, but he had to worry about being sent to prison.

176. The conversation continued to the point where SCLAFANI said he had a trainee once that did not listen properly when it came to shooting techniques.

177. He said he later found out the trainee had been shot and killed because he didn't take his gun out fast enough. SCLAFANI said he did not

CONSOLIDATED COMPLAINT FOR DAMAGES

46

want to see that happen to Andrea Heath. SCLAFANI suggested to Andrea Heath that she take a stress leave, and think about retiring. This was another act of retaliation by SCLAFANI against Andrea Heath.

178.  SCLAFANI and the other defendants to this action were influencing other officers and administration, by conspiring with them, to threaten Andrea Heath's employment and safety.

179.  On or about  March 9, 2010, at a Training hosted by Riverside County Sheriff's Department for Perishable Skills Training, Officer Phillip Weigle (a DHSPD officer), the other officers in the class said they heard Andrea Heath was a veteran officer and had been placed as Trainee. Andrea Heath was so humiliated and embarrassed; it appeared that Andrea Heath's reputation as a police officer was sabotaged and tarnished.

180.  On or about March 9, 2010, Andrea Heath attended training the second day at the Ben Clark Training Center. She received a text message from Sgt. Gil telling her it was urgent for her to come back.

181.  He said that Andrea Heath's trainee observations needed to be signed again because he had to change the wording. He said the administration wanted him to use stronger language. He again

reminded Andrea Heath that she was on the list to be fired. This was another threat of Andrea Heath's employment ending.

182. Also that day, Andrea Heath called SCLAFANI on his cellular phone. She asked for him to work it out so that the hostility and retaliation would stop.

183. SCLAFANI said that Andrea Heath should consider taking a stress leave and to use his name or Officer Tapia's name for the stress complaint. He said he wasn't worried about it and to do what Andrea Heath needed, in order to survive.

184. In the conversation that took place it appeared that SCLAFANI had no intentions of stopping or backing off so that Andrea Heath could go to work as she normally had the previous years. It appeared out of control.

185. On or about March 17, 2010, DHSPD Officer Raul Sandoval was assigned as Andrea Heath's F.T.O. (new hire on probationary period and received F.T.O certificate January of 2010).

186. Andrea Heath was dispatched to a call of a possible man with a gun. The dispatcher advised the suspect was carrying possibly a rifle, walking with three to four other males subjects dressed in dark

CONSOLIDATED COMPLAINT FOR DAMAGES

clothing. The suspects were last seen near the vacant field of Pierson/ Mission Lakes.

187. While enroute to the call, Officer Sandoval told Andrea Heath to explain to him what she was going to do.

188. Andrea Heath told him she was going to set up with other units and check the area. He asked Andrea Heath if she was going to take her handgun out. Andrea Heath said "No", that she was going to take the AR-15 rifle out of the vehicle.

189. She looked at the AR-15 rifle that was locked in the gun rack in the vehicle as usual but she discovered there were no bullets and the entire magazine was missing from the rifle. Andrea Heath asked Officer Sandoval where the bullets were to the rifle. Officer Sandoval said he stored them tucked in the side panel of the driver's door. At that point, Andrea Heath felt that her life was being threatened and her safety was in danger. Andrea Heath observed another police unit arrive to the scene. The officer never stopped to make contact and continued driving by Andrea Heath. It was fortunate at the time, that Andrea Heath did not come into any contact with an armed suspect but the situation was a clear sign that she was being retaliated against, and working in a hostile environment. Against these actions by

CONSOLIDATED COMPLAINT FOR DAMAGES

49

190.   On or about  March 17, 2010, Andrea Heath had been called in the office by SCLAFANI to inspect her gun. This was unusual because in the history of her employment, Andrea Heath was never asked by SCLAFANI to keep inspecting her gun. This was another form of continued harassment and retaliation by SCLAFANI. Andrea Heath was not quite sure why SCLAFANI continued to ask to look at her gun. Andrea Heath  did not trust him or what he was capable of by this point.

191.   On or about March 18, 2010 Andrea Heath called FBI Special Agent Novak's cellular phone number regarding her employment being threatened, and that she needed to meet with him. Special Agent Novak said that he would call her back with a date to meet. Also on that same day, Andrea Heath texted SCLAFANI on his cellular phone, requesting the retaliation to stop.

192.   Andrea Heath met with SCLAFANI and Sgt. Gil was present.  A short time later, Andrea Heath told them that she had spoken to the FBI about the retaliation that she was receiving at work.

193.   Andrea Heath told SCLAFANI that she believed that she was being retaliated against because of her testimony before the federal Grand Jury that Indicted SCLAFANI, and because of her reporting

SCLAFANI's crimes, above-referenced, to law enforcement authorities.

194. SCLAFANI denied having any involvement in the threats that she was receiving regarding her employment.

195. On the same date, March 18, 2010, Andrea Heath was called into the DHSPD office to meet with Commander SINGER and Sgt. Gil.

196. Commander SINGER said that Andrea Heath's fellow officers reported to her that she had officer safety issues. Commander SINGER said it appeared that Andrea Heath lacked confidence, and referred to a call regarding an evaluation of 5150 WIC- elderly female.

197. Commander SINGER said Andrea Heath took too long on the call. She said she received complaints from Andrea Heath's fellow officers that she had officer safety issues, because her searching techniques of suspects were outdated.

198. Andrea Heath had never had any prior complaints in the past twelve years of her employment with DHSPD of any officer safety issues. She was not able to give Andrea Heath any valid examples of Officer Safety issues that involved Andrea Heath. Commander Singer said she was sending Andrea Heath to an Officer's Survival course at the San

CONSOLIDATED COMPLAINT FOR DAMAGES

Bernardino Sheriff's Training Center; training that was set-up by SCLAFANI.

199. Thereafter, Andrea Heath was also notified that she was being sent to attend a Requalification Academy with Orange County Sheriff's Department. The course was designed for person's who needed to renew their POST certificate.

200. Andrea Heath did not fall into that category because she had an Advanced Post Certificate. Commander Singer said if Andrea Heath passed the academy, that she would then have a meeting with herself and Chief Williams to ascertain if Andrea Heath was able to keep her employment with the City of Desert Hot Springs.

201. Andrea Heath asked her on what grounds was Chief Williams looking to fire her. Commander SINGER said she could get "rid" of Andrea Heath because of her attitude.

202. Andrea Heath apologized to her and told her that she very much needed her job.

203. This was the last day (March 18, 2010) that Andrea Heath had worked as a police officer on patrol for DHSPD, and due to the ongoing harassment and retaliation, and continued threats of being fired, Andrea Heath believed that her only alternative at that point was to

CONSOLIDATED COMPLAINT FOR DAMAGES

take a stress disability leave as, SCLAFANI had suggested; above-referenced.

204.   Andrea Heath was afraid that she was going to be fired for an invalid reason, and if she continued working there (DHSPD) under the conditions described above, that her personal safety was unreasonably at risk.

205.   Andrea Heath reasonably believed that said continued harassment / retaliation being perpetrated against her may also result in Andrea Heath being killed or seriously injured while performing her police duties. She could not continue to function under these conditions, and became terribly stressed-out[46] from the continuous acts of harassment / retaliation; above-described.

206.   Accordingly, at that time, Andrea Heath contacted Dr. Daniel Watson, and took a leave of absence due to mental and emotional distress / stress; especially for reasonably being afraid for her personal safety, and stress caused by the acts of retaliation; above-referenced.

207.   On or about March 22, 2010, Andrea Heath called Commander SMITH via cellular phone and told him that she had another appointment to meet with FBI Special Agent Steve Novak. He

---

[46] And, with SCLAFANI still at DHSPD, reasonably scared that SCLAFANI and his co-conspirators may just get Plaintiff killed on duty.

CONSOLIDATED COMPLAINT FOR DAMAGES

53

directed Andrea Heath to call SINGER and advise her, which Andrea Heath did.

208.   On or about  March 22, 2010, said FBI meeting was cancelled per Special Agent Novak. He stated he was working on a confidential detail at the time.

209.   On or about March 29, 2010 Andrea Heath was seen by her physician, Dr. Daniel Watson. Andrea Heath expressed her concerns of feeling unsafe at work; especially because of SCLAFANI.

210.   Dr. Watson placed Andrea Heath on medical disability at that time, as he felt that Andrea Heath was not safe (under her working conditions, above-described), and that she was mentally unable to work under said above-referenced working conditions (i.e. continued acts of harassment and retaliation, including setting-up Andrea Heath to be killed or injured, such as for lack of officer back-ups.)

211.   On or about March 29, 2010 Andrea Heath received a text from Sgt. Gil, stating it was urgent that she call him. He told Andrea Heath that Chief Williams told him that she was not to meet with the FBI on that date (March 29, 2010)  because she was not able to work (disability leave.) Andrea Heath called Special Agent Novak and passed on the

details of what Chief Williams told her. Andrea Heath cancelled the meeting.

212. On or about March 29, 2010 Andrea Heath made a Worker's Compensation claim with DHS Human Resources.  SCLAFANI was assigned as Andrea Heath's Training Supervisor, and he was leading the charge to get Andrea Heath out of the DHSPD.

213. On or about  April 6, 2010, then Retired DHSPD Sgt. David Henderson and SCLAFANI surrendered to the United States Marshall's Service on their federal Indictments; above-referenced.

214. On or about  April 15, 2010, Commander SMITH called Andrea Heath and stated that Andrea Heath was subpoenaed for court, and to contact DDA Roderick.

215. On or about  April 17, 2010, DHSPD Officer Jim Henson told Andrea Heath that SCLAFANI called his cellular phone and told him that Chief Williams waived the Administrative Leave rules and stated even though he (SCLAFANI) was placed on Administrative Leave he was permitted to contact any co-workers and fellow officers that he desired to contact.

216. Andrea Heath felt intimated and terrified that SCLAFANI was calling her boyfriend (Henson) who was at her house.

217. On or about May 15, 2010, Andrea Heath had a Worker's Compensation appointment rescheduled, due to short notice and being out of town.

218. Andrea Heath was requested to meet with Dr. Strong when she came to Palm Springs which was rescheduled with Worker's Compensation official Danny Fernandez

219. On or about July 7, 2010, Andrea Heath had a Worker's Compensation examination scheduled appointment. Andrea Heath went to Dr. Strong's office, and met with the receptionist ("Olivia") at Dr. Barbara Strong's office.

220. Andrea Heath was told that someone had cancelled her appointment. Andrea Heath explained to Dr. Strong that she did not cancel the appointment. Dr. Strong said she would not be able to see Andrea Heath since someone had cancelled her appointment for that date.

221. On or about July 7, 2010, Andrea Heath called the office of Dr. Strong and spoke to the receptionist; Olivia. She stated according to her records Danny Fernandez from Worker's Comp had cancelled her appointment. This was without Andrea Heath's knowledge.

222. Andrea Heath then spoke to Mr. Fernandez on or about that date. Mr. Fernandez stated the City of DHS had obtained an attorney and that

Andrea Heath would have to wait until the attorney scheduled a doctor's appointment for her.

223.  On or about  August 30, 2010, DHSPD Commander SMITH called Andrea Heath and stated that he needed to meet Andrea Heath to give Andrea Heath paperwork that was needed for IPD. Andrea Heath met him in DHS at the 7-11 store.  He stated if Andrea Heath was to meet at the station it would cause a lot of chaos at that time.

224.  On or about September 6, 2010, Andrea Heath was directed to fax paperwork to Commander Smith for IPD.

225.  On or about September 9, 2010, Andrea Heath met with Internal Affairs Investigator Jeff Love at Lackier & Diemmer, in their Upland, California office, to make a formal complaint against SCLAFANI and the other defendants to this action (and their co-conspirator DHSPD officers and CITY officials) regarding Andrea Heath's hostile work environment (retaliation and harassment.)

226.  On or about September 20, 2010, Andrea Heath was contacted by Commander SMITH, who called and stated that he needed to meet with Andrea Heath regarding a records download for her taser.

227.  On or about  September 9, 2010, Andrea Heath met with Commander SMITH at the DHSPD and provided him with her taser.

CONSOLIDATED COMPLAINT FOR DAMAGES

228.   On or about  September 29, 2010, Andrea Heath observed David

Henderson and his girlfriend, Laura Scully, at Walmart, about 8:30

am.

229.   After walking around Andrea Heath observed Scully following her

down several isles of the store. Andrea Heath then observed a male

subject

that resembled Henderson (possibly a relative) following Andrea

Heath on every isle of the store and out of the store into the parking

lot. Andrea Heath observed Henderson's truck parked in the parking

lot with him sitting in the driver's seat. Andrea Heath felt afraid for

her safety and called her boyfriend Jim Henson. He was currently at

work (DHSPD). Andrea Heath then called her daughter's father,

Kendall Johnson, to meet Andrea Heath, because she was afraid for

her safety; especially in light of the sadistic and depraved David

Henderson following her, which he did. Andrea Heath then drove

nearby because she observed a motor cycle police officer. Andrea

Heath parked her vehicle and did not notice Henderson's vehicle at

that time.

230.   On or about October 20, 2010, Andrea Heath received a call from

Commander Smith regarding IPD paperwork.

CONSOLIDATED COMPLAINT FOR DAMAGES

58

231.   On or about November 10, 2010, Andrea Heath called CCPD Captain Conner and advised him that she was receiving annoying and harassing phone calls from MENDOZA (in violation of CPC 653(m).)

232.   Andrea Heath explained that she was already going through a difficult situation and was home from DHSPD. Captain Conner said that he would call her in the office and advise her that she was going to be listed as a suspect and Andrea Heath as a victim, and at this time Andrea Heath was non-desirous of prosecution, but told him she needed to stop calling her, or Andrea Heath would file a criminal complaint against her.

233.   On or about  November 23, 2010, Andrea Heath  received a call from 760-200-9431. Unknown caller hung up the phone. Andrea Heath called Jim Henson and told him to tell MENDOZA to stop calling Andrea Heath.

234.   On or about November 29, 2010, Andrea Heath  received a call from a restricted number. Andrea Heath recognized the caller's voice as MENDOZA'S.

235.   She asked someone what the deal was. Then she screamed "Fuck where my car is", and hung up the phone. Andrea Heath called Jim

CONSOLIDATED COMPLAINT FOR DAMAGES

Henson and advised him about her calling Andrea Heath and told him to tell her to stop harassing Andrea Heath.

236.   On or about  December 1, 2010, Andrea Heath called Officer Eddie Cole and explained that MENDOZA was calling her on a regular basis and was harassing her.

237.   Andrea Heath asked him if he could talk to her and tell her to stop calling or she was going to seriously report her harassing Andrea Heath.

238.   In December of 2010, Officer Mendoza was hired full time at Desert Hot Springs Police Department as a Sergeant.

239.   On or about  January 1, 2011, FBI Special Agent Novak called Andrea Heath advised her that the court dates were rescheduled for SCLAFANI and HENDERSON for March 29, 2011.

240.   On or about  February 7, 2011, DHSPD Detective Jim Henson said he was advised that he had to meet with Commander Bressler and Sgt. Perry on February 9, 2011.

241.   He was nervous because he thought he was going to be retaliated against because he and Andrea Heath were continuing to date.

242.   On or about  February 9, 2011 Detective Jim Henson told Andrea Heath that during the meeting that Commander Bressler asked him if

he and Andrea Heath were still dating. Henson said Commander Bressler also asked him about SCLAFANI'S court date coming up; he wanted to make sure there was no "off duty" issues with the stress.

243.   On or about February 2, 2011, SCLAFANI returned to work at DHSPD after the federal Indictment on both counts of Civil Rights Violations had issued.

244.   On or about  March 1, 2011, Dr. Job Lopez wrote Andrea Heath a letter to return to work. Andrea Heath sent a copy to Human Resources.

245.   On or about  March 2, 2011, Detective Jim Henson gave Andrea Heath  a large envelope that he stated Sgt. Peary told him to give to Andrea Heath. Andrea Heath observed a letter from DHSPD Police Officers Association ("POA") regarding a meeting for officers currently working at DHSPD to attend. This was done to intimidate Andrea Heath.

246.   On or about  March 10, 2011,  Dr. David Kauss wrote Andrea Heath a letter to return to work, but to have no contact with SCLAFANI.

247.   On or about March 14, 2011, Dr. Daniel Watson wrote Andrea Heath a letter to return to work at DHSPD, but to have no contact with SCLAFANI due to fear of safety.

248. On or about March 23, 2011, Andrea Heath contacted Human Resources (Letty Gallegos-Gallardo) who stated that she received the letter but stated she wasn't sure if the Police Department could accommodate her.

249. On or about April 25, 2011, Andrea Heath again met with FBI Special Agent Novak, Assistant U.S. Attorney Steven Arkow and Assistant U.S. Attorney Cheryl O'Connor at the United States Courthouse.

250. Andrea Heath expressed her concerns that SCLAFANI was working at the Police Department while Andrea Heath was being denied to go back to work for DHSPD. Andrea Heath also complained to said federal officials about the acts of retaliation that were perpetrated against her; above-referenced.

251. On or about April 28, 2011, Andrea Heath attended a FFDE with Dr. Ari Kalechstein. Dr. Kalechstein stated he had been provided letters from fellow officers against her. Dr. Kalechstein audio recorded the entire session and stated he was going to provide the recorded conversation to City Attorney of Desert Hot Springs.

252. Andrea Heath verbally told him that she did not want the City Attorney to have her recorded doctor/client communications, due to it being privileged information, and privileged under HIPPA law. Union

Representative Dale Nowicki wrote Dr. Kalechstein a letter immediately revoking any release of the audio recorded conversation.

253. On or about June 18, 2011, Andrea Heath received a certified letter from DHSPD stating that she was the focus of an internal affairs investigation being conducted by Commander D. Bressler. The allegations was (on or around October of 2010) Conduct Unbecoming a Police Officer; alleging that Andrea Heath made telephone contact with a member of another law enforcement agency which was annoying, threatening and malicious. This was alleged to have been done in violation of DHSPD Policy Manual Section 340.3.5(a).

254. On or about June 27, 2011, Andrea Heath called Commander Bressler and left a voice mail message regarding the investigation.

255. On or about June 30, 2011, Andrea Heath obtained a reply from Dr. Ari Kalechstein regarding the FFDE, that stated that he referred to letters written by fellow officers, and his examination revealed that Andrea Heath was not presently fit for duty to work as a DHSPD police officer, but that Andrea Heath's condition was treatable.

256. On or about July 23, 2011, Internal Affairs Investigation Attorney Kasey Castillo from Lackier & Diemmer represented Andrea Heath. They met with Commander Bressler, who audio recorded the

CONSOLIDATED COMPLAINT FOR DAMAGES

interview. Andrea Heath provided Attorney Castillo a copy of her phone bill that showed that MENDOZA had called and harassed her on numerous occasions in October through December of 2010.

257.   On or about July 24, 2011, Detective Jim Henson told Andrea Heath that she should resign from DHSPD or take their retirement offer. He stated everyone at the department believed that Andrea Heath would not be able to work. This was another form of intimidation by SCLAFANI and the defendants to this action, by using Henson, indirectly.

258.   On or about August 5, 2011, a notice was sent to Attorney Nowicki that the CITY will proceed to review its obligations to file non-industrial disability retirement for Andrea Heath. Andrea Heath was never notified.

259.   On or about August 9, 2011, the CITY allegedly sent a follow up letter to Attorney Nowicki about above intention to file non-industrial disability retirement for Andrea Heath. Andrea Heath was not notified.

260.   On or about August 9, 2011, the City of Desert Hot Springs sent a Notice Of Intent To Disability Retire.

CONSOLIDATED COMPLAINT FOR DAMAGES

261.   On or about August 29, 2011 a quasi - *Skelly* Hearing (conference) was held for the Notice Of Intent to File a Non-Industrial PERS Retirement.

262.   Said August 29, 2011 a quasi - *Skelly* Hearing was a mere formality. A proceeding in which Andrea Heath had no chance to prevail, as the purpose of said hearing was to terminate Andrea Heath, by the very same defendants who had been, and who continued to, retaliate against Andrea Heath for her having complained to federal law enforcement officials, and for her having testified before a federal Grand Jury, about crimes committed by SCLAFANI, HENDERSON and other DHSPD police officers and personnel.

263.   Moreover, at said quasi - *Skelly* Hearing, Andrea Heath was not permitted to call any witnesses, to present any evidence, or to even examine or cross-examine any persons at all. To even appear at the hearing at all was a futile act.

264.   Moreover, the two DHSPD officers who Andrea Heath primarily complained about (i.e. those who tortured and framed civilians; SCLAFANI and HENDERSON), were among those main conspirators who were orchestrating ridding the department (DHSPD) of the Andrea Heath, via the vehicle of said quasi - *Skelly* Hearing

CONSOLIDATED COMPLAINT FOR DAMAGES

proceedings (and the "dirty tricks" associated therewith), as well as the outrages, above-described.

265.   SIMPSON, DANIELS and the other co-conspirators / defendants to this action, merely used the quasi - *Skelly* Hearing to claim that Andrea Heath was not fit for duty, because she was afraid for her life to patrol the streets of Desert Hot Springs with SCLAFANI being her supervisor, and with (many of) the other officers at DHSPD trying to get the Andrea Heath killed or badly injured (i.e. no back-up when needed.)

266.   On or about  August 29, 2011, Andrea Heath sent her response to Chief Williams, advising him that Andrea Heath was able to work and that she disagreed with the CITY'S claims otherwise. She just could not work with SCLAFANI at DHSPD; especially with him as her supervisor.

267.   Moreover, although SCLAFANI was under federal Indictment for torturing prisoners, above-described, he was still actively working for and at the City of Desert Hot Springs, *inter alia*, vetted new DHSPD police officers.

268.   On or about  September 13, 2011, Andrea Heath received a Notice Of Decision To Recommend Application for Non-Industrial Disability Retirement from the City.

269.   On or about September 28, 2011, Andrea Heath was deposed as a witness in the case of *Edward Moore, Jr. v. City of Desert Hot Springs, et al*; an Indio – Riverside County Superior Court civil rights case alleging criminal / tortious acts against the CITY for the actions of several DHSPD officers against the Moore family, including actions by SCLAFANI and HENDERSON. During her testimony in said deposition, Andrea Heath accused SCLAFANI, HENDERSON and other DHSPD officers, of criminal / tortious acts against civilians, including the Andrea Heaths in said *Moore* case, and otherwise accused top CITY and DHSPD officials of condoning, tolerating and covering-up said criminal / tortious acts against civilians.

270.   On or about  October 3, 2011, Andrea Heath was seen by Worker's Compensation Doctor; Dr. Lawrence Moss, and on or about October 4, 2011, Andrea Heath was again seen by Dr. Lawrence Moss.

271.   On or about  October 6, 2011, Andrea Heath received a call from DHSPD Sgt. Brian Link, who stated he was conducting a locker inspection, and that he would be available during night shift from

October 17, 2011 through October 19, 2011 for Andrea Heath's DHSPD locker inspection.

272.   Andrea Heath went on October 19, 2011 for said DHSPD locker inspection. Her lockers had already been opened and articles from locker #1 were all stuffed into Locker #2. Andrea Heath did not give anyone permission to enter her lockers; another violation of Andrea Heath's privacy rights under Cal. Gov't Code § 3309. Moreover, said locker inspection was another act of retaliation, including retaliation for the Andrea Heath's deposition testimony against said DHSPD and CITY defendants and officials.

273.   On or about October 12, 2011, Andrea Heath received official notification[47] from Assistant City Manager Jason Simpson (via a letter sent via certified mail on October 6, 2011, that was received by her on October 12, 2011), that the City Manager has decided to adopt the recommendations of the quasi-*Skelly* hearing / conference (that Andrea Heath was not fit to work as a police officer), and that the CITY would apply for a Non-Industrial Disability Retirement for Andrea Heath on the ground that she was no longer fit for duty as a DHSPD officer.

---

[47] And first learned.

CONSOLIDATED COMPLAINT FOR DAMAGES

274.   Andrea Heath shows that said decision letter from Assistant City Manager Jason Simpson, was another act of retaliation against the Andrea Heath, for her giving said deposition testimony, and for otherwise testifying about and otherwise accusing the defendants of criminal / tortious acts against civilians.

275.   The letter also informed Andrea Heath that she had 30 days from the date that she received that letter (dated September 19, 2011, post-dated October 6, 2011 and received by Andrea Heath on October 12, 2011) to appeal the City's decision to apply for a Non-Industrial Disability Retirement for Andrea Heath.

276.   Although any such administrative appeal was obviously futile, on or about November 7, 2011, Andrea Heath personally met with DHS[48] City Clerk at the City Clerk's Office, and, in writing, requested a two week extension for said appeal, as her counsel for the quasi-Skelly hearing abandoned her, on order from SCLAFANI and other CITY officials.

277.   On or about November 14, 2011, the City received a response from Dr. Lawrence Moss based on his examination of Andrea Heath, recommending Andrea Heath's return to work.

---

[48] City of Desert Hot Springs.

CONSOLIDATED COMPLAINT FOR DAMAGES

278.   On or about November 14, 2011, Andrea Heath received mail from her Worker's Comp attorney's office regarding possible unknown file with negative letters against and about her that were provided to FFDE and Worker's Compensation attorneys. Andrea Heath discovered letters for the first time written against her by fellow officers.

279.   On or about December 19, 2011, Andrea Heath received a call from Sgt. Larry Essex requesting an inspection of Andrea Heath's taser.

280.   On or about January 23, 2012, Andrea Heath met with FBI Agent Tamara McKen, FBI Agent Steven Novak, Assistant U.S. Attorney Steven Arkow, Assistant U.S. Attorney Cheryl O'Connor about the upcoming SCLAFANI criminal trial.

281.   On or about February 2, 2012, an Investigator for SCLAFANI came to Andrea Heath's residence after she had already expressed concern over

not wanting him (Tom Crompton) at her residence.

282.   On or about February 3, 2012, Andrea Heath received a letter from Desert Hot Springs City Manager Jason Simpson, notifying her, inter alia, that she was now officially separated from the City of Desert Hot Springs: *"This is to notify you that as of October 21, 2011, you were*

CONSOLIDATED COMPLAINT FOR DAMAGES

70

*no longer considered to be employed by the City of Desert Hot Springs."*

283.  On or about February 2, 2012, two cars / vehicles attempted to run into Andrea Heath's car while she was picking her daughter up from School;  License plate 6JTJ389.

284.  Andrea Heath called Agent Tamara and advised her of what occurred and that she felt that her life was being threatened as a form of witness intimidation for the upcoming (February 9, 2012) federal felony criminal trial of SCLAFANI[49], and as a form of retaliation for Andrea Heaths actions; above-described.

285.  On or about February 3, 2012, Andrea Heath's Medical Insurance coverage from the city was cancelled by the CITY.

286.  On or about February 6, 2012, Andrea Heath received e-mails and texts from the DHSPD POA, and from Officer Paul Tapia, attempting to dissuade her from testifying against SCLAFANI at his upcoming federal criminal trial. This also put Andrea Heath in fear for her life and safety.

---

[49] Former DHSPD Lieutenant David Henderson had already pleaded guilty to misdemeanor violation of 18 U.S.C. § 242; also for torturing prisoners.

287.   On or about February 9, 2012, Andrea Heath reported said e-mails and texts from Officer Tapia, to FBI Agent Tamara McKen.  Andrea Heath was afraid for her safety.

288.   On or about February 13, 2012, Andrea Heath was requested by FBI Agent Tamara to meet in Los Angeles for the SCLAFANI federal criminal trial.

289.   On or about February 13, 2012, Andrea Heath received a call and text from Officer Paul Tapia. She again was afraid for her safety.

290.   On or about February 13, 2012, Andrea Heath sent Assistant City Attorney Jason Simpson notification that she appealed every portion of the

notification of her separation / termination from the City, and Jason Simpson replied that she filed said appeal untimely.

291.   On or about February 13, 2012, Andrea Heath was advised by the FBI that SCLAFANI was found guilty on both felony counts of Civil Rights violations.

292.   Andrea Heath currently has a pending appeal of her non-industrial disability pension status; an appeal from the September 19, 2011 (probably actually October 6, 2011) notice that the City Manager was

CONSOLIDATED COMPLAINT FOR DAMAGES

essentially terminating Andrea Heath and that the City had applied for

a non-industrial disability retirement for her.

293.   Moreover, Andrea Heath timely filed her formal complaint with the

California Department of Fair Employment and Housing, and on June

18, 2012, Andrea Heath received a Right-To-Sue letter from said

agency.

294.   Andrea Heath's complaints to the United States Department of Justice

(i.e. the United States Attorney's Office and the FBI) about criminal

actions by SCLAFANI, HENDERSON and the other defendants to

this action, including and those complaints made while Andrea Heath

was off-duty and on medical, family and disability leave, are speech

that is/are protected by the first amendment to the United States

Constitution, as was Andrea Heath's Grand Jury testimony and her

testifying at said September 28, 2011 deposition in the *Moore* case.

295.   A substantial or motivating factor in the decision of the defendants to

take said actions against the Andrea Heath complained of above, was

Andrea Heath's exercise of her right to freedom of speech, as

described above.

CONSOLIDATED COMPLAINT FOR DAMAGES

296. But for Andrea Heath's exercise of her right to freedom of speech as described above, defendants would not have taken the adverse employment actions[50] against the Andrea Heath that they did.

297. As a direct and proximate result of defendants' actions, above-referenced, Andrea Heath was substantially mentally and emotionally injured, and Andrea Heath incurred medical and psychological costs/bills and expenses, lost wages, lost benefits, lost pension monies/benefits attorney's fees and other special and general damages and expenses; all in an amount to be proven at trial; in excess of $3,000,000.00.

298. The actions by said defendants were done maliciously and in reckless disregard of Andrea Heath's constitutional rights, sufficient for an award of punitive / exemplary damages in an amount to be shown at trial, in excess of $2,000,000.00.

**SECOND CAUSE OF ACTION**
**VIOLATION OF 42 U.S.C. § 1983**
**Violation Of First Amendment Right To**
**Petition Government For Redress Of Grievances**
**(Against all defendants)**

299. Plaintiffs hereby reallege and incorporate by reference the allegations set forth in paragraphs 1 through 298, inclusive, above, as

---

[50] And other bad acts.

CONSOLIDATED COMPLAINT FOR DAMAGES

74

if set forth in full herein.

300.  Andrea Heath's conduct in complaining to the F.B.I., Internal Affairs and testifying against other DHSPD Officers, including testifying at said September 28, 2011 deposition in the *Moore* case, was protected under the first amendment's right to petition the government for redress of grievances.

301.  A substantial or motivating factor in the decision of defendants in taking the actions against the Andrea Heath complained of above, was Andrea Heath's exercise of her constitutional right to complain to and to protest to government officials, as described above.

302.  As a direct and proximate result of defendants' actions, above-referenced, Andrea Heath was substantially mentally and emotionally injured, and Andrea Heath incurred medical and psychological costs/bills and expenses, lost wages, lost benefits and lost pension monies/benefits and attorney's fees and other special and general damages and expenses; all in an amount to be proven at trial; in excess of $3,000,000.00.

303.  The actions by said defendants were done maliciously and in reckless disregard of Andrea Heath's constitutional rights, sufficient for an

award of punitive / exemplary damages in an amount to be shown at

trial, in excess of $2,000,000.00.

### THIRD CAUSE OF ACTION
### VIOLATION OF 42 U.S.C. § 1983
### LOSS OF AND INTERFERENCE WITH PARENT- CHILD / CHILD –
### PARENT RELATIONSHIP UNDER FOURTEENTH AMENDMENT
### (By plaintiffs against all defendants)

304.   Plaintiffs hereby reallege and incorporate by reference the

allegations set forth in paragraphs 1 through 303, inclusive, above, as

if set forth in full herein.

305.   A substantial or motivating factor in the decision of the defendants to

take said actions against the Andrea Heath complained of above, was

Andrea Heath's exercise of her right to freedom of speech, as

described above.

306.   But for Andrea Heath's exercise of her right to freedom of speech as

described above, defendants would not have taken the adverse

employment actions against the Andrea Heath that they did.

307.   The acts of harassment, intimidation, threats, humiliation,

degradation, racial slurs, silent treatment, assignment of demeaning

tasks, demotions, mental torment, mental torture, reduction in pay,

and ultimately, being involuntarily non-industrially related retired,

and then ultimately being terminated, caused plaintiffs' decent,

Andrea Heath, to take her own life, at her home in Cathedral City, California, on October 8, 2013, by shooting herself with a pistol in her head that day.

308.   On October 8, 2013 Andrea Heath passed away, leaving her daughter and son, plaintiffs J.M.J. and DOMINIC HEATH without their mother.

309.   The death of Andrea Heath, was caused by all defendants, whose actions were all shocking to the conscience, and who all acted with a reckless and deliberate indifference to her being driven to suicide from their actions, and to her parent-child relationship with her children, and said death deprived plaintiffs J.M.J. and DOMINIC HEATH of their Parent – Child / Child – Parent Relationship with Andrea Heath, guaranteed to plaintiffs under the Fourteenth Amendment to the United States Constitution. Said defendants' actions were done maliciously, and with the intention to cause Andrea Heath to suffer great and severe emotional distress, and were a substantial contributed factor in her decision to take her own life; or, in the alternative, with malice aforethought and the intention to murder Andrea Heath.

310.   The defendants' actions that caused the death of Andrea Heath (their

deliberate indifference to her life), were done intentionally, and were outrageous and shocking to the conscience.

311.   The death of plaintiffs' deceased, Andrea Heath, also caused plaintiffs J.M.J. and DOMINIC HEATH to suffer the loss of their mother, Andrea Heath, and her society, solace and comfort, and the loss of her relationship with them, the loss of financial support from her, and caused them to suffer great mental and emotional distress, pain and suffering (and the physical manifestation of same), as well as a substantial loss of wages, profits and other income, that Andrea Heath would have earned and would have provided to plaintiffs J.M.J. and DOMINIC HEATH; in an amount to be shown at trial, in an amount in excess of $15,000,000.00.

312.   The death of Andrea Heath, caused by all defendants, above-referenced, was done maliciously and in reckless disregard of Andrea Heath's constitutional rights; sufficient for an award of punitive damages against all defendants, save defendant COUNTY, in an amount to be proven at trial which is in excess of $10,000,000.00.

### FOURTH CAUSE OF ACTION
### VIOLATION OF CAL. LABOR CODE § 1102.5
**Retaliation Against Employee For Protected Activity**
**Under California State Law**
**(Against defendants City of Desert Hot Springs)**

CONSOLIDATED COMPLAINT FOR DAMAGES

78

313.  Plaintiffs hereby reallege and incorporate by reference the allegations set forth in paragraphs 1 through 312, inclusive, above, as if set forth in full herein.

314.  Andrea Heath's conduct in complaining to the F.B.I., DHSPD Internal Affairs and testifying against other DHSPD Officers, including her Grand Jury testimony and her testifying at said September 28, 2011 deposition in the *Moore* case, was protected conduct under the First Amendment's right to petition the government for redress of grievances.

315.  Moreover, said conduct by Andrea Heath in complaining to the F.B.I., DHSPD Internal Affairs and testifying against other DHSPD Officers, including her Grand Jury testimony and her testifying at said September 28, 2011 deposition in the *Moore* case, Andrea Heath had reasonable cause to believe that the information disclosed a violation of state or federal statute, or a violation or noncompliance with a state or federal rule or regulation.

316.  Said acts of retaliation taken against the Andrea Heath by defendants and their co-conspirators, above-referenced, constituted a violation of Cal. Labor Code § 1102.5, in that defendants took said actions against Andrea Heath in retaliation for her complaining to the F.B.I., DHSPD

Internal Affairs and testifying against other DHSPD Officers, including her Grand Jury testimony and her testifying at said September 28, 2011 deposition in the *Moore* case.

317. As a direct and proximate result of defendants' actions, above-referenced, Andrea Heath was substantially mentally and emotionally injured, and Andrea Heath incurred medical and psychological costs/bills and expenses, lost wages, lost benefits and lost pension monies/benefits and attorney's fees and other special and general damages and expenses; all in an amount to be proven at trial; in excess of $3,000,000.00.

318. The actions by said defendants were done maliciously, oppressively and constituted despicable conduct; sufficient for an award of punitive / exemplary damages in an amount to be shown at trial, in excess of $2,000,000.00.

## FIFTH CAUSE OF ACTION
## WRONGFUL DEMOTION AND TERMINATION IN
## VIOLATION OF PUBLIC POLICY
### Under California State Law
### (Against defendants City of Desert Hot Springs)

319. Plaintiffs hereby reallege and incorporate by reference the allegations set forth in paragraphs 1 through 318, inclusive, above, as if set forth in full herein.

CONSOLIDATED COMPLAINT FOR DAMAGES

320.  The actions of defendants and their co-conspirators against the Andrea Heath complained of above were taken against her in retaliation for her complaining to the F.B.I., DHSPD Internal Affairs and testifying against other DHSPD Officers, including her Grand Jury testimony and her testifying at said September 28, 2011 deposition in the *Moore* case; in violation of public policy.

321.   As a direct and proximate result of defendants' actions, above-referenced, Andrea Heath was substantially mentally and emotionally injured, and Andrea Heath incurred medical and psychological costs/bills and expenses, lost wages, lost benefits and lost pension monies/benefits and attorney's fees and other special and general damages and expenses; all in an amount to be proven at trial; in excess of $3,000,000.00.

322.  The actions by said defendants were done maliciously, oppressively and constituted despicable conduct; sufficient for an award of punitive / exemplary damages in an amount to be shown at trial, in excess of $2,000,000.00.

**SIXTH CAUSE OF ACTION**
**VIOLATION OF CAL. GOV'T CODE § 3300 et seq.**
**Under California State Law**
**(Against all defendants)**

323.  Plaintiffs hereby reallege and incorporate by reference the
CONSOLIDATED COMPLAINT FOR DAMAGES

81

allegations set forth in paragraphs 1 through 322, inclusive, above, as if set forth in full herein.

324.   The actions of defendants and their co-conspirators against the Andrea Heath complained of above were adverse action that were taken against her, without the procedural protections set forth in Cal. Gov't Code § 3300 et seq., in retaliation for her complaining to the F.B.I., DHSPD Internal Affairs and testifying against other DHSPD Officers, including her Grand Jury testimony and her testifying at said September 28, 2011 deposition in the *Moore* case; in violation of Cal. Gov't Code § 3300 et seq.

325.   As a direct and proximate result of defendants' actions, above-referenced, Andrea Heath was substantially mentally and emotionally injured, and Andrea Heath incurred medical and psychological costs/bills and expenses, lost wages, lost benefits and lost pension monies/benefits and attorney's fees and other special and general damages and expenses; all in an amount to be proven at trial; in excess of $3,000,000.00.

325.   The actions by said defendants were done maliciously, oppressively

and constituted despicable conduct; sufficient for an award of punitive / exemplary damages in an amount to be shown at trial, in excess of $2,000,000.00.

## SEVENTH CAUSE OF ACTION
### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### Under California State Law
### (Against all defendants)

326.  Plaintiffs hereby reallege and incorporate by reference the allegations set forth in paragraphs 1 through 325, inclusive, above, as if set forth in full herein.

327.  The actions of defendants and their co-conspirators against the Andrea Heath complained of above were taken against her, knowing that Andrea Heath was likely to suffer severe emotional distress from such actions, and with the intent to inflict such severe emotional distress upon the Andrea Heath.

328.  The actions of defendants and their co-conspirators against the Andrea Heath complained of above were outrageous, and were not the type of actions tolerated in a civilized society.

329.  The actions of defendants and their co-conspirators against the Andrea Heath complained of above, were done in retaliation for her complaining to the F.B.I., DHSPD Internal Affairs and testifying against other DHSPD

CONSOLIDATED COMPLAINT FOR DAMAGES

83

Officers, including her Grand Jury testimony and her testifying at said September 28, 2011 deposition in the *Moore* case; in violation of Andrea Heath's right to be free from the intentional infliction of emotional distress upon her.

330.    As a direct and proximate result of defendants' actions, above-referenced, Andrea Heath was severely mentally and emotionally injured, and Andrea Heath incurred medical and psychological costs/bills and expenses, lost wages, lost benefits and lost pension monies/benefits and attorney's fees and other special and general damages and expenses; all in an amount to be proven at trial; in excess of $3,000,000.00.

331.    The actions by said defendants were done maliciously, oppressively and constituted despicable conduct; sufficient for an award of punitive / exemplary damages in an amount to be shown at trial, in excess of $2,000,000.00.

**EIGHTH CAUSE OF ACTION**
**FAILURE TO PROVIDE REASONABLE ACCOMMODATION**
**FOR PERSON WITH DISABILITY –**
**Cal. Gov't Code Section 12940(m)**
**Under California State Law**
**(Against All Defendants)**

332.   Plaintiffs hereby reallege and incorporate by reference the allegations set forth in paragraphs 1 through 331, inclusive, above, as if set forth in full herein.

333.   Defendants were aware that they caused Andrea Heath to suffer a temporary mental disability; being scared to do field police work with SCLAFANI being present, or being her supervisor, or even with SCLAFANI vetted new police officers for DHSPD, for fear or being injured or killed. This fear was caused by defendants' own actions that were intended to induce such fear in the Andrea Heath.

334.   Defendants were aware that Andrea Heath could have performed her essential job duties as a police officer, with a reasonable accommodation.

335.   Despite this, defendants failed to so reasonably accommodate the Andrea Heath.

336.   As a direct and proximate result of defendants' actions, above-referenced, Andrea Heath was substantially mentally and emotionally injured, and Andrea Heath incurred medical and psychological costs/bills and expenses, lost wages, lost benefits and lost pension monies/benefits and attorney's fees and other special and general

CONSOLIDATED COMPLAINT FOR DAMAGES

damages and expenses; all in an amount to be proven at trial; in excess of $3,000,000.00.

337.   The actions by said defendants were done maliciously, oppressively and constituted despicable conduct; sufficient for an award of punitive / exemplary damages in an amount to be shown at trial, in excess of $2,000,000.00.

**WHEREFORE**, plaintiffs pray for judgment as follows:

1.   That Andrea Heath be awarded a judgment against all defendants for compensatory damages in an amount in to be proven at trial, in excess of $3,000,000.00;

2.   That Andrea Heath be awarded a judgment against defendants save CITY, for punitive / exemplary damages in an amount in to be proven at trial, in excess of $2,000,000.00.

3.   That Andrea Heath be awarded prejudgment interest;

4.   That Andrea Heath be awarded attorney's fees and costs of suit herein;

5.   That Andrea Heath be given a trial by jury;

6.   That this honorable court make and award such other relief as this honorable court deems just and equitable.

_____

Jerry L. Steering

CONSOLIDATED COMPLAINT FOR DAMAGES

86